1
2
3
4
5
6

Alex R. Straus, SBN 321366
alex@whitfieldbryson.com
**WHITFIELD BRYSON LLP**
16748 McCormack Street
Los Angeles, CA  91436
Telephone: (917) 471-1894
Facsimile: (310) 496-3176
*Plaintiff's Attorneys*

7

*Additional attorneys on signature page*

8

*Attorneys for Plaintiff*

9

10
11

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

12

13
14
15

DESTINI KANAN, individually and
on behalf of all others similarly
situated,

16

Plaintiff,

17

18

v.

19

THINX INC.,

20

Defendant.

21

CASE NO.   2:20-cv-10341

**CLASS ACTION COMPLAINT FOR:**

**1. BREACH OF IMPLIED WARRANTY**
**2. UNJUST ENRICHMENT**
   **(In the Alternative)**
**3. VIOLATION OF CALIFORNIA**
   **FALSE ADVERTISING LAW, Cal.**
   **Bus. & Prof. Code § 17500, *et seq.***
**4. VIOLATION OF CALIFORNIA**
   **LEGAL REMEDIES ACT, Cal. Bus. &**
   **Prof. Code § 1750, *et seq.***
**5. VIOLATION OF CALIFORNIA**
   **UNFAIR COMPETITION LAW, Cal.**
   **Bus. & Prof. Code § 17200, *et seq***
**6. NEGLIGENT FAILURE TO WARN**

22
23
24
25
26
27
28

1

Plaintiff Destini Kanan  ("Plaintiff") brings this Class Action Complaint against Defendant Thinx Inc. ("Defendant"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to herself and her own acts and experience and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## <u>NATURE OF THE CASE</u>

1.      This is a civil class action brought by Plaintiff on behalf of consumers who purchased Defendant's Thinx Period Proof Cotton Brief ("Thinx Underwear"), which are used for personal hygiene purposes. Plaintiff seeks damages and equitable remedies for herself, and for the putative Class.

2.      Defendant designs, formulates, manufactures, markets, advertises, distributes, and sells the Thinx Underwear to consumers throughout the United States, including in the State of California. Its products are sold online on its website, as well as at various online and brick-and-mortar retailers.

3.      The business of menstrual products is a $3 billion dollar a year, highly unmonitored, unregulated industry.[1] The Food and Drug Administration regulates menstrual hygiene products as medical devices, and as such, they are not required to disclose specific ingredients contained therein.[2] According to FDA spokeswoman, Deborah Kotz, the agency recommends manufacturers provide general information on the label about the material composition of the Thinx Underwear, but does not require the individual ingredients be labeled.[3]

4.      Consumers, including Plaintiff, willingly pay a premium for this personal hygiene product compared to cheaper disposable alternatives such as tampons. This is

---

[1] https://www.thegoodtrade.com/features/natural-organic-tampons-disrupting-the-feminine-hygiene-industry (last accessed November 10, 2020)
[2] https://www.nytimes.com/2017/05/24/well/live/period-activists-want-tampon-makers-to-disclose-ingredients.html (last accessed November 10, 2020)
[3] *Id.*

because consumers, including Plaintiff, would like a safer and more comfortable approach to feminine hygiene care compared to more traditional feminine hygiene products.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some Members of the proposed Class are citizens of a state different from Defendant.

6.     This Court has personal jurisdiction over Defendant because it transacts business in the United States, including in this District, has substantial aggregate contacts with the United States, including in this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of California, and further, because Plaintiff purchased the Thinx Underwear in this District.

7.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because this District is where a substantial part of the conduct giving rise to Plaintiff's claims occurred, where Defendant transacts business, and where Plaintiff purchased the Thinx Underwear.

## PARTIES

8.     Plaintiff Destini Kanan is a citizen of California residing in San Fernando, Los Angeles County.

9.     Defendant Thinx, Inc. is incorporated in Delaware with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS

**Plaintiff Destini Kanan's Facts**

10.     In 2018, Plaintiff Kanan purchased the Thinx Underwear from a Nordstrom Rack located at 21490 Victory Blvd, Woodland Hills, California, 91367. This Nordstrom Rack location has since closed.

11.     At the time of all her purchase, Plaintiff Kanan relied on Defendant's factual representations about the safety of the Thinx Underwear, including those representations on the product label. The representations all indicate that that the Thinx Underwear were safe to use for normal use.

12.     When Plaintiff Kanan learned that the Defendant mislabeled its products, she stopped purchasing the Thinx Underwear.

13.     Plaintiff Kanan did not receive the benefit of her bargain when she purchased the Thinx Underwear products that included ingredients that did not conform to the packaging representations and to the warranties made by Defendant.  Had she been aware of the misrepresentations, she would have either not purchased the Thinx Underwear or paid substantially less for it.

**Thinx's Material Misrepresentations**

14.     Public health officials, including Dr. Ami Zota, Assistant Professor of Environmental and Occupational Health at The George Washington University Milken School of Public Health, have expressed concern over the lack of transparency regarding chemicals in feminine hygiene products. Dr. Zota is quoted as saying, "It is concerning that we don't have a clear picture of the chemicals used in [feminine hygiene products] given that women are using these products regularly throughout their child-bearing years. [Finding chemicals in feminine hygiene products] underscores the need

for more comprehensive testing to better understand the potential health risks that may arise from long-term product use."[4]

15.    New York is the first and only state in the nation to require that manufacturers of menstrual products disclose ingredients on the packaging.[5] The Menstrual Products Right To Know Act went into effect in late January 2020, but companies will have until June 2021 to introduce new packaging with labels listing ingredients.[6]

16.    Support for the Menstrual Products Right to Know Act was driven by increasing concern on the part of consumers regarding the safety and sustainability of traditional products. "Never before have we been more aware of what we put in and on our bodies, from good food choices to beauty products," says Robyn McLean the cofounder of the menstrual cup company Hello Cup. "[The Menstrual Products Right To Know Act] will definitely make people with periods think about what products they use."[7]

17.    Industry research shows that demand for alternative products has largely been driven by young women in the 18-34-year-old category who cite environmental and health concerns about traditional disposable period products.[8] According to sustainability marketing firm Shelton Group, nearly 40% of women in this category have switched or are considering switching to reusable products to manage their periods.[9]

18.    Thinx, Inc. has quickly become a leader in the alternative menstrual product market. The company was founded in 2011 by Miki Agrawal, Radha Agrawal,

---

[4] https://www.womensvoices.org/2018/06/05/new-tampon-testing-reveals-undisclosed-carcinogens-and-reproductive-toxins/ (last accessed November 10, 2020)
[5] https://www.vogue.com/article/new-york-menstrual-period-product-labeling-act (last accessed November 10, 2020)
[6] *Id.*
[7] *Id.*
[8] https://www.nonwovens-industry.com/issues/2019-11/view_features/feminine-hygiene-manufacturers-shift-focus/ (last accessed November 10, 2020)
[9] *Id.*

CLASS ACTION COMPLAINT

and Antonia Saint Dunbar with the mission of empowering women by providing "safe, comfortable, and sustainable options for people with periods and bladder leaks."[10] The founders raised $65,000 in a Kickstarter campaign in 2013 to fund their initial production; in four years time, Thinx, Inc. had generated $40 million in revenue.[11]

19.     Thinx Underwear are washable, reusable underwear designed to replace pads and tampons, or to be worn with tampons and menstrual cups for extra protection. Thinx uses "signature, innovative technology" to absorb menstrual flow, wick moisture, control odors, and prevent leaks.[12]

20.     Thinx, Inc. has been widely praised for its innovative approach to women's healthcare. Thinx Underwear was named one of Time magazine's "25 Best New Inventions of 2015" and Thinx, Inc. was named on Fast Company's list of "World's Most Innovative Companies of 2017."[13] It rose to notoriety in Silicon Alley for its edgy feminist advertising, direct-to-consumer business model, innovative product, and female founders.[14]

21.     Despite meager initial funding, Thinx grew in a hyper-specific niche of the $38 billion global lingerie market with its new concept.[15] In 2019, Kimberly-Clark, who owns the Kotex tampon brand, invested $25 million in Thinx, Inc.[16] The investment was expected to help Thinx, Inc. gain additional brand awareness and market share by moving Thinx Underwear into more mainstream retail stores, such as Target and Walmart.[17]

---

[10] https://www.shethinx.com/pages/thinx-it-works (last accessed September 4, 2020)
[11] https://www.inc.com/christine-lagorio/thinx-maria-molland-new-ceo.html (last accessed November 10, 2020)
[12] Id.
[13] https://shesummit.com/thought-leader/miki-agrawal/ (last accessed November 10, 2020)
[14] https://www.inc.com/christine-lagorio/thinx-maria-molland-new-ceo.html (last accessed November 10, 2020)
[15] Id.
[16] https://www.wsj.com/articles/going-beyond-the-tampon-big-brands-try-new-ideas-11568739657 (last accessed November 10, 2020)
[17] https://www.nonwovens-industry.com/contents/view_breaking-news/2019-09-17/kimberly-clark-invests-in-thinx/ (last accessed November 10, 2020)

22.     From its inception, Defendant has used a candid, personal approach to connect with its customers. As part of its first grass roots fundraising campaign in 2013, Thinx, Inc.'s founders created a video pitch which featured the three women frankly discussing their experiences in facing stigma related to menstruation.

23.     Defendant has also employed a provocative approach to its advertising, with the goal of removing taboos regarding menstruation and feminine hygiene products. Thinx have been marketed and advertised to women across a variety of platforms, including online advertisements, Facebook and Instagram mobile video ads, television commercials, and print advertisements. Defendant also created a variety of advertisements appearing in the New York City subway system and Bay Area Rapid Transit (BART) system, some examples of which are reproduced below.[18]





---

[18] https://www.thedrum.com/news/2016/03/07/its-not-copy-its-just-conversation-ceo-thinx-miki-agrawal-brands-clever-subway; https://money.cnn.com/2016/11/03/technology/thinx-trump-inspired-bart-ad/ (last accessed November 10, 2020)

PERIOD-PROOF UNDERWEAR THAT ABSORBS UP TO 2 TAMPONS' WORTH OF BLOOD (NO, YOU DON'T HAVE TO CHANGE EVERY FEW HOURS, NO, THEY DON'T FEEL LIKE DIAPERS, AND NO, IT'S NOT LIKE SITTING IN UR BLOOD ALL DAY). BOOM.

hellothinx.com
$5 off with code "subway"                    THINX

24.   Because Defendant is aware of growing safety concerns surrounding traditional menstrual products, especially among younger women, it has always positioned itself as a safe alternative. In an article for New York Magazine's website The Cut, co-founder Miki Agrawal gave voice to these concerns, asking the author, "What kind of tampon are you wearing? Did you not read the article that just came out about them causing cancer? You need to be wearing organic cotton tampons if anything. Which, by the way, we're introducing. Just friend to friend, don't wear that regular shit! You have no idea! Toxic shock syndrome starts after three hours, and there are so many cases that get, like, pushed under the rug by tampon companies."[19]

25.   In contrast to traditional products, Thinx, Inc. represents to that it "take[s] customer health and safety seriously."[20] Specifically, Defendant represents that The Thinx Underwear undergo rigorous absorbency testing and objective third-party tests of finished products.[21] Defendant also offers several styles of Thinx made of organic cotton.[22]

---

[19] https://www.thecut.com/2016/01/thinx-miki-agrawal-c-v-r.html (last accessed November 10, 2020)
[20] https://www.shethinx.com/pages/thinx-faq (last accessed November 10, 2020)
[21] https://www.shethinx.com/pages/thinx-product-safety-standards (last accessed November 10, 2020)
[22] https://www.shethinx.com/collections/thinx-organic-cotton (last accessed November 10, 2020)

26.     On its website, on a page called "Product Safety," Defendant makes the following claims:

> "[Thinx Underwear] are rigorously tested for harmful chemicals, and independently certified through STANDARD 100 by OEKO-TEX®, which includes REACH[23] requirements. This OEKO-TEX® certification means every component—from fabric to trim—is thoroughly tested and certified for ecological safety. Our finished products also undergo third-party testing by Bureau Veritas, an accredited, globally recognized facility. We're committed to third-party testing because it puts your safety first, ensuring that all results are honest and objective."[24]

27.     Thinx first came under scrutiny in early 2020 when reporter Jessian Choy wrote that she had sent several unused pairs of the underwear to Dr. Graham Peaslee, a nuclear scientist at the University of Notre Dame, for analysis. After testing, Dr. Peaslee discovered high levels of polyfluoroalkyl substances in the underwear he tested. Ms. Choy reported her findings in an article in Sierra magazine, published on January 7, 2020.[25]

28.     According to the Environmental Protection Agency (EPA), per- and polyfluoroalkyl substances (PFAS) are a group of man-made chemicals that have been manufactured and used in a variety of industries around the globe, including in the United States, since the 1940s.[26] PFAS are very persistent in the environment and in the human body – meaning they don't break down and they can accumulate over time. There is evidence that exposure to PFAS can lead to adverse human health effects.[27]

---

[23] REACH is a regulation of the European Union, adopted to improve the protection of human health and the environment from the risks that can be posed by chemicals. *See* https://echa.europa.eu/regulations/reach/understanding-reach (last accessed November 10, 2020)

[24] https://www.shethinx.com/pages/thinx-product-safety-standards (last accessed November 10, 2020)

[25] *See* https://www.sierraclub.org/sierra/ask-ms-green/my-menstrual-underwear-has-toxic-chemicals-it (last accessed November 10, 2020)

[26] *See* https://www.epa.gov/pfas/basic-information-pfas (last accessed November 10, 2020)

[27] *Id.*

29.     Certain PFAS chemicals are no longer manufactured in the United States as a result of phase outs in which major chemical manufacturers agreed to eliminate the use of perfluorooctanoic acid (PFOA) and PFOA-related chemicals in their products and as emissions from their facilities.[28] Although PFOA and PFOA-related chemicals are no longer manufactured in the United States, they are still produced internationally and can be imported into the United States in consumer goods such as carpet, leather and apparel, textiles, paper and packaging, coatings, rubber and plastics.[29]

30.     PFAS chemicals stay in the human body for long periods of time. As a result, as people get exposed to PFAS from different sources over time, the level of PFAS in their bodies may increase to the point where they suffer from adverse health effects.[30]

31.     Studies indicate that PFAS can cause reproductive and developmental, liver and kidney, and immunological effects in laboratory animals. The most consistent findings from human epidemiology studies are increased cholesterol levels among exposed populations, with more limited findings related to infant birth weights, effects on the immune system, cancer, and thyroid hormone disruption.[31]

32.     The Center for Disease Control (CDC) and the Agency for Toxic Substances and Disease Registry (ATSDR) have recognized that because exposure to high levels of PFAS may impact the immune system, this exposure may then impact how individuals are affected by COVID-19.[32] There is also evidence from human and animal studies that PFAS exposure may reduce antibody responses to vaccines and may reduce infectious disease resistance.[33]

---

[28] *Id.*
[29] *Id.*
[30] https://health.ri.gov/water/about/pfas/ (last accessed November 10, 2020)
[31] *See* https://www.epa.gov/pfas/basic-information-pfas (last accessed November 10, 2020)
[32] https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last accessed November 10, 2020)
[33] https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last accessed November 10, 2020)

CLASS ACTION COMPLAINT

33.     Rates of chemical absorption through the skin varies based on the area of the body exposed. The vagina is the most permeable organ in a woman's body, absorbing 10-80% more than when exposed to the same toxins orally.[34] As compared to the forearms, chemicals are absorbed 12 times faster in the genital area,[35] making exposure to toxic chemicals in underwear and menstrual products particularly concerning.

34.     In response to Ms. Choy's allegations that The Thinx Underwear contained harmful chemicals, Defendant's current CEO, Maria Molland, released the following statement on February 6, 2020:

> At Thinx Inc., we take customer health and product safety very seriously. As a CEO, and mother to my three-year-old daughter, I'm personally committed to ensuring our products are designed and made to be safe for people and the planet. Our products undergo the strictest safety testing available, and it was the company's deep and abiding commitment to safe and sustainable products that made me want to join the team.
>
> We take the recent allegations about PFAS in Thinx Inc. products very seriously. For that reason, we immediately engaged Dr. Chris Mackay, who is a toxicologist with Intertox, Inc., a leading toxicology company that has been testing and assessing the risks posed by chemical and biological agents for the last 25 years, to review Dr. Peaslee's findings.
>
> Based on this review, Dr. Mackay stated: "The testing methods Dr. Peaslee used are inappropriate and only indicate the presence of elemental fluoride — not PFAS. Fluoride is a common salt that's in everyday products like toothpaste. All of us carry fluoride around in our bodies and secrete it through things like blood and sweat. The presence of fluoride doesn't mean something contains PFAS; what it does mean is that some time in the history of the sample, it came into contact with one or more of any number of products containing fluoride. On its own, it has no toxicological significance."
>
> Thinx Inc. uses the most rigorous scientific methods available in the world to ensure safe and sustainable products. Our products are tested by Bureau Veritas, S.A. an international certification agency with an accredited third-party lab that is recognized and respected around the world. This testing demonstrates that Thinx Inc. products meet the globally recognized standards of OEKO-TEX and comply with REACH

---

[34] https://www.thegoodtrade.com/features/natural-organic-tampons-disrupting-the-feminine-hygiene-industry (last accessed November 10, 2020)
[35] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3791087/(last accessed November 10, 2020)

regulations. Our testing with Bureau Veritas confirms that ***no detectable long-chain PFAS chemicals*** are present in Thinx Inc. products (emphasis added).

We appreciate and hear the concern our customers have expressed. In the weeks since Sierra Club's reporting, we've completed further testing that goes above and beyond REACH regulations and OEKO-TEX standards. This additional third-party testing, available for download on our blog, reaffirmed that Thinx Inc. products meet and exceed global safety standards. Make no mistake, since our founding, we have made safety a pillar of our products and brand identity. We remain committed to these principles even in the face of unreliable science and misinformation.

We will always push for more disclosure from our manufacturers, and more rigorous industry standards for regulation and compliance — and we urge others in our category to do the same.[36]

35.     Ms. Molland's statement was designed to further mislead and confuse customers regarding the presence of harmful chemicals in Defendant's products, as well as to actively conceal the company's deceptive behavior with regard to the safety of its products.

36.     Intertox, Inc., the scientific consulting firm engaged to refute Dr. Graham Peaslee's findings, has a history of exerting inappropriate influence in its attempts to convince the public at large regarding health policy – including recommending chemical safety thresholds far above those recommended by public health experts – and it has been frequently criticized for its actions.[37]

37.     Defendant also contracted with Bureau Veritas to obtain independent testing of its products. Bureau Veritas is a company offering a "proactive approach to brand protection," by testing softlines (i.e., textiles and clothing) for quality and safety

---

[36] https://medium.com/@thinx/how-i-know-thinx-inc-products-are-safe-1e509dde60d5(last accessed November 10, 2020)
[37] *See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1277886/#b2-ehp0113-a0087b. (An article was published in the Environmental Health Perspectives Journal, and published to the National Institute of Health's website, accusing Intertox, Inc. of attempting to manipulate the press to downplay the adverse health effects of the chemical percholate.) (last accessed November 10, 2020); https://www.wsj.com/articles/SB113582468652933598 (last accessed November 10, 2020); See also https://www.seattlepi.com/local/article/Parents-charge-school-district-s-toxicologist-1152997.php (Seattle parents drafted a "no confidence" letter criticizing Intertox, who was hired to oversee water contamination in local schools, based on expert's refusal to adequately address lead poisoning in drinking water.) (last accessed November 10, 2020)

CLASS ACTION COMPLAINT

compliance in order to enhance risk management and protect brand reputation.[38] It has come under fire for protecting brands at the expense and safety of workers in the garment industry.[39] Bureau Veritas offers toxicology screening as part of its Softline Testing Services, but does not specifically offer PFAS testing.[40]

38.     Ms. Molland also stated that the testing conducted by Bureau Veritas "demonstrates that Thinx Inc. products meet the globally recognized standards of OEKO-TEX and comply with REACH regulations." Elsewhere on its website, Defendant explicitly represents that all Thinx Underwear not only meet the standards, but are "***independently certified*** through STANDARD 100 by OEKO-TEX®.[41] (emphasis added)

39.     The International Association for Resesarch and Testing in the Field of Textile and Leather Ecology ("OEKO-TEX") issues company certifications regarding the safety of consumer textile products.[42] One such certification is the Standard 100, which aims at making it obvious to consumers that the labeled textile products have undergone laboratory testing for a wide range of harmful substances, and that the content of those substances remains below the limit values established by OEKO-TEX. .[43]

40.     According to OEKO-TEX's website, if a textile article carries the STANDARD 100 label, you can be certain that every component "has been tested for harmful substances and that the article therefore is harmless for human health."[44]

---

[38] https://www.cps.bureauveritas.com/sites/g/files/zypfnx236/files/media/document/CPS_QA_Softline_v6_15OCT15.pdf(last accessed November 10, 2020)
[39] https://www.business-humanrights.org/en/latest-news/social-audit-industry-criticised-for-protecting-brands-reputations-while-failing-to-protect-garment-worker-safety-improve-working-conditions-includes-auditing-company-responses/(last accessed November 10, 2020)
[40] https://www.cps.bureauveritas.com/sites/g/files/zypfnx236/files/media/document/CPS_QA_Softline_v6_15OCT15.pdf(last accessed November 10, 2020)
[41] https://www.shethinx.com/pages/thinx-product-safety-standards(last accessed November 10, 2020)
[42] https://en.wikipedia.org/wiki/Oeko-Tex(last accessed November 10, 2020)
[43] *Id.*
[44] https://www.oeko-tex.com/en/our-standards/standard-100-by-oeko-tex (last accessed November 10, 2020)

CLASS ACTION COMPLAINT

41.     Defendant has produced a OEKO-TEX label number on its website.[45] Checking this label in the OEKO-TEX label check database[46] produces the following certificate:

<div style="border:1px solid green; text-align:center">

**The certificate is valid**

</div>



STANDARD 100 by OEKO-TEX®
Certified according to annex 4

Product class:
II

Type of certified article:
Thinx underwear produced from knitted fabric made of CO, PES, PA, EL and
their blends with each other, white, yarn dyed, piece dyed (including CO in
mélange), reactive, pigment printed, with TPU film/membrane, and finished
(including wicking, anti-odor [finished with biological active products accepted
by OEKO-TEX®]), absorbent microfiber fabric made of PES, PES/PA, CO/EL;
including accessories (sewing and embroidery thread, interlining, elastic tape,
TPU tape, lace, zipper, heat transfer label); exclusively produced from material
certified according to STANDARD 100 by OEKO-TEX®.

42.     For products purchased online, companies claiming STANDARD 100 or any other OEKO-TEX certifications must include an OEKO-TEX label ***either on the packaging or the product  itself***.[47] Consumers are advised to report any online retailers who advertise a certification but do not include a label on the product or its packaging.[48]

---

[45] https://www.shethinx.com/pages/thinx-product-safety-standards (last accessed November 10, 2020)
[46] https://www.oeko-tex.com/en/label-check?tx_avsite_validitycheck%5Baction%5D=check&tx_avsite_validitycheck%5Bcontroller%5D=Validity&cHash=07353bd4b930f358743a3f1b45bf9364#c9 (last accessed November 10, 2020)
[47] https://www.oeko-tex.com/en/faq/consumer (last accessed November 10, 2020)
[48] *Id.*

CLASS ACTION COMPLAINT

43.     The OEKO-TEX certification label contains a unique product ID that can be cross-referenced with OEKO-TEX's database.[49] An example of this label is reproduced below:



44.     Based on information and belief, Thinx Underwear does not contain a label or tag on its packaging or individual products identifying the OEKO-TEX product ID. Without this unique identifier, a consumer cannot independently verify Defendant's claims regarding a specific product.

45.     Before a final article can carry the STANDARD 100 label, OEKO-TEX tests every single component and ingredient.[50] Based on information and belief, Thinx Underwear do not contain the appropriate labels on the packaging or products because Defendant has not obtained certification for all of its products.

46.     Thinx Underwear is manufactured in Sri Lanka by the apparel manufacturing company MAS Holdings.[51] MAS Intimates, a division of MAS Holdings, produces lingerie, sleepwear, and other performance apparel for a variety of global brands, including Victoria's Secret, Athleta, Gap, Soma, and Hanes Brands

---

[49] *Id.*
[50] https://www.oeko-tex.com/en/our-standards/standard-100-by-oeko-tex (last accessed November 10, 2020)
[51] https://www.shethinx.com/blogs/thinx-piece/where-thinx-manufactured-mas-factory (last accessed November 10, 2020)

International.[52] In 2016, MAS Intimates produced 228 million units of product for a variety of brands, including Thinx.[53] MAS Holdings is also an investor in Thinx.[54]

47.     Based on information and belief, MAS Intimates has applied for and obtained a STANDARD 100 certification from OEKO-TEX related to certain textiles used in its manufacturing. However, this certification and/or label number does not appear on any of the Thinx Underwear it manufactures for Thinx, Inc. Defendant has held out MAS Intimates' certification as its own in an attempt to deceive customers into believing Thinx Underwear held the STANDARD 100 certification.

48.     After Ms. Molland's statement was released in February of 2020, Jessian Choy published a follow up article in Sierra Magazine in March 2020 in which she refuted Defendant's claims.[55] With regard to the testing methods Defendant attempted to discredit in its statement, Ms. Choy reiterated that Dr. Peaslee had utilized a particle induced gamma ray emission (PIGE) spectroscopy test to determine whether two different Thinx Underwear (the Organic Bikini and BTWN Shorty) contained fluorine, an indicator of PFAS chemicals.[56] The inside of the crotch in the Organic Bikini had thousands of parts per million (3,264 ppm) according to the PIGE spectroscopy test, a level that Dr. Peaslee opined would not occur from incidental contamination.[57] While Ms. Molland advanced Intertox's claim that Peaslee's PIGE test "only indicates the presence of elemental fluoride," Ms. Choy reaffirmed the fact that the PIGE test looks at *fluorine*, not *fluoride*, and is therefore an appropriate method for evaluating the presence of PFAS chemicals.[58]

---

[52] https://www.masholdings.com/intimates.html#intimates-overview (last accessed November 10, 2020)
[53] *Id.*
[54] https://www.masholdings.com/brands.html#brands-overview (last accessed November 10, 2020)
[55] https://www.sierraclub.org/sierra/what-you-need-know-about-nontoxic-menstrual-underwear
[56] *Id.*
[57] *Id.*
[58] https://saferchemicals.org/methods-description-screening-of-food-packaging-for-total-fluorine/ (last accessed November 10, 2020)

CLASS ACTION COMPLAINT

49.     PFAS chemicals can be classified as either "long-chain" or "short-chain." Long-chain PFAS chemicals typically are designated as perfluoroalkyl sulfonic acids containing ≥ 6 carbons and perfluoroalkyl carboxylic acids with ≥ 7 carbons.[59] Short-chain PFAS chemicals have fewer carbons, such as perfluorobutanoic acid (PFBA).

50.     Short-chain PFAS chemicals are widely used as alternatives to long-chain PFAS chemicals.[60] Long-chain PFAS chemicals have become gradually regulated under REACH and other international regulations due to having persistent, bioaccumulative and toxic properties and/or being toxic for reproduction.[61] The increasingly used short-chain PFAS chemicals are assumed to have a lower bioaccumulation potential. Nonetheless, they have other properties of concern and are already widely distributed in the environment, also in remote regions.[62] The REACH Regulation does not directly address these emerging properties of concern, complicating the implementation of regulatory measures.[63]

51.   Short and long chain PFAS chemicals show similar toxicity, according to the U.S. National Toxicology Program.[64]

52.     Perfluorobutanoic acid (PFBA) is a short-chain PFAS chemical, and a member of a group of perfluorinated chemicals used in many consumer products. Perfluorinated chemicals can cause serious health effects, including cancer, endocrine

---

[59] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwje5MbV6_zsAhUJjVkKHdxIBtIQFjAAegQIBhAC&url=https%3A%2F%2Fwww.awwa.org%2FPortals%2F0%2FAWWA%2FETS%2FResources%2FPer-andPolyfluoroalkylSubstances(PFAS)-OverviewandPrevalence.pdf%3Fver%3D2019-08-14-090234-873&usg=AOvVaw1WaZR5yzS5UdWnxIStbnHL (last accessed November 10, 2020)
[60] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5834591/ (last accessed November 10, 2020)
[61] Id.
[62] Id.
[63] Id.  (last accessed November 10, 2020)
[64] https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33 (last accessed November 10, 2020)

disruption, accelerated puberty, liver and immune system damage, and thyroid changes. These chemicals are persistent in the environment and they accumulate in people.[65]

53.     Of more than 5,000 different types of PFAS chemicals,[66] independent testing Defendant obtained from Bureau Veritas only looked for the presence of 15 types of PFAS chemicals.[67] Of the PFAS chemicals Bureau Veritas did test for, only one (PFOA) would be expected to appear in textiles. They did not test for any short-chain PFAS chemicals.[68]

54.     In fact, Plaintiff's independent testing from third party lab found PFAS chemicals within Thinx Underwear at material and above trace amounts. This non-conforming ingredient found within Thinx Underwear is material to Plaintiff, customers, and potential class members.

55.     The method of testing used in Plaintiff's independent testing of Thinx Underwear is the industry standard method of testing used to detect and determine whether materials, such as Thinx Underwear, comply with quality and safety standards.

56.     Defendant knew, or at minimum *should have known*, about the existence of PFAS chemicals it its products. Defendant's patent[69] for Thinx indicates that Thinx Underwear may be treated with "polyfluoroalkylacrylates," which could potentially shed short-chain PFAS over time and wear.[70]

57.     Ms. Molland's statement denying the existence of "long-chain PFAS chemicals" in its products was specifically designed to deceive consumers, as the average consumer would not be aware of the existence of short-chain vs. long-chain

---

[65] https://www.ewg.org/tapwater/contaminant.php?contamcode=E203 (last accessed November 10, 2020)

[66] https://www.fda.gov/food/chemicals/and-polyfluoroalkyl-substances-pfas (last accessed November 10, 2020)

[67] https://www.shethinx.com/blogs/thinx-piece/how-we-ensure-thinx-are-body-safe (last accessed November 10, 2020)

[68] *Id.*

[69] https://patents.google.com/patent/US20140039432A1/en (last accessed November 10, 2020)

[70] https://www.sierraclub.org/sierra/what-you-need-know-about-nontoxic-menstrual-underwear(last accessed November 10, 2020)

CLASS ACTION COMPLAINT

PFAS chemicals. Defendant would have no reason to explicitly disclaim its use of "long-chain PFAS chemicals" except for the purpose of misleading customers into believing no PFAS chemicals were present in its products.

58.     Defendant has always understood that its customers choose Thinx, in part, because they are perceived as a safe and healthy product – differentiating them from traditional feminine hygiene products which have come under fire in recent years[71]. In an email to Ms. Choy on February 19, 2020, Ms. Molland wrote, "The implication that The Thinx Underwear have negative health effects connected to PFAS is unsubstantiated—and the continued reporting of this narrative does a disservice to people seeking out safer alternatives to traditional period products."[72]

59.     Despite requests from journalists and consumers, Defendant has refused to provide any independent testing data from prior years.[73]

60.     As a direct and intended result of Defendant's advertising, marketing, and public statements, consumers, including Plaintiff, purchased Thinx Underwear for their personal use.

61.     Contrary to representations made by Defendant in marketing materials, advertisements, social media and instructional videos on its website, Thinx Underwear contains chemicals which are harmful to humans.

62.     Some users of Thinx Underwear have experienced physical symptoms including, but not limited to, irregular menstrual cycles, urinary tract infections, yeast infections, thyroid issues, and unexplained infertility.

63.     Defendant knew or should have known of these dangers, and has undertaken a deliberate and willful pattern of conduct (including taking active

---

[71] *See* https://goop.com/wellness/sexual-health/are-tampons-toxic/; (last accessed November 10, 2020)
[72] https://www.sierraclub.org/sierra/what-you-need-know-about-nontoxic-menstrual-underwear (last accessed November 10, 2020)
[73] *Id.*

CLASS ACTION COMPLAINT

measures) aimed at deceiving consumers, including Plaintiff, to believe that Thinx Underwear are free of chemicals shown to cause adverse health outcomes.

64.     As more fully described below, Thinx Underwear suffers from a common defect that make them unreasonably dangerous and not able to be used for their intended purpose, specifically, their inclusion of PFAS ( "Defect").

65.     At all relevant times, Defendant knew about the Defect, but nevertheless marketed, advertised, and sold Thinx Underwear for use without adequately warning consumers that they contain chemicals which could be damaging to the user's health.

66.     Even after being alerted to the presence of toxic chemicals in its products in early 2020, Defendant continued to willfully conceal this information from consumers by representing that its products had been independently certified as being free from harmful chemicals.

67.     As a direct and proximate result of Defendant's concealment of the Defect and its failure to sufficiently warn consumers about it or its harmful consequences prior to their purchase, Plaintiff and other similarly situated consumers purchased and used Defendant's defective Thinx Underwear to their detriment.

68.     Plaintiff and Class Members were unaware of the Defect at the time they purchased Thinx Underwear. Had Plaintiff and Class Members known the Thinx Underwear contained a Defect rendering it unfit for its intended purpose, they would not have purchased the Thinx Underwear or would have paid substantially less for it.

69.     Plaintiff and all putative Class Members purchased Thinx Underwear which suffered from the same Defect at the point of sale, and poses substantially the same safety risk to Plaintiff, Class Members, consumers, and the public. Thinx Underwear cannot be used safely for its intended purpose as represented.

70.     Plaintiff and each of the Class Members have been damaged and suffered an injury in fact caused by Defendant's false, fraudulent, unfair, deceptive, and

misleading practices, as set forth herein, and seek compensatory damages and injunctive relief.

71.     Given the massive quantities of Thinx Underwear believed to have been sold all over the country, this class action is the proper vehicle for addressing Defendant's misconduct and for attaining needed relief for those affected.

72.     Defendant offers a variety of absorbent underwear in different styles, including products specifically marketed to teenagers (BTWN line) and those suffering from urinary incontinence (SPEAX line).

73.     Thinx is made with "signature innovative technology," designed to absorb wetness, wick moisture, control odors, and prevent leaks, while still looking and feeling like traditional underwear.[74]

74.     Defendant represents that Thinx can hold up to 4 tampons' worth of liquid and can serve as a complete replacement for traditional period products.[75]

75.     Without exception, every advertisement, marketing campaign, instructional video, and public statement produced and distributed in relation to Defendant encourages customers to use the Thinx Underwear the same way as traditional menstrual products.

## CLASS ACTION ALLEGATIONS

Plaintiff brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the members of the following class ("Class"):

> All persons residing in the United States who purchased Thinx Underwear during the maximum period permitted by law.

In addition, or alternatively, Plaintiff brings this action on behalf of herself and the members of the following subclass ("California Subclass"):

---

[74] https://www.shethinx.com/pages/thinx-it-works (last accessed November 10, 2020)
[75] *Id.*

> All persons residing in the State of California who purchased Thinx
> Underwear during the maximum period permitted by law.

76.    Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiff reserve the right to amend the Class definition and Subclass definitions as necessary.

77.    <u>Numerosity</u>: The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of tens of thousands of people geographically disbursed throughout California. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable from information and records in the possession of Defendant and its authorized retailers.

78.    <u>Typicality</u>: The claims of the representative Plaintiff are typical in that Plaintiff, like all Class Members, purchased The Thinx Underwear that were designed, manufactured, marketed, advertised, distributed, and sold by Defendant. Plaintiff, like all Class Members, has been damaged by Defendant's misconduct in that, *inter alia*, she has incurred or will continue to incur damage as a result of overpaying for a Product with a Defect that makes Thinx inherently dangerous and not fit for its intended use. Furthermore, the factual basis of Defendant's misconduct is common to all Class Members because Defendant has engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members.

79.   <u>Commonality</u>: Common questions of law and fact exist as to all Members of the Class. These questions predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such common legal or factual questions include, *inter alia*:

(a)   Whether Defendants engaged or continue to engage in consumer fraud in the packaging, labeling, sale and marketing of Thinx Underwear;

(b)   Whether Thinx Underwear are reasonably safe for use as directed;

(c)   Whether Defendants omitted or failed to disclose material information to Plaintiff and Class members;

(d)   Whether Defendant committed deception by concealment by knowingly concealing material facts regarding the safety risks posed by Thinx Underwear;

(e)   Whether Defendant's alleged conduct violated public policy;

(f)   Whether the claims discussed above about Thinx Underwear are true, or are misleading or reasonably likely to deceive;

(g)   Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the defective Thinx Underwear;

(h)   Whether Defendant breached the implied warranty of merchantability and the Song-Beverly Consumer Warranty Act, relating to Thinx Underwear;

(i)   Whether Defendant violated Cal. Bus. & Prof. Code § 17500, *et seq.* (FAL);

(j)   Whether Defendant violated Civil Code §§ 1750, *et seq.* (CLRA);

(k)   Whether Defendant violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* (UCL);

(l)   Whether Defendant was negligent in its failure to adequately test;

(m)   Whether Defendant was negligent in its failure to warn;

(n)   Whether Defendant is strictly liable for its defective design and/or manufacture of Thinx Underwear;

(o)   Whether Plaintiff and the Class are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

(p)   Whether Defendant should be enjoined from selling and marketing the defective Thinx Underwear; and

(q)   Other issues which may be revealed in discovery.

80.   <u>Adequate Representation</u>: Plaintiff will fairly and adequately protect the interests of Class Members. She has no interests antagonistic to those of Class Members. Plaintiff retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intends to prosecute this action vigorously.

81.   <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Defendant will continue to commit the unlawful practices alleged herein, and Class Members will remain at an unreasonable and serious safety risk as a result of the Defect. Defendant has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

82.   <u>Predominance and Superiority</u>: Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members

will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

83.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

84.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

## **FIRST CLAIM FOR RELIEF**

### **Breach of Implied Warranties and Song-Beverly Consumer Warranty Act California Civil Code § 1790, *et seq.***

85.    Plaintiff brings this count on behalf of herself and the Class, and alternatively, the California Subclass, and repeat and re-allege all previous paragraphs, as if fully included herein.

86.    As described above, Plaintiff has standing to pursue this claim because she has suffered injury-in-fact and has lost money or property as a result of Defendant's conduct.

87.    Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of Thinx Underwear. Defendant knew or had reason to know of the specific use for which the Thinx Underwear was purchased, including that the Thinx Underwear was marketed, advertised, and sold as a replacement and/or supplement to traditional feminine hygiene products like pads and tampons.

88.    By placing Thinx Underwear into the stream of commerce, Defendant provided Plaintiff and Class Members with implied warranties that the Thinx

Underwear were merchantable and fit for the ordinary purposes for which they were sold.

89.     However, Thinx Underwear are not fit for its ordinary purpose of being used as a menstrual products because, *inter alia*, the Thinx Underwear contained a Defect causing it to become unreasonably dangerous and unsuitable for its intended use.

90.     The problems associated with the Defect, such as increased exposure to toxic PFAS chemicals, prevent the Thinx Undewear from being safely used for their intended purpose, and thus constitutes a breach of the implied warranty of merchantability. These problems are caused by Defendant's failure to adequately warn Plaintiff and consumers of the Defect and that Thinx Underwear is not safe to use as a menstrual products without significant exposure to toxic chemicals and risk of resulting injury.

91.     The Defect was undiscoverable by Plaintiff and Class Members at the time that they purchased Thinx Underwear;

92.     Defendant impliedly warranted that Thinx Underwear were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that Thinx Underwear manufactured, supplied, distributed, and/or sold by Defendant was safe and reliable for use as a menstrual products and (ii) a warranty that Thinx Underwear would be fit for its intended use.

93.     Contrary to the applicable implied warranties, Thinx Underwear, at the time of sale and thereafter, was not fit for its ordinary and intended purpose of providing Plaintiff and Class Members with a safe menstrual product. Instead, Thinx Underwear suffer from a defective design and/or defective manufacturing, as alleged herein.

94.     Defendant's actions, as complained of herein, breached the implied warranties that Thinx Underwear were of merchantable quality and fit for such use in violation of Cal. Civ. Code §§ 1791.1 and 1792.

95.     Defendant's intended beneficiaries of these implied warranties were ultimately Plaintiff and the Class, not third-party retailers, resellers or distributors who sold Thinx Underwear. Moreover, Defendant exercises substantial control over which outlets can carry and sell its Product, which are the same places that Plaintiff and Class Members purchased Think Underwear. In addition, Defendant's warranties are in no way designed to apply to the third-party retailers, resellers or distributors who purchase Thinx Underwear in bulk and then sell them on an individual basis to consumers. Individual consumers are the ones who ultimately review the labels prior to making any purchasing decisions. Accordingly, these warranties are specifically designed to benefit the individual consumers who purchased Thinx Underwear.

96.     Plaintiff and Class Members sustained damages as a direct and proximate result of Defendant's breaches in that they paid a premium for Thinx Underwear that they would not have otherwise paid. Plaintiff and the Class also did not receive the value of Thinx Underwear they paid for—Thinx Underwear are worthless or worth far less than Defendant represents due to the Defect.

97.     Defendant's conduct described in this complaint constitutes a breach of implied warranties under UCC §§ 2-314 and 2-315, as adopted in whole or in substance by statutes in all 50 states and the District of Columbia:

> Ala. Code § 7-2-314, *et seq.*; Alaska Stat. § 45.02.314, *et seq.*; Ariz. Rev. Stat. § 47-2314, *et seq.*; Ark. Code § 4-2-314, *et seq.*; Cal. Com. Code § 2314, *et seq.*; Colo. Rev. Stat. § 4-2-314, *et seq.*; Conn. Gen. Stat. § 42a-2-314, *et seq.*; 6 Del. C. § 2-314, *et seq.*; D.C. Code § 28:2-314, *et seq.*; Fla. Code § 672.314, *et seq.*; O.C.G.A. § 11-2-314, *et seq.*; Haw. Rev. Stat. § 490:2-314, *et seq.*; Idaho Code § 28-2-314, *et seq.*; 810 Ill. Comp. Stat. 5/2-314, *et seq.*; Ind. Code § 26-1-2-314, *et seq.*; Iowa Code § 554.2314, *et seq.*; Kan. Stat. § 84-2-314, *et seq.*; Ky. Rev. Stat. § 355.2-314, *et seq.*; La. Rev. Stat § 9:2800.53(6), *et seq.*; 11 M.R.S.A. § 2-314, *et seq.*; Md. Code Ann., Com. Law § 2-314, *et seq.*; Mass. Code 106, § 2-314, *et seq.*; Mich. Comp. Laws

440.2314, *et seq.*; Minn. Stat. § 336.2-314, *et seq.*; Miss. Code § 75-2-314, *et seq.*; Mo. Rev. Stat. § 400.2-314, *et seq.*; Mont. Code § 30-2-314, *et seq.*; Neb. U.C.C. § 2-314, *et seq.*; Nev. Rev. Stat. § 104.2314, *et seq.*; N.H. Rev. Stat. § 382-A:2-314, *et seq.*; N.J. Stat. § 12A:2-314, *et seq.*; N.M. Stat. § 55-2-314, *et seq.*; N.Y. U.C.C. § 2-314, *et seq.*; N.C. Gen. Stat. § 25-2-314, *et seq.*; N.D. Cent. Code § 41-02-30, *et seq.*; Ohio Rev. Code § 1302.26, *et seq.*; Okla. Stat. Tit. 12A, § 2-314, *et seq.*; Or. Rev. Stat. § 72.3130, *et seq.*; 13 Pa. Cons. Stat. § 2314, *et seq.*; R.I. Gen. Laws § 6A-2-314, *et seq.*; S.C. Code § 36-2-313, *et seq.*; S.D. Codified Laws § 57A-2-313, *et seq.*; Tenn. Code § 47-2- 314, *et seq.*; V.T.C.A., Bus. & C. § 2.314, *et seq.*; Utah Code § 70A-2-314, *et seq.*; Vt. Stat. Tit. 9A, § 2-314, *et seq.*; Va. Code § 8.2-314, *et seq.*; Wash. Rev. Code § 62A.2-314, *et seq.*; W. Va. Code § 46-2-314, *et seq.*; Wis. Stat. § 402.314, *et seq.*; and Wyo. Stat. § 34.1-2-314, *et seq.*

98.     Plaintiff and the Class have sustained, are sustaining, and will sustain damages if Defendant continues to engage in such deceptive, unfair, and unreasonable conduct.

99.     As a result of the breach of the implied warranty of merchantability, Plaintiff and Class Members are entitled to legal and equitable relief, including injunctive relief, damages, attorneys' fees, litigation expenses and costs, rescission, and/or other relief as deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment

100.    Plaintiff bring this count on behalf of themselves and the Class, and alternatively, the California Subclass, and repeats and re-alleges all previous paragraphs, as if fully included herein.

101.   Plaintiff and Class Members conferred a monetary benefit on Defendant, and Defendant had knowledge of this benefit. The retail price for Thinx Underwear listed online is $24.00 or more.

102.   By its wrongful acts and omissions described herein, including selling the defective Thinx Underwear, Defendant was unjustly enriched at the expense of Plaintiff and Class Members.

103.   Plaintiff and Class Members' detriment and Defendant's enrichment were related to and flowed from the wrongful conduct alleged herein.

104.   Defendant has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and Class Members under circumstances in which it would be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the defective Thinx Underwear.

105.   Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased Thinx Underwear on the same terms or for the same price had they known that the Thinx Underwear contained a Defect.

106.   Defendant either knew or should have known that payments rendered by Plaintiff and Class Members were given and received with the expectation that The Thinx Underwear were free of defects and capable of providing the benefits represented by Defendant in the labeling, marketing, and advertising of Thinx Underwear. It is inequitable for Defendant to retain the benefit of payments under these circumstances.

107.   Plaintiff and Class Members seek restitution from Defendant and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct and establishing a constructive trust from which Plaintiff and  Class Members may seek restitution.

108.   When required, Plaintiff and Class Members are in privity with Defendant because Defendant's sale of Thinx Underwear was either direct or through authorized third-party retailers and resellers. Purchase through authorized retailer and resellers is sufficient to create such privity because such authorized third parties are Defendant's agents for the purpose of the sale of Thinx Underwear.

109.   As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiff and Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant for its inequitable and unlawful conduct.

### <u>THIRD CLAIM FOR RELIEF</u>

**Violation of the California False Advertising Law ("FAL")
California Business and Professions Code §§ 17500, *et seq.***

110.   Plaintiff brings this count on behalf of herself and the California Subclass and repeats and re-alleges all previous paragraphs, as if fully included herein.

111.   The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

112.   The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

113.   It also is unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

114.   Defendant, when it marketed, advertised and sold Thinx, represented to Plaintiff and California Class Members that Thinx was free of defects and safe, despite the fact that Thinx was defective, not safe, and prone to failure.

115.   At the time of its misrepresentations, Defendant was either aware that Thinx was defective and not safe, or was aware that it lacked the information and/or knowledge required to make such a representation truthfully. Defendant concealed and omitted and failed to disclose this information to Plaintiff and California Class Members.

116.   Defendant's descriptions of Thinx Underwear were false, misleading, and likely to deceive Plaintiff and other reasonable consumers.

117.   Defendant's conduct therefore constitutes deceptive or misleading advertising.

118.   Plaintiff has standing to pursue claims under the FAL as they reviewed and relied on Defendant's packaging, advertising, representations, and marketing materials regarding Thinx Underwear when selecting and purchasing Thinx Underwear.

119.   In reliance on the statements made in Defendant's advertising and marketing materials and Defendant's omissions and concealment of material facts regarding the quality and use of Thinx Underwear, Plaintiff and California Class Members purchased Thinx Underwear.

120.   Had Defendant disclosed the true defective nature of Thinx Underwear, Plaintiff and California Class Members would not have purchased Thinx Underwear or would have paid substantially less for it.

121.   As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including but not limited to money from Plaintiff and California Class Members who paid for the Thinx Underwear, which contained a Defect.

122.   Plaintiff and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendant and by means of its deceptive or misleading representations, including monies already obtained from Plaintiff and California Class Members as provided for by the California Business and Professions Code § 17500.

## FOURTH CLAIM FOR RELIEF

### Violation of the California Consumer Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*

123.    Plaintiff brings this count on behalf of herself and the California Subclass and repeats and re-alleges all previous paragraphs, as if fully included herein.

124.   The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*

125.   The CLRA applies to all claims of all California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

126.   Plaintiff and California Class Members are "consumers" as defined by Civil Code § 1761(d).

127.   Defendant is a "person" as defined by Civil Code § 1761(c).

128.   Thinx qualifies as "goods" as defined by Civil Code § 1761(a).

129.   Plaintiff and the California Class Members' purchases of Thinx Underwear are "transactions" as defined by Civil Code 25 § 1761(e).

130.   As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

(a)    "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." Civil Code § 1770(a)(5); and

(b)    "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

131.   Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5) and (a)(7) when it represented, through its advertising and other express representations, that Thinx Underwear had benefits or characteristics that it did not actually have.

132.   As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA, and has made representations regarding Thinx Underwear's benefits or characteristics that it did not in fact have, and represented Thinx Underwear to be of a quality that was not true. Indeed, Defendant concealed this information from Plaintiff and California Class Members.

133.   Thinx Underwear was not and is not "reliable," in that it is not safe and is of inferior quality and trustworthiness compared to other products in the industry. As detailed above, Defendant further violated the CLRA when it falsely represented that Thinx Underwear meets a certain standard or quality.

134.   As detailed above, Defendant violated the CLRA when it advertised the Thinx Underwear with the intent not to sell Thinx Underwear as advertised and knew that the Thinx Underwear was not as represented.

135.   Defendant's deceptive practices were specifically designed to induce Plaintiff and California Class Members to purchase or otherwise acquire Thinx Underwear.

136.   Defendant engaged in uniform marketing efforts to reach California Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use Thinx manufactured by Defendant. Defendant's packaging,

advertising, marketing, website and retailer product identification and specifications, contain numerous false and misleading statements regarding the quality, safety, and reliability of Thinx. These include, *inter alia*, the following misrepresentations contained in its advertising, marketing, social media platforms, and website:

- "At its core, Thinx Inc. was founded to provide safe, comfortable, and sustainable options for people with periods and bladder leaks."

- "Customer safety is important to us, and so is your trust. That's why we'll always be honest and transparent about how our products are made."

- "All Thinx Inc. underwear are rigorously tested for harmful chemicals."

- "We're proud to say that third party testing has never revealed any harmful chemical levels in Thinx Inc. products."

- "Our products undergo the strictest safety testing available, and it was the company's deep and abiding commitment to safe and sustainable products that made me want to join the team."

- "Call me a feminist, call me an entrepreneur, call me whatever you want, but I believe in elevating humanity using conscious consumerism as the vehicle to do that."

- "We will always push for more disclosure from our manufacturers, and more rigorous industry standards for regulation and compliance — and we urge others in our category to do the same."

- "What does a more sustainable period look like? It just makes me feel better about my period."[76]

137.   Despite these representations, Defendant also omitted and concealed information and material facts from Plaintiff and California Class Members.

---
[76]

CLASS ACTION COMPLAINT

138.   In their purchase of Thinx Underwear, Plaintiff and California Class Members relied on Defendant's representations and omissions of material facts.

139.   These business practices are misleading and/or likely to mislead consumers and should be enjoined.

140.   On November 11, 2020, Plaintiff provided written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions pursuant to the Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1770, *et seq*. Plaintiff will amend her complaint to add claims for monetary damages if Defendant fails to take the corrective actions.

141.   Plaintiff's declaration stating facts showing that venue in this District is proper pursuant to Cal. Civ. Code § 1780(c) is attached hereto as Exhibit A.

142.   In accordance with Civil Code § 1780(a), Plaintiff and the other California Class Members seek injunctive and equitable relief for Defendant's violations of the CLRA, including an injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

143.   Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiff seeks an order enjoining Defendant from the unlawful practices described above, a declaration that Defendant's conduct violates the Consumers Legal Remedies Act, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA

## FIFTH CLAIM OF ACTION

### Violations of The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*

144.   Plaintiff brings this count on behalf of herself and the California Subclass and repeats and re-alleges all previous paragraphs, as if fully included herein.

145.   Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

146.   Plaintiff and Class Members who purchased Defendant's The Thinx Underwear suffered an injury by virtue of buying defective products in which Defendant misrepresented and/or omitted Thinx Underwear's true quality, reliability, safety, and use. Had Plaintiff and Class Members known that Defendant materially misrepresented Thinx Underwear and/or omitted material information regarding its defective The Thinx Underwear and its safety, they would not have purchased Thinx.

147.   Defendant's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in the preceding paragraphs of this complaint.

148.   There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its Thinx Underwear.

149.   Plaintiff and Class Members who purchased Defendant's Product had no way of reasonably knowing that Thinx Underwear was deceptively packaged, marketed, advertised, and labeled, was defective, not safe, and unsuitable for its intended use. Thus, Plaintiff and California Class Members could not have reasonably avoided the harm they suffered.

150.   The gravity of the harm suffered by Plaintiff and Class Members who purchased Defendant's Thinx outweighs any legitimate justification, motive or reason for packaging, marketing, advertising, and labeling the defective Thinx Underwear in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff and California Class Members.

151.   The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the State of California, including to Plaintiff and Class Members, were and are likely to deceive reasonable consumers by obfuscating the true defective nature of Defendant's Thinx Underwear, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

152.   As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiff, on behalf of herself and all others similarly situated, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law.

## SIXTH CLAIM OF ACTION

### Negligence – Failure to Warn
### (Plaintiff Individually and on Behalf of the Class)

153.   Plaintiff brings this count on behalf of herself and the California Subclass and repeats and re-alleges all previous paragraphs, as if fully included herein.

154.   At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling Thinx Underwear to Plaintiff and the Class. At all relevant times, it was reasonably foreseeable by Defendant that the use of Thinx Underwear in its intended manner involved a substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of Thinx.

155.   At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that Thinx Underwear posed to Plaintiff and Class Members, as the Defect within Thinx Underwear existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

156.   Defendant, as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of Thinx Underwear, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use of Thinx Underwear.

157.   At minimum, the duty arose for Defendant to warn consumers that use of Thinx Underwear could result in injury and become unreasonably dangerous.

158.   Defendant was negligent and breached its duty of care by negligently failing to provide adequate warnings to purchasers and users of Thinx Underwear, including Plaintiff and the Class, regarding the Defect, risks, and potential dangers of Thinx Underwear.

159.   Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Thinx Underwear contains ingredients known to cause adverse health effects in humans.

160.   Defendant knew, or through the exercise of reasonable care, should have known of the inherent Defect and resulting dangers associated with using Thinx Underwear as described herein, and knew that Plaintiff and Class Members could not reasonably be aware of those risks. Defendants failed to exercise reasonable care in providing Plaintiff and the Class with adequate warnings.

161.   As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of Thinx Underwear, including its intended use, could cause and has caused injuries and other damages, Plaintiff and the Class have suffered damages, as described herein.

## **RELIEF DEMANDED**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant, as follows:

a.   For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and the Subclass and Plaintiff's attorneys as Class Counsel;

b.   For an order declaring that Defendant's conduct violates the statutes referenced herein;

c.   For an order finding in favor of Plaintiff and the Class and the Subclass on all counts asserted herein;

d.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.     For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.     For injunctive relief as pled or as the Court may deem proper; and

h.     For an order awarding Plaintiff and the Class and the Subclass their reasonable attorneys' fees, expenses, and costs of suit.

CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

DATED: November 12, 2020.          Respectfully submitted,

Alex R. Straus, SBN 321366
**WHITFIELD BRYSON LLP**
16748 McCormack Street
Los Angeles, CA  91436
Telephone: (917) 471-1894
Facsímile: (310) 496-3176
alex@whitfieldbryson.com

Daniel K. Bryson*
Erin J. Ruben*
J. Hunter Bryson*
**WHITFIELD BRYSON LLP**
900 W. Morgan Street
Raleigh, NC 27603
P.O. Box 12638
Raleigh, NC 27605
Dan@whitfieldbryson.com
Erin@whitfieldbryson.com
Hunter@whitfieldbryson.com

*Pro hac vice forthcoming

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT