1  PURVI G. PATEL (CA SBN 270702)
   PPatel@mofo.com
2  MEGAN L. WHIPP (CA SBN 319182)
   MWhipp@mofo.com
3  PRABHJYOT K. SINGH (CA SBN 330066)
   PSingh@mofo.com
4  MORRISON & FOERSTER LLP
   707 Wilshire Boulevard
5  Los Angeles, California  90017-3543
   Telephone: 213.892.5200
6  Facsimile: 213.892.5454

7
   PENELOPE A. PREOVOLOS (CA SBN 87607)
8  PPreovolos@mofo.com
   WILLIAM F. TARANTINO (CA SBN 215343)
9  WTarantino@mofo.com
   MORRISON & FOERSTER LLP
10 425 Market Street
   San Francisco, California  94105-2482
11 Telephone: 415.268.7000
   Facsimile: 415.268.7522
12
   Attorneys for Defendant
13 THINX INC.

14                  UNITED STATES DISTRICT COURT

15                  CENTRAL DISTRICT OF CALIFORNIA

16

17
   DESTINI KANAN and HALEY          Case No. 2:20-cv-10341 JVS (JPRx)
18 BURGESS, individually and on behalf
   of all others similarly situated,  **DEFENDANT THINX INC.'S**
19                                     **NOTICE OF MOTION AND**
                     Plaintiffs,       **MOTION TO DISMISS**
20                                     **PLAINTIFFS' FIRST AMENDED**
                                       **CLASS ACTION COMPLAINT**
21         v.                          **AND STRIKE PORTIONS**
                                       **THEREOF**
   THINX INC.,
22                                     Judge:   Hon. James V. Selna
                     Defendant.        Date:    June 21, 2021
23                                     Time:    1:30 p.m.
                                       Courtroom:  10C
24
                                       Complaint filed:  Nov. 12, 2020
25                                     FAC filed:  March 16, 2021

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on June 21, 2021, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 10C of this Court, located at 411 West 4th Street, Santa Ana, California, Defendant Thinx Inc. will and hereby does move this Court for an order dismissing Plaintiffs' First Amended Class Action Complaint and, in the alternative, striking portions thereof.

This motion is made pursuant to Federal Rules of Civil Procedure 9(b), 10(b), 12(b)(1), 12(b)(2), and 12(b)(6), and is made on the grounds that (a) Plaintiffs fail to plead their fraud-based claims with requisite particularity; (b) Plaintiffs lack standing; (c) Plaintiffs fail to state any claim for relief; and (d) the Court lacks personal jurisdiction over Thinx for the claims of non-resident putative class members.  In the alternative, Thinx moves pursuant to Rules 8 and 12(f) for an order striking Paragraphs 25, 39, 44-69, 81, and 192 of the First Amended Class Action Complaint:

- Thinx's "innovative" marketing approach, on which no Plaintiff claims to have relied (FAC ¶¶ 25, 192);
- Long-chain PFAS, which Plaintiffs do not allege are present in Thinx Underwear (*id.* ¶ 39);
- Actions of companies other than Thinx (*id.* ¶ 44);
- Whether Thinx Underwear is organic and allegations regarding Ocean Lanka's GOTS certification, which are unsupported and conclusory (*id.* ¶¶ 58-69, 81); and
- Unsubstantiated claims regarding Agion treatment (*id.* ¶¶ 45-57).

This motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities, Request for Judicial Notice; the Declaration of Purvi G. Patel, the pleadings, files, and records in this action; and such additional evidence and arguments as may be presented at the

2

1   hearing of this motion.

2       This motion is made following a conference of counsel pursuant to L.R. 7-3,

3   which took place on April 8, 2021.  (Patel Decl. ¶ 2.)

4

5   Dated:    April 15, 2021            MORRISON & FOERSTER LLP

6

7                                       By:/s/ Purvi G. Patel
                                        _____
                                        Purvi G. Patel

8                                       **Attorneys for Defendant
                                        Thinx Inc.**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THINX'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

sf-4460208

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................ 1

II.   RELEVANT BACKGROUND .......................................................... 2

III.  LEGAL STANDARD ..................................................................... 4

IV.   ARGUMENT .................................................................................. 5

    A.    Plaintiffs Fail to Satisfy Rule 9(b)'s Heightened Pleading
        Requirement for Claims Sounding in Fraud ............................ 5

        1.    Plaintiffs' allegations are conclusory, vague, and
              unsupported and fail to state either affirmative
              misrepresentations or omissions ................................. 6

        2.    Plaintiffs have not sufficiently alleged exposure or
              reliance ................................................................... 10

        3.    Plaintiffs' allegations also fail to state an omissions claim
              under Rule 9(b) ....................................................... 12

    B.    Plaintiffs Lack Article III Standing ....................................... 13

        1.    Plaintiffs fail to allege an injury in fact ..................... 13

        2.    Plaintiffs lack standing to seek injunctive relief ......... 16

    C.    Plaintiffs' Warranty Claims Fail as a Matter of Law ............. 17

        1.    Plaintiffs fail to state a claim for breach of express
              warranty ................................................................. 17

        2.    Plaintiffs' implied warranty claims fail because Plaintiffs
              fail to allege that they purchased a product unfit for use ........ 18

    D.    Plaintiffs' Negligent Failure to Warn Claim Should Be
        Dismissed ............................................................................ 20

    E.    Plaintiffs Are Not Entitled to Equitable Relief Because They
        Have an Adequate Remedy at Law ........................................ 22

    F.    Plaintiffs' FAC Is Still Replete with Extraneous Allegation
        Which Should Be Dismissed or Stricken ............................... 23

    G.    The Court Lacks Personal Jurisdiction Over Thinx for the
        Claims of Putative Non-California Class Members ................ 24

V.    CONCLUSION ............................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aberin v. Am. Honda Motor Co.*,
No. 16-cv-04384-JST,
2018 WL 1473085 (N.D. Cal. Mar. 26, 2018) ...................................................... 5

*Anthony v. Pharmavite*,
No. 18-CV-02636-EMC,
2019 WL 109446 (N.D. Cal. Jan. 4, 2019) ....................................................... 10

*Arroyo v. TP–Link USA Corp.*,
No. 5:14-cv-04999-EJD,
2015 WL 5698752 (N.D. Cal. Sept. 29, 2015)................................................... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... 4, 5

*Bautista v. L.A. Cnty.*,
216 F.3d 837 (9th Cir. 2000) ............................................................................ 19

*Becerra v. Dr Pepper/Seven UP, Inc.*,
No. 17-cv-05921 (WHO),
2018 WL 1569697 (N.D. Cal. Mar. 30, 2018) ................................................... 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................... 4

*Birdsong v. Apple, Inc.*,
590 F.3d 955 (9th Cir. 2009)...................................................................... 14, 18

*Boysen v. Walgreen Co.*,
No. C 11–06262 SI,
2012 WL 2953069 (N.D. Cal. July 19, 2012).................................................... 16

*Bristol-Myers Squibb Co. v. Superior Court of California,*
*San Francisco County*, 137 S. Ct. 1773 (2017) ........................................... 24, 25

*Cahen v. Toyota Motor Corp.*,
147 F. Supp. 3d 955 (N.D. Cal. 2015)................................................................ 14

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*Carpenter v. PetSmart, Inc.*,
  441 F. Supp. 3d 1028 (S.D. Cal. 2020) ............................................................ 25

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
  598 F.3d 1115 (9th Cir. 2010) ......................................................................... 13

*Chavez v. Glock, Inc.*,
  207 Cal. App. 4th 1283 (2012) ........................................................................ 20

*Chowning v. Kohl's Dep't Stores, Inc.*,
  No. CV 15-08673 RGK,
  2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) ............................................... 22

*In re Clearly Canadian Sec. Litig.*,
  875 F. Supp. 1410 (N.D. Cal. 1995) ................................................................ 23

*Cohen v. Ainsworth Pet Nutrition, LLC*,
  2:20-cv-05289-MCS-AS,
  2021 U. S. Dist. LEXIS 15923 (C.D. Cal. Jan. 21, 2021).................................. 9

*Cordes v. Boulder Brands USA, Inc.*,
  No. CV18-6534 PSG,
  2018 WL 6714323 (C.D. Cal. Oct. 17, 2018) ................................................. 17

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014) ........................................................................................ 24

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018)............................................................................ 17

*Dutta v. State Farm Mut. Auto. Ins. Co.*,
  895 F.3d 1166 (9th Cir. 2018).......................................................................... 13

*Hadley v. Kellogg Sales Co.*,
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) ........................................................... 18

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018)............................................................................ 12

*Isip v. Mercedes-Benz USA, LLC*,
  155 Cal. App. 4th 19 (2007)............................................................................. 18

iii

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Kaupelis v. Harbor Freight Tools USA, Inc.*,

4

    No. SACV 19-1203 JVS (DFMx),

    2019 WL 6998661 (C.D. Cal. Oct. 9, 2019) ................................................. 13, 14

5

*Kearns v. Ford Motor Co.*,

6

    567 F.3d. 1120 (9th Cir. 2009) .................................................. 6, 10, 12

7

*Kwan v. SanMedica Int'l*,

8

    854 F.3d 1088 (9th Cir. 2017) ........................................................ 9, 10

9

*Ladore v. Sony Computer Ent. Am., LLC*,

10

    75 F. Supp. 3d 1065 (N.D. Cal. 2014) ........................................... 21, 22

11

*Lujan v. Defs. of Wildlife*,

12

    504 U.S. 555 (1992) .................................................................... 13

13

*In re MacBook Keyboard Litig.*,

14

    No. 5:18-cv-02813-EJD,

    2020 WL 6047253 (N.D. Cal. Oct. 13, 2020) ................................... 22

15

*Mauro v. Gen. Motors Corp.*,

16

    No. CIV 5-07-892 ECD GGH,

17

    2008 WL 2775004 (E.D. Cal. July 15, 2008) ................................... 17

18

*McKinnis v. Kellogg USA*,

19

    No. CV 07-2611 ABC,

    2007 WL 4766060 (C.D. Cal. Sept. 19, 2007) ................................. 17

20

*Merrill v. Navegar, Inc.*,

21

    26 Cal.4th 465 (2001) ................................................................. 20

22

*Minkler v. Apple, Inc.*,

23

    65 F. Supp. 3d 810 (N.D. Cal. 2014) ............................................ 21, 22

24

*Moncada v. Allstate Ins. Co.*,

25

    471 F. Supp. 2d 987 (N.D. Cal. 2006) ............................................ 10

26

*In re NJOY, Inc. Consumer Class Action Litig.*,

27

    No CV 14-00428 MMM,

    2014 WL 12586074 (C.D. Cal. Oct. 20, 2014) ................................. 18

28

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ................................................................. 23

*Padilla v. Costco Wholesale Corp.*,
No. 11-C-7686,
2012 WL 2397012 (N.D. Ill. June 21, 2012) ........................... 7

*Palmer v. Apple, Inc.*,
No. 5:15-cv-05808-RMW,
2016 WL 1535087 (N.D. Cal. Apr. 15, 2016) ....................... 10

*Paulsen v. CNF, Inc.*,
559 F.3d 1061 (9th Cir. 2009) .................................................. 5

*Przybylak v. Bissell Better Life LLC*,
No. CV 19-2038 PA,
2019 WL 8060076 (C.D. Cal. July 19, 2019) ....................... 19

*Robinson v. Unilever United States, Inc.*,
No. CV-173010 DMG,
2018 WL 6136139 (C.D. Cal. June 25, 2018) ....................... 25

*Simon v. Ultimate Fitness Grp., LLC*,
No. 19 Civ. 890 (CM),
2019 WL 4382204 (S.D.N.Y. Aug. 19, 2019) ....................... 25

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ........................................... 22, 23

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ........................................................... 13

*Stanley v. Bayer Healthcare LLC*,
No. 11cv862-IEG (BLM),
2012 WL 1132920 (S.D. Cal. Apr. 3, 2012) ......................... 10

*Stearns v. Select Comfort Retail Corp.*,
No. 08-2746 JF,
2009 WL 1635931 (N.D. Cal. June 5, 2009) ......................... 19

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

4

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ................................................................ 5

5

6

*Stover v. Experian Holdings, Inc.*,
   978 F.3d 1082 (9th Cir. 2020) ............................................................. 17

7

8

*In re Toyota Motor Corp.*,
   790 F. Supp. 2d 1152 (C.D. Cal. 2011) ........................................ 13, 14

9

*Trejo v. Johnson & Johnson*,
   13 Cal. App. 5th 110 (2017) ............................................................... 20

10

11

*Tubbs v. AdvoCare Int'l, LP*, No. CV 17-4454 PSG (AJWx),
   2017 WL 4022397 (C.D. Cal. Sept. 12, 2017) .................................... 9

12

13

14

*Vavak v. Abbott Labs., Inc.*,
   No. SACV 10-1995 JVS (RZx),
   2011 WL 10550065 (C.D. Cal. June 17, 2011) ................................. 22

15

16

*Warth v. Seldin*,
   422 U.S. 490 (1975) .......................................................................... 13

17

18

*Whitson v. Bumbo*,
   No. C 07–05597 MHP,
   2009 WL 1515597 (N.D. Cal. Apr. 16, 2009) ................................... 16

19

20

*Wilson v. FritoLay N. Am., Inc.*,
   961 F. Supp. 2d 1134 (N.D. Cal. 2013) ............................................... 5

21

22

*Wilson v. Hewlett-Packard Co.*,
   668 F.3d 1136 (9th Cir. 2012) ........................................................... 12

23

24

*Yumul v. Smart Balance, Inc.*,
   733 F. Supp. 2d 1117 (C.D. Cal. 2010) ........................................ 10, 11

25

26

*Zapata Fonseca v. Goya Foods Inc.*,
   No. CV-02559-LHK,
   2016 WL 4698942 (N.D. Cal. Sept. 8, 2016) .................................... 22

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

**Statutes**

Cal. Bus. & Prof. Code
  §§ 17200 *et seq.* .......................................................................... 4, 10, 22
  § 17203 .................................................................................................. 22
  §§ 17500 *et seq.* .......................................................................... 4, 10, 22
  § 17508 .................................................................................................... 9

Cal. Civ. Code
  §§ 1750 *et seq.* ...................................................................... 4, 10, 22, 23
  §§ 1790 *et seq.* ...................................................................... 4, 18, 19, 23

Cal. Com. Code § 2314 ............................................................................ 18, 19

Cal. Health & Safety Code § 111822.2(a) ................................................... 20

**Other Authorities**

Fed. R. Civ. P.
  8 ........................................................................................................... 23
  8(a) ...................................................................................................... 23
  8(a)(2) .................................................................................................. 23
  9(b) ............................................................................................... *passim*
  10(b) .................................................................................................... 19
  12(b)(1) ................................................................................................ 13
  12(b)(2) ................................................................................................ 24
  12(b)(6) .................................................................................................. 4
  12(f) ..................................................................................................... 23

U.S. Const. am. 5 ......................................................................................... 25

U.S. Const. art. III .......................................................................... 13, 14, 16

THINX'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

sf-4460208

## I.      INTRODUCTION

Plaintiffs Destini Kanan and Haley Burgess' First Amended Complaint ("FAC") (ECF No. 29) is fatally flawed for the same reasons Defendant Thinx Inc. identified in Plaintiff Kanan's original complaint.  Plaintiffs still base their claims primarily on the contention that they overpaid for Thinx Underwear[1] because it allegedly contains short-chain PFAS[2] that are supposedly "harmful" and pose a "safety risk."

Plaintiffs, however, do not allege facts that support any of the multiple assumptions necessary to make that claim sufficiently plausible to survive a motion to dismiss.  Plaintiffs once again rely on their purported "independent testing," but the FAC tells us virtually nothing about that testing other than the conclusion that it supposedly reveals short-chain PFAS in whichever Thinx Underwear Plaintiffs tested.  The FAC tells us nothing about the types or levels of short-chain PFAS that are harmful or that Plaintiffs' alleged testing found in Thinx Underwear, let alone any facts that support the conclusion that Thinx Underwear contains the type or levels of short-chain PFAS that could even pose a risk of harm.  Notably, Plaintiffs concede that "thousands" of different PFAS chemicals exist, while the sources they rely on point to two types of short-chain PFAS chemicals and one short-chain PFAS compound that may pose a risk of harm, which Plaintiffs do not specifically allege are present in Thinx Underwear.  This disconnected and unsupported speculation does not come close to alleging a plausible claim for relief.

Nor do Plaintiffs plausibly allege any harm to themselves.  Plaintiff Burgess does not allege that she experienced any effect at all from wearing the Thinx Sport underwear she purchased.  Plaintiff Kanan claims she experienced two extraordinarily common infections during the time she wore Thinx underwear, with

---

[1] Plaintiffs define this term to include all of the styles of period underwear Thinx sells.  (FAC ¶ 1.)

[2] PFAS stands for polyfluroalkyl substances.  (FAC ¶ 5.)

1

no facts whatsoever to suggest that, unlike the thousands of women who experienced the same infections at the same time without wearing Thinx Underwear, her experience was in any way linked to the Thinx Underwear she wore.  Plaintiffs also fail to offer allegations sufficient to support the final link required for their claims:  exposure and reliance to alleged misrepresentations.  While Plaintiffs point to various statements on Thinx's website and in its advertising, they still fail to identify any specific representation or statement to which *they* were exposed or read, let alone relied on.  Indeed, Plaintiffs do not differentiate between statements made before and after Plaintiffs' alleged purchases.

Plaintiffs' newly-added allegations fail for the same reasons.  Plaintiffs seek to concoct claims that Thinx misrepresents that Thinx Underwear are "organic," but ignore what Thinx actually represents, which is only that the *cotton* used in *certain* (not all) styles of Thinx Underwear is organic—a fact that Plaintiffs do not dispute.  Plaintiffs further take issue with Thinx's use of Agion®, an EU-regulated treatment that uses safe, non-migratory silver zeolite and silver copper zeolite.  Plaintiffs claim that Thinx's representation that the Agion treatment uses non-migratory silver is false, but once again, Plaintiffs do not allege facts to support their speculation.

For the reasons set forth herein, Plaintiffs have once again failed to satisfy minimal pleading requirements, and the FAC should be dismissed with prejudice.[3]

## II.   RELEVANT BACKGROUND

Thinx produces washable, reusable underwear designed to replace or be used in conjunction with other menstrual products.  (FAC ¶ 23.)  Plaintiffs seek to represent consumers who purchased Thinx Underwear—defined as Thinx Cotton Brief, Cotton Bikini, Cotton Thong, Sport, Hiphugger, Hi-Waist, Boyshort, French

---

[3] A copy of Plaintiffs' FAC is attached as **Exhibit 1.**

Cut, Cheeky, and Thong.  (*Id.* ¶ 1.)  Plaintiffs' claims regarding Thinx Underwear are premised on three contentions: (1) they allegedly contain short-chain PFAS (*id.* ¶¶ 5, 33); (2) they are not organic because they allegedly contain short-chain PFAS (*id.* ¶ 81); and (3) they allegedly contain migratory silver and copper nanoparticles (*id.* ¶¶ 5, 189).  Plaintiffs allege Thinx misrepresented the "true nature" of Thinx Underwear by claiming, among other things, the underwear is safe and free from harmful chemicals.  (*Id.* ¶ 7.)

**PFAS Allegations.**  PFAS are a group of man-made chemicals that may be used to enhance the performance of textiles and apparel.  (*Id.* ¶ 35.)  In claiming Thinx Underwear contain short-chain PFAS, Plaintiffs rely on testing by Dr. Graham Peaslee reported in Sierra magazine (*id.* ¶ 34) and their own "independent third-party testing" (*id.* ¶¶ 31).  According to Plaintiffs, Dr. Peaslee "discovered high levels of *fluorine* in the underwear he tested," and, based on this finding, he "opined" that the underwear "*likely*" contained PFAS.  (*Id.* ¶ 34 (emphasis added).)  Plaintiffs point to no authority suggesting high levels of fluorine conclusively or even probably establish the presence or amount of PFAS.  Moreover, Plaintiffs do not allege which Thinx Underwear Dr. Peaslee actually tested.  (*Id.*)

Plaintiffs' allegations regarding their "independent" testing are equally deficient.  They offer only the vague and conclusory assertion that the testing found "short-chain PFAS chemicals within Thinx Underwear at material and above trace amounts."  (*Id.* ¶ 33.)  Plaintiffs do not specify what type of short-chain PFAS was found, what amount was found, what constitutes "material and above trace amounts," or any basis to suggest that the amounts they found pose any risk of harm.  (*Id.* at ¶ 33.)  Nor do they provide any details whatsoever regarding the testing itself, including which Thinx Underwear were tested.

**Allegations Regarding Organic Cotton Underwear.**  Plaintiffs attempt to leverage their PFAS allegations into a claim that Thinx misrepresents that its products are "organic."  (*Id.* ¶ 65.)  Plaintiffs allege that Global Organic Textile

Standards ("GOTS") do not permit the use of PFAS in organic textiles.  (*Id.* ¶¶ 61-62.)  Thinx, however, does not represent that Thinx Underwear is organic.  Rather, Thinx produces only a few, select styles of underwear made with organic cotton,[4] and accurately represents that the cotton contained in those products is organic.  (*Id.* ¶¶ 28, 66.)

*Agion Allegations.*  Agion is a non-migratory antimicrobial treatment which uses silver and silver copper zeolites to reduce odor in textiles.  (*Id.* ¶¶ 47, 48.) Plaintiffs allege Agion is unsafe because it contains silver and silver copper nanoparticles/zeolites that they claim are "known to migrate."  (*Id.* ¶ 57.)  They cite no support for this claim.  Plaintiffs also do not cite any authority or study to suggest that Agion specifically is unsafe, migratory, or harmful to the female body.

Based on these allegations, Plaintiffs assert seven causes of action: (1) breach of express warranty; (2) breach of implied warranty and violation of California Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 *et seq.*; (3) unjust enrichment; (4) violation of California's False Advertising Law ("FAL"), Cal. Bus & Prof. Code § 17500 *et seq.*; (5) violation of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (6) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; and (7) negligent failure to warn.

## III.   LEGAL STANDARD

A complaint must be dismissed for failure to state a claim under Rule 12(b)(6) if the plaintiff fails to allege "enough facts to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to . . . [t]hreadbare

---

[4] See concurrently filed Request for Judicial Notice ("RJN"), Ex. A (https://www.shethinx.com/collections/thinx-organic-cotton/products/thinx-cotton-brief?variant=50491926407).

recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Aberin v. Am. Honda Motor Co.*, No. 16-cv-04384-JST, 2018 WL 1473085, at *2 (N.D. Cal. Mar. 26, 2018) (quotation omitted).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (citation omitted).  Where, as here, documents referenced in Plaintiffs' FAC contain statements that contradict its allegations, the Court should "not [] assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Paulsen v. CNF, Inc.*, 559 F.3d 1061, 1071 (9th Cir. 2009) (citations and quotation marks omitted); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) (citation omitted).

## IV.    ARGUMENT

### A.    Plaintiffs Fail to Satisfy Rule 9(b)'s Heightened Pleading Requirement for Claims Sounding in Fraud

Plaintiffs' claims indisputably sound in fraud; accordingly, Rule 9(b) requires that Plaintiffs plead their claims with particularity.  *See Wilson v. FritoLay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1139 (N.D. Cal. 2013).  With the exception of their "organic" claim, which is based on a mischaracterization of what Thinx actually represents, Plaintiffs' claims are predicated entirely on the allegation that Thinx misrepresents the safety of its underwear.  Plaintiffs' safety allegations still primarily relate to PFAS, and are based on a tenuous thread of assumptions and speculation, none of which comes close to demonstrating that the type or level of short-chain PFAS allegedly found in Thinx Underwear poses a safety risk to Plaintiffs (or to anyone).  Plaintiffs' new-found allegations relating to the Agion treatment are if anything still more speculative:  Plaintiffs assert that the non-migratory silver used in the treatment *may* be migratory, and that migratory silver may pose health risks, but they never square the circle with credible factual allegations that Thinx Underwear contains migratory silver that poses health risks. Finally, all Plaintiffs' claims fail because they continue to offer conclusory

allegations about what they supposedly saw in Thinx's advertising and on its website, but never identify *any* specific statements they saw or relied on.  In every respect, Plaintiffs fail to satisfy the requirement that their fraud-based averments must plead specific facts that establish the "'who, what, when, where, and how' of the misconduct charged.'"  *Kearns v. Ford Motor Co.*, 567 F.3d. 1120, 1124 (9th Cir. 2009) (citation omitted).

### 1.  Plaintiffs' allegations are conclusory, vague, and unsupported and fail to state either affirmative misrepresentations or omissions

Despite having the benefit of Thinx's motion to dismiss the original complaint (ECF No. 26), Plaintiffs still do not—likely because they cannot—satisfy Rule 9(b)'s heightened pleading requirements.  Plaintiffs' claims, old and new, are premised on allegations that are conclusory, speculative and either unsupported by, or contrary to, the facts.  All Plaintiffs' claims fail as a result.

***PFAS Allegations.***  Plaintiffs do not allege specific facts demonstrating that Thinx Underwear contain harmful short-chain PFAS at harmful levels.  While Plaintiffs complain that Thinx fails to test for short-chain PFAS,[5] the overwhelming majority of the materials Plaintiffs rely on relate to *long*-chain PFAS, *which Plaintiffs concede are not present in Thinx Underwear*.  (FAC ¶¶ 39, 72.)  As the FAC further concedes, *only* long-chain PFAS are regulated.  (*See id*. ¶ 40.)  With respect to short-chain PFAS, Plaintiffs rely on the National Toxicology Program's research into "*potential* adverse health outcomes" based on studies of *two specific* short-chain PFAS chemicals and a *single* short-chain PFAS compound that are far from conclusive.  (RJN, Ex. B ("Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says,") and Ex. C ("Research Overview

---

[5] Inexplicably, Plaintiffs allege that Bureau Veritas (the third-party laboratory Thinx uses for its own testing) "does not specifically offer PFAS testing." (FAC ¶ 79.)  The original complaint, however, alleged that Bureau Veritas only looked "for the presence of 15" PFAS out of the "more than 5,000 different types of PFAS." (Compl. ¶ 53.)

THINX'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

sf-4460208

of Per- and Polyfluoroalkyl Substances (PFAS)," from the National Toxicology Program).) (emphasis added).  Critically, Plaintiffs do not allege that either of these two PFAS chemicals or the PFAS compound were found in the Thinx Underwear they purportedly tested, or that they even tested for these PFAS.  (*See* FAC ¶ 31.)

Plaintiffs' allegations regarding their supposed "independent" testing are conclusory and vague, perhaps deliberately so to mask the testing's failure to establish facts that support Plaintiffs' claim that Thinx Underwear contains short-chain PFAS that pose a safety risk.  Thus, Plaintiffs fail to state the type or level of short-chain PFAS the testing supposedly disclosed, nor do they offer any facts to support the claim that the types or levels allegedly found present any risk of harm.  Plaintiffs' conclusory assertion that the testing revealed the presence of short-chain PFAS "at material and above trace amounts" (*id*. at ¶¶ 33, 65, 83) is evasive and insufficient.  If the levels were "material" what were they?  Is "material" just another way of saying "above trace"?  How much is above "trace" and were the levels and type of short-chain PFAS found sufficient to pose a risk of harm?  What levels of short-chain PFAS *do* pose a risk of harm? Plaintiffs do not offer facts to answer any of these questions.

Nor do Plaintiffs provide any information regarding the testing itself:  not the styles or number of pairs of underwear tested, the standard relied on for the testing, what specifically Plaintiffs tested for, when the testing was done, or even the test results themselves.  In short, there is absolutely nothing in the FAC to lend credibility to Plaintiffs' alleged testing results.  Nor can Plaintiffs rely on Dr. Peaslee's testing results to support their claims.  As Plaintiffs concede, Dr. Peaslee did not test for or find the actual presence of any PFAS in Thinx underwear.  (*See id*. ¶ 34, 70.)

Plaintiffs have exclusive knowledge of their alleged testing—the basis of their claim Thinx Underwear contains short-chain PFAS—and must plead facts to support that claim.  *See Padilla v. Costco Wholesale Corp.*, No. 11-C-7686, 2012

7

1    WL 2397012, at *4 (N.D. Ill. June 21, 2012) (dismissing claims for failure to meet

2    Rule 9(b)'s particularity requirements where plaintiff alleged that "numerous

3    clinical studies" have shown the products "do not work" but did not provide any

4    specifics as to why or how the products did not work).

5         ***Organic Cotton.***  Contrary to Plaintiffs' claims, Thinx does not represent that

6    Thinx Underwear is organic.  Rather, it represents *only* that the cotton used in three

7    of the nine styles of underwear at issue is organic.  (RJN, Ex. A.)  For example,

8    Thinx expressly states that the Organic Cotton brief is made with 95% organic

9    cotton, but that the remainder of the underwear is made of other materials.  (RJN,

10   Ex. D (https://www.shethinx.com/collections/thinx-organic-cotton/products/thinx-

11   cotton-brief?variant=50491926407).)  In contrast, the product label for the

12   Hiphugger does not include any "organic" representation whatsoever, and for this

13   reason cannot be the basis for an alleged "organic" misrepresentation.  (*See* FAC

14   ¶ 30.)  Similarly, as Plaintiffs acknowledge, the FAQ section of the Thinx website

15   states: "'Are they really organic? Yes, our Organic cotton line is ***made with organic***

16   ***cotton***.'"  (*Id*. ¶¶ 66 (emphasis added).)  Thinx's representations regarding

17   "organic" are accurate, and Plaintiffs' claims fail as a result.

18        Even if Thinx had represented Thinx Underwear is organic—it did not—

19   Plaintiffs' "organic" claims would still fail to satisfy Rule 9(b).  Plaintiffs claim that

20   Thinx Underwear cannot be organic because it allegedly contains short-chain

21   PFAS, which is prohibited by GOTS.  (*Id*. ¶¶ 62, 65.)  Plaintiffs' claim that Thinx

22   purportedly held out a GOTS certificate issued to another company also

23   mischaracterizes what Thinx actually represents.  (*Id*. ¶ 64.)  The certificate

24   Plaintiffs rely on clearly identifies the company to which it was issued—Ocean

25   Lanka—and it clearly applies to Ocean Lanka's cotton, which is the cotton

26   contained in certain Thinx Underwear.  Thus, Plaintiffs' "organic" claims fail.

27        ***Agion Treatment.***  Thinx states that it uses Agion®, an "EU regulated

28   treatment that uses safe, non-migratory silver zeolite and silver copper zeolite," in

8

Thinx Underwear.  (FAC ¶ 47.)  Plaintiffs allege that the silver zeolite and silver copper zeolite in Agion is migratory, not non-migratory (*id.* ¶ 56), but offer no factual allegations to support that claim.  Plaintiffs do not allege that the use of Agion treatment has been deemed by *any* regulatory body or scientific research to be unsafe.  Plaintiffs rely on an October 2018 report that discusses consideration of the possibility that silver zeolites and silver copper zeolites may be phased out of use in Europe.  But Plaintiffs' own allegations make clear that not only have these substances not been phased out at this time, but also that no determination has been made that they will *ever* be phased out.  *(Id.* ¶ 53.)  Plaintiffs' allegations that Thinx's representations regarding Agion are false are thus pure speculation about what a study *might* conclude, and are not sufficient to support Plaintiffs' claim.  *See, e.g., Tubbs v. AdvoCare Int'l, LP*, No. CV 17-4454 PSG (AJWx), 2017 WL 4022397, at *6 (C.D. Cal. Sept. 12, 2017) (granting dismissal of complaint "premised on an impermissible lack-of-substantiation theory," where cited articles "contain[ed] no allegations regarding Defendant's conduct or its products, and certainly no indication that the representations upon which Plaintiffs reputedly relied were false"); *see Cohen v. Ainsworth Pet Nutrition, LLC*, 2:20-cv-05289-MCS-AS, 2021 U. S. Dist. LEXIS 15923, (C.D. Cal. Jan. 21, 2021) (dismissing claims with prejudice where plaintiffs relied on ongoing FDA study).[6]

Next, Plaintiffs conclude—based on the absence of a study "demonstrating the success of 'nonmigratory' silver additives"—that Thinx's representation that its Agion treatment is non-migratory is "untrue and misleading."  (FAC ¶ 56.)  This is a textbook substantiation claim, which must be dismissed under *Kwan v. SanMedica Int'l*, 854 F.3d 1088 (9th Cir. 2017).  There, the Ninth Circuit concluded that individuals may not bring suit under California consumer protection statutes alleging that advertising claims lack substantiation.  *Id.* at 1091 (citing Cal.

---

[6] A Westlaw citation was not available for *Cohen* at the time of filing.

Bus. & Prof. Code § 17508).  Because no private right of action exists for a substantiation claim, a plaintiff "must allege facts *affirmatively disproving* Defendant's claims."  *Id.* (emphasis added); *see also Stanley v. Bayer Healthcare LLC*, No. 11cv862-IEG (BLM), 2012 WL 1132920, at *4 (S.D. Cal. Apr. 3, 2012) ("alleged lack of substantiation does not render claims false and misleading"). Plaintiffs have not done so here, and their claims regarding the use of the Agion treatment should be dismissed.

### 2.     Plaintiffs have not sufficiently alleged exposure or reliance

Exposure and reliance are essential elements for a fraud-based claim under California's FAL, CLRA, and UCL, as well as for an alleged breach of express warranty claim that, like Plaintiffs' express warranty claim here, is based on advertising representations rather than an actual written warranty.  *Kearns*, 567 F.3d. at 1126 (elements of fraud in California include reliance); *Moncada v. Allstate Ins. Co.*, 471 F. Supp. 2d 987, 997 (N.D. Cal. 2006) (express warranty requires reliance on defendant's representation).  Rule 9(b) requires that Plaintiffs plead facts identifying the specific representations that they read and relied on.  *See Palmer v. Apple, Inc.*, No. 5:15-cv-05808-RMW, 2016 WL 1535087, at *5 (N.D. Cal. Apr. 15, 2016) (allegations were insufficient under Rule 9(b) where plaintiff did not allege "which specific advertisements or statements he personally saw"); *Anthony v. Pharmavite*, No. 18-CV-02636-EMC, 2019 WL 109446, at *5 (N.D. Cal. Jan. 4, 2019) (dismissing complaint for failure to "plead with the particularity required by Rule 9(b) what [the plaintiffs] saw, relied upon, and understood with respect to [defendant's] labeling").  Plaintiffs' failure to identify any specific representation that they saw, much less relied on, requires dismissal.  *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1124 (C.D. Cal. 2010) (dismissing claims because "the complaint does not adequately identify the packaging that [plaintiff] saw and on which she relied").

While the FAC alleges a variety of representations on Thinx's website and in

10

1   its advertising, neither Plaintiff identifies any specific statement she personally saw

2   on Thinx's website or in its advertising, or even offers any detail about the

3   statements she allegedly saw, let alone any facts to establish that she relied on such

4   a statement.  Plaintiff Kanan alleges that she learned about Thinx Underwear

5   through its online advertising, but she does not specify when or what she saw or

6   where she saw it.  (FAC ¶ 86.)[7]  She further alleges that she relied on "factual

7   representations. . . including those representations made on Thinx's own website, in

8   its online advertising and marketing materials, and the product's label and

9   packaging" (*id.* ¶ 88), but she never tells us what exactly those representations *said*.

10  Rather, Plaintiff Kanan offers only the vague and self-serving assertion that the

11  "representations all indicate that the Thinx Underwear was safe for normal use and

12  fit for the purpose of collecting and/or absorbing menstrual fluid and other vaginal

13  discharge."  (*Id.*)  She alleges with similar vagueness that Thinx stated that the

14  underwear was "organic," but of course, as discussed above, that is *not* what Thinx

15  actually said.  In any event, Plaintiff Kanan's failure to identify the specific

16  statements that she saw and relied on requires that, pursuant to Rule 9(b), her

17  claims be dismissed.

18         Plaintiff Burgess's allegations are similarly vague, general and self-serving;

19  like Plaintiff Kanan, she never identifies any specific statement she allegedly saw

20  and relied on.  Plaintiff Burgess alleges that she "viewed Thinx's website" (*id.*

21  ¶ 97); she does not allege that she viewed any other Thinx advertising or

22  representations.  She offers the conclusory allegation that she "relied on Thinx's

23  representations on its website that the product was safe, free of harmful chemicals,

24  and certified for ecological safety," but she never identifies any specific

25

26  ⁷ Plaintiff Kanan's purchase allegations also lack specificity; she vaguely alleges
    she purchased in 2019 "several varieties" of Thinx Underwear from Nordstrom,

27  including the "organic cotton brief."  (FAC ¶¶ 85, 89).  This is a departure from her
    original allegation that she had only purchased the Cotton Brief.  (*See* Compl. ¶¶ 1,

28  10.)  The other varieties are unidentified.

11

representation or what it said.  Plaintiff Burgess also alleges that she relied on the website's representations that "the product was organic" but of course, as discussed above, that is not what the website said.[8]  Moreover, she does not allege that she purchased any of the organic styles.  (*See id.* ¶ 94.)

Plaintiffs' failure to identify specific, misleading representations that they saw or relied on requires that their fraud-based allegations be dismissed.

### 3.    Plaintiffs' allegations also fail to state an omissions claim under Rule 9(b)

Plaintiffs' allegations are also insufficient to support an omissions claim under Rule 9(b).  *See Kearns*, 567 F.3d. at 1124 applying Rule 9(b) to omissions claims).  To state a claim for omissions, Plaintiffs must allege facts giving rise to an affirmative duty to disclose by establishing that the defendant either:  (1) is in a fiduciary relationship with the plaintiff, (2) has exclusive knowledge of material facts not known to plaintiff, (3) actively conceals a material fact from plaintiff, or (4) makes a partial representation while suppressing a material fact.  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1142 (9th Cir. 2012); *Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018) (affirming district court's dismissal of plaintiff's omission claims for failure to allege facts establishing a duty to disclose).

Plaintiffs fail to do so.  No fiduciary relationship exists between Thinx and Plaintiffs, and the "material facts" (according to Plaintiffs) are the studies, magazine report, and public comments Plaintiffs reference—none of which specifically involves Thinx Underwear, and all of which are publicly available.  These allegations demonstrate that Thinx did not have exclusive knowledge regarding the alleged "material facts," and certainly could not have actively concealed or suppressed them from Plaintiffs.  Accordingly, to the extent it is based

---

[8] Plaintiff Burgess further alleges that she "relied on Thinx's representations that the products were OEKO-TEX certified."  (FAC ¶ 98.)  She does not, however, claim that this representation is false.

THINX'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

sf-4460208

1  on omissions, Plaintiffs' claim fails.

2  ### B.   Plaintiffs Lack Article III Standing

3  Rule 12(b)(1) requires that a complaint be dismissed if the plaintiff lacks

4  Article III standing.  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115,

5  1121-22 (9th Cir. 2010).  To establish Article III standing, Plaintiffs must plead

6  (1) an "injury in fact," (2) causation, and (3) redressability.  *Lujan v. Defs. of*

7  *Wildlife*, 504 U.S. 555, 560-61 (1992).  Injury in fact requires "'an invasion of a

8  legally protected interest' that is 'concrete and particularized' and 'actual or

9  imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct.

10  1540, 1548 (2016) (citation omitted).  Plaintiffs must themselves have standing

11  before they can represent a class*.  See Warth v. Seldin*, 422 U.S. 490, 501 (1975)

12  ("[T]he plaintiff still must allege a distinct and palpable injury to himself, even if it

13  is an injury shared by a large class of other possible litigants.").  Plaintiffs here do

14  not and cannot allege that they sustained injury in fact, and accordingly their claims

15  must be dismissed.

16  ### 1.   Plaintiffs fail to allege an injury in fact

17  Plaintiffs have not pled an "injury in fact"—"the '[f]irst and foremost'

18  element a plaintiff must show to satisfy standing."  *Dutta v. State Farm Mut. Auto.*

19  *Ins. Co.*, 895 F.3d 1166, 1173 (9th Cir. 2018) (citation omitted).  While this Court

20  has recognized that "factual allegations tying an economic loss to a 'market effect'

21  are sufficient to establish an injury for standing purposes," the Court also has made

22  clear that a plaintiff may "not simply allege that [the product they purchased is]

23  defective, but rather offer detailed, non-conclusory factual allegations of the

24  product defect."  *Kaupelis v. Harbor Freight Tools USA, Inc.*, No. SACV 19-1203

25  JVS (DFMx), 2019 WL 6998661, at *4 (C.D. Cal. Oct. 9, 2019) (quoting *In re*

26  *Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1157 (C.D. Cal. 2011)).  Despite the

27  opportunity to amend, Plaintiffs have not done so.  Plaintiffs do not plausibly allege

28  that they (or anyone else) has experienced any of the health risks they claim are

associated with short-chain PFAS or with the *non*-migratory silver contained in Agion.  Plaintiffs' allegations that Agion contains migratory silver are unsupported by the actual facts alleged, as discussed above.  Speculation that product contents or features may someday, under some unknown circumstances and at some unspecified level, pose a risk of injury to someone, does not suffice.  Nor does adding the allegation that the product should have cost less based on such speculation and conjecture rescue such insufficient allegations of injury.

*Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009), rejected precisely such an effort to establish injury in fact based on a speculative and conjectural supposed safety risk.  There, the plaintiffs alleged that iPods could cause hearing loss if played at unsafe levels.  *Id.* at 957.  The Ninth Circuit explained that the plaintiffs' injury was "conjectural and hypothetical" because plaintiffs had not pled "facts showing that hearing loss from iPod use is actual or imminent, as required."  *Id.* at 961.  The court further observed that while the "plaintiffs' alleged economic harm center[ed] on their claim that the iPod has a defect (an inherent risk of hearing loss), which caused their iPods to be worth less than what they paid for them," they had "failed to allege a cognizable defect under any of their asserted claims."  *Id.*  In short, "conclusory allegations of economic loss stemming from a speculative future risk of harm cannot establish Article III standing unless plaintiffs plead 'something more.'"  *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 969 (N.D. Cal. 2015); *see also id.* at 969 (distinguishing *In re Toyota* because "[w]hile it was appropriate for that court to infer a market effect from widespread and well-documented acceleration problems, here the market effect is hypothetical").

Here, Plaintiffs offer no concrete, non-speculative allegations, let alone the "detailed, non-conclusory factual allegations" required to establish economic harm. *See Kaupelis*, 2019 WL 6998661, at *4.  As discussed, they fail to offer factually supported allegations that Thinx Underwear contain short-chain PFAS, let alone that they contain short-chain PFAS of a type or at a level that *may* pose a risk of

14

harm.  Plaintiffs' assertion, with no additional factual information whatsoever, that their supposed testing found short-chain PFAS of an unspecified type at an unspecified level in (again unspecified) Thinx underwear does not cross that bar. (*See* Section IV.A.1.)  Nor do they offer any other factual allegations, let alone detailed and specific allegations, to demonstrate that the Thinx Underwear are otherwise defective or have harmed anyone.

Plaintiffs allege that the "adverse effects" of PFAS exposure is "seen in the liver and thyroid," and that "exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.  (FAC ¶¶ 41-42.)  But Plaintiffs offer no facts to "connect the dots" and establish that Thinx Underwear contains short-chain PFAS of a type or level that poses a risk of such effects. Plaintiffs also allege that the adverse impact of migratory silver exposure is "bacterial vaginosis, increased risk of sexually transmitted diseases, increased risk of pregnancy complications and other similar conditions."  (*Id.* ¶ 52.)  But again, Plaintiffs offer no facts to even suggest that the silver in the Agion treatment is migratory, let alone that *migratory* silver is found in any Thinx Underwear at a level that poses a risk to the wearer.  Rather, Plaintiffs seek to turn press reports and studies about the theoretical risks of certain substances at certain levels into a concrete and particularized threat of harm, with no specific facts whatsoever about those substances in the products at issue.

Further, Plaintiffs do not allege facts suggesting that they (or anyone else) have experienced any of these alleged health effects as a result of wearing Thinx Underwear.  Plaintiffs allege that "[s]ome users of Thinx Underwear have experienced physical symptoms including, but not limited to, urinary tract infections and yeast infections."  (FAC ¶ 109.)  But Plaintiffs provide no citation or authority whatsoever for this allegation, notwithstanding that they include numerous footnotes with citations purportedly supporting various other allegations, and the fact that Thinx raised this very issue in its first motion to dismiss.  *See* ECF

No. 26 at p. 13.  Nor, critically, do Plaintiffs cite to any evidence that these extraordinarily common conditions were *caused* by exposure to Thinx Underwear, or even that they occurred at a higher rate than among a similar population of women who did *not* wear any Thinx Underwear.

Plaintiff Kanan similarly alleges that "during the time period in which [she] used the Thinx underwear she also experienced recurrent yeast infections and urinary tract infections."  (FAC ¶ 90.)  (Plaintiff Burgess does not allege even this much.)  But again, Plaintiffs do not allege that the Thinx Underwear *caused* these physical symptoms, or even that Plaintiff Kanan did not experience such infections before she ever wore Thinx Underwear.  "[C]orrelation is not causation, neither for purposes of science nor the law."  *See Becerra v. Dr Pepper/Seven UP, Inc.*, No. 17-cv-05921 (WHO), 2018 WL 1569697, at *6 (N.D. Cal. Mar. 30, 2018).

Finally, Plaintiffs cannot rely on their "economic loss" theory of injury to save their speculative and insufficient allegations that Thinx Underwear posed a health risk.  Plaintiffs cannot base an allegation that they overpaid for products based on a "defect"—a supposed health risk—that is not plausibly alleged.  And they certainly cannot cure their lack of injury and standing by doing so. Accordingly, the FAC should be dismissed for lack of standing.  *See Whitson v. Bumbo*, No. C 07–05597 MHP, 2009 WL 1515597, at *6 (N.D. Cal. Apr. 16, 2009) ("[T]he instant complaint oscillates between tort and contract law language but fails to allege any actual injury."); *Boysen v. Walgreen Co.*, No. C 11–06262 SI, 2012 WL 2953069, at *7 (N.D. Cal. July 19, 2012) ("Put simply, plaintiff only alleges that he purchased and consumed the fruit juices, but that the levels of lead and arsenic in defendant's product were unsatisfactory to him. . . .  [T]his is not sufficient to establish Article III injury in fact" (citation omitted).).

## 2.   Plaintiffs lack standing to seek injunctive relief

Plaintiffs have no standing to seek injunctive relief.  "For injunctive relief, which is a prospective remedy, the threat of injury must be 'actual and imminent,

not conjectural or hypothetical.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citation omitted). Plaintiffs seek "an injunction to enjoin [Thinx] from continuing its deceptive advertising and sales practices." (FAC ¶ 197.) But Plaintiffs do not and cannot allege the likelihood of future harm necessary to obtain this kind of injunctive relief.

The Ninth Circuit requires a plaintiff seeking injunctive relief to allege a "*desire* to purchase the product" in the future. *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1088 (9th Cir. 2020); *see Cordes v. Boulder Brands USA, Inc.*, No. CV18-6534 PSG (JCx), 2018 WL 6714323, at *4 (C.D. Cal. Oct. 17, 2018) (finding no standing for injunctive relief in lie of the "complete absence of any allegations about Plaintiff's future intentions with regard to the Product"). Here, Plaintiffs never say they want to purchase Thinx Underwear again; to the contrary, they allege that they have stopped purchasing Thinx Underwear. (FAC ¶¶ 92, 99.)

## C.   Plaintiffs' Warranty Claims Fail as a Matter of Law

### 1.   Plaintiffs fail to state a claim for breach of express warranty

To state a claim for breach of express warranty under California law, Plaintiffs must allege (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused the plaintiff's injury. *Mauro v. Gen. Motors Corp.*, No. CIV 5-07-892 ECD GGH, 2008 WL 2775004, at *8 (E.D. Cal. July 15, 2008). To satisfy the first element, Plaintiffs must "'identify a specific and unequivocal written statement' about the product that constitutes an 'explicit guarantee[ ].'" *Arroyo v. TP–Link USA Corp.*, No. 5:14-cv-04999-EJD, 2015 WL 5698752, at *10 (N.D. Cal. Sept. 29, 2015) (citation omitted). Plaintiffs do not satisfy this requirement. As discussed in Section IV.A.1, they do not plead facts that establish a misrepresentation and, accordingly, there can be no breach of warranty. *See, e.g., McKinnis v. Kellogg USA*, No. CV 07-2611 ABC (RCx), 2007 WL 4766060, at *5 (C.D. Cal. Sept. 19, 2007) ("Absent a [mis]representation" no "claim for breach of an express warranty.").

Further, Plaintiffs must allege the specific statements that they personally read and relied on to create the warranty; as discussed in Section IV.A.2, neither Plaintiff identifies a specific statement she saw, let alone relied on. *See In re NJOY, Inc. Consumer Class Action Litig.*, No CV 14-00428 MMM (RZx), 2014 WL 12586074, at *18 (C.D. Cal. Oct. 20, 2014) (dismissing express warranty claims where plaintiffs failed "plausibly to plead that they relied on the representations included on NJOY's packaging and in its marketing materials that purportedly constitute an express warranty"). Accordingly, Plaintiffs' claim for breach of express warranty must be dismissed.

### 2. Plaintiffs' implied warranty claims fail because Plaintiffs fail to allege that they purchased a product unfit for use

Plaintiffs assert two implied warranty claims under California law. They allege that Thinx "impliedly warranted that Thinx Underwear were of merchantable quality and fit for use." (FAC ¶ 145.) The California Uniform Commercial Code governs implied warranty claims involving sales of goods. *See* Cal. Com. Code § 2314.[9] Plaintiffs further allege that Thinx violated the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792. (*See* FAC ¶¶ 147, 150.)

These claims fail because Plaintiffs do not allege facts—as they must for either their UCC or Song-Beverly claim—showing that Thinx Underwear were unwearable or otherwise not fit for use, or that they did not perform as advertised or were not of the same quality as those generally accepted in the trade. *See* Cal. Com. Code § 2314; *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 26-27 (2007) (UCC implied warranty elements apply to Song-Beverly claim); *Birdsong*, 590 F.3d at 958 (breach of implied warranty occurs when a product "lacks even the

---

[9] Under California law, when an implied warranty claim based solely on whether the product "[c]onforms to the promises or affirmations of fact" on the packaging of the product, the implied warranty of merchantability claim rises and falls with the express warranty claims. *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1106 (N.D. Cal. 2017).

sf-4460208

1  most basic degree of fitness for ordinary use"); *Stearns v. Select Comfort Retail*
2  *Corp.*, No. 08-2746 JF, 2009 WL 1635931, at *8 (N.D. Cal. June 5, 2009) (implied
3  warranty "does not impose a general requirement that goods precisely fulfill the
4  expectation of the buyer" (citation omitted)).  In addition, Plaintiffs must (but fail
5  to) allege that they were harmed by the lack of expected quality.  Cal. Com. Code
6  § 2314; Judicial Council of California Civil Jury Instruction (CACI) Nos. 1231,
7  1232 (UCC); Judicial Council of California Civil Jury Instruction (CACI)
8  Nos. 3210, 3211 (Song-Beverly Act).  Further, Plaintiffs' "implied warranty"
9  claims are premised on exactly the same allegations as their breach of express
10  warranty and consumer protection claims, and thus fail for all the same reasons
11  discussed with respect to those claims.  The claims must be dismissed.

12  Plaintiffs' list of implied warranty statutes in all 49 other states (FAC ¶ 150)
13  it should be disregarded for at least three reasons.  Most fundamentally, Plaintiffs
14  lack statutory standing to invoke these statutes because they cannot sue based on
15  another state's warranty law for retail purchases they allegedly made in California.
16  *See Przybylak v. Bissell Better Life LLC*, No. CV 19-2038 PA (GJSx), 2019 WL
17  8060076, at *3 (C.D. Cal. July 19, 2019) ("Plaintiffs are both California citizens
18  who purchased Defendant's products in Los Angeles County.  Claims under other
19  states' [warranty] laws must be dismissed for lack of standing" (citation omitted).).
20  Further, this half-hearted effort to invoke other states' warranty laws fails both
21  because it alleges neither the elements of these laws nor facts establishing that they
22  were violated, and because Federal Rule of Civil Procedure 10(b) requires parties to
23  state claims in separately numbered paragraphs.  *See Bautista v. L.A. Cnty.*,
24  216 F.3d 837, 840-41 (9th Cir. 2000) (separate counts required to allow defendants
25  "to frame a responsive pleading," "understand the claims," and identify defenses
26  "applicable to one or more plaintiffs but not to the others").  Finally, as discussed in
27  Section IV.G, Plaintiffs cannot create standing to sue under the laws of states where
28  they do not reside by purporting to allege a nationwide class.

### D.     Plaintiffs' Negligent Failure to Warn Claim Should Be Dismissed

"Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer. . . did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about." *Chavez v. Glock, Inc*., 207 Cal. App. 4th 1283, 1305 (2012) (citation omitted).  Plaintiffs have failed to establish that Thinx did not act as a reasonably prudent manufacturer or that it owed them a duty.  A manufacturer of menstrual products has no duty to disclose individual ingredients. Indeed, Plaintiffs have acknowledged that the FDA does not require the disclosure of individual ingredients in menstrual hygiene products.[10]  (FAC ¶ 3.)  Moreover, "under . . . a negligence . . . theory of products liability, to recover from a manufacturer, a plaintiff must prove that a defect caused injury."  *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 479 (2001); Judicial Council of California Civil Jury Instruction (CACI) No. 1222.  Plaintiffs fail to plead that any defect in the Thinx Underwear caused them injury.  (*See* Sections IV.A.1 and IV.B.1.)

Indeed, because Plaintiffs fail to allege these necessary elements, their case does not resemble a products liability action.  Consider a typical case, *Trejo v. Johnson & Johnson*, 13 Cal. App. 5th 110 (2017), where a jury found a defendant manufacturer of over-the-counter ibuprofen liable for negligent failure to warn.  *Id.* at 127.  The jury found that the defendant knew or should have known about the dangers of its products when used in a foreseeable manner, the defendant should have known that users would not realize the potential danger, and the failure to warn was a substantial factor in causing harm.  *Id.*  The Court of Appeal reversed because an *additional* element was required—whether a reasonable manufacturer would have provided a warning under these circumstances.  *Id.* at 141.

---

[10] California, where both Plaintiffs made their alleged purchases, recently passed the Menstrual Products Right to Know Act, which will apply to menstrual products manufactured on or after January 1, 2023.  *See* Cal. Health & Safety Code § 111822.2(a).

sf-4460208

1      None of these requirements is satisfied here.  Plaintiffs have not pled facts

2   establishing that Thinx Underwear caused them or anyone else harm.  Because they

3   fail to plead the actual "danger" that is allegedly present in the Thinx Underwear—

4   that the product contains either short-chain PFAS of a type and at a level that poses

5   a risk of harm or migratory silver—they have not pled a danger of which Thinx was

6   allegedly aware of and of which it failed to warn.  It further follows that Thinx

7   owed Plaintiffs no duty, including for the additional reasons discussed in

8   Section IV.A.3.  Accordingly, Plaintiffs' negligence claim should be dismissed.

9      Separately, Plaintiffs' negligence claim is barred by the economic loss rule,

10   which provides that "recovery of purely economic loss is foreclosed in the absence

11   of '(1) personal injury, (2) physical damage to property, (3) a 'special relationship'

12   existing between the parties, or (4) some other common law exception to the rule.'"

13   *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810, 820 (N.D. Cal. 2014) (citation omitted).

14   "'[P]laintiffs seeking economic losses must be able to demonstrate that either

15   physical damage to property (other than the defective product itself) or personal

16   injury accompanied such losses; if they cannot, then they would be precluded from

17   any tort recovery in strict liability or negligence.'"  *Ladore v. Sony Computer Ent.*

18   *Am., LLC*, 75 F. Supp. 3d 1065, 1075 (N.D. Cal. 2014) (citations omitted).

19      Plaintiffs do not allege personal injury or property damage, only that they

20   would not have purchased the product or would have paid less for the product had

21   they known the true nature of the product.  (FAC ¶ 93 (alleging Plaintiff Kanan

22   "did not receive the benefit of her bargain which she purchased the Thinx

23   Underwear" and "would have either not purchased the Thinx Underwear or paid

24   substantially less for it"); *id.* ¶¶ 100-101 (same allegations regarding Plaintiff

25   Burgess).).[11]  As this Court has held, the economic loss doctrine bars negligence

26

27   [11] Plaintiffs allege Plaintiff Kanan and "[s]ome users… experienced" urinary
tract and yeast infections (FAC ¶¶ 90, 109), but do not allege Thinx Underwear

28   *caused* these infections.  (*See supra* at Section IV.B.1.)

21

claims based on economic injury in consumer class actions.  *See, e.g.*, *Vavak v. Abbott Labs., Inc.*, No. SACV 10-1995 JVS (RZx), 2011 WL 10550065, at *4-6 (C.D. Cal. June 17, 2011) (negligence claims based solely on "purchase price" money damages barred by the "economic loss" rule where purchaser alleged that she would not have paid for allegedly defective baby formula); *Minkler*, 65 F. Supp. 3d at 820; *Ladore*, 75 F. Supp. 3d 1065 at 1075-76.  As Plaintiffs have not and cannot establish the required injury to avoid the economic loss doctrine, their negligent failure to warn claim should be dismissed as a matter of law.

**E.     Plaintiffs Are Not Entitled to Equitable Relief Because They Have an Adequate Remedy at Law**

Plaintiffs' UCL and FAL claims must be dismissed in their entirety under *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020), because they provide exclusively equitable relief, not damages, and Plaintiffs do not and cannot establish that they lack an adequate remedy at law.  *See* Cal. Bus. & Prof. Code §§ 17203 (UCL remedies), 17535 (FAL remedies); *Chowning v. Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx), 2016 WL 1072129, at *5 (C.D. Cal. Mar. 15, 2016) ("[D]amages. . . are not available under the UCL [or FAL]" (quotations omitted).).  The same is true for Plaintiffs' claim for unjust enrichment. *Zapata Fonseca v. Goya Foods Inc.*, Case No. CV-02559-LHK, 2016 WL 4698942 at *8 (N.D. Cal. Sept. 8, 2016).  *Sonner* further requires that Plaintiffs' CLRA claim be dismissed to the extent it seeks equitable relief, including injunctive relief.  *See, e.g., In re MacBook Keyboard Litig.*, No. 5:18-cv-02813-EJD, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020) ("[N]othing about the Ninth Circuit's reasoning [in *Sonner*] indicates that the decision is limited to claims for restitution.  In fact, numerous courts in this circuit have applied *Sonner* to injunctive relief claims.")

In *Sonner*, the Ninth Circuit affirmed dismissal of the plaintiff's UCL and CLRA claims for equitable restitution because the plaintiff did not plead "the inadequacy of remedies at law," and because the plaintiff sought money damages

22

under the CLRA.  *Id*. at 844 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).  Here, as in *Sonner*, nowhere in the FAC do Plaintiffs assert that money damages are insufficient to compensate them, let alone allege a single fact to support such an assertion.  Nor could they do so:  Plaintiffs seek monetary damages for their causes of action for violation of the CLRA (FAC ¶ 198), Song-Beverly Consumer Warranty Act and breach of implied warranties (*id*. ¶ 152) and in their Request for Relief (*id*. Request for Relief).  (*See also id*. ¶ 1 ("Plaintiffs seek damages and equitable remedies."), ¶ 121 ("including compensatory, exemplary, and statutory damages…").)  Because Plaintiffs do not and cannot plead that they lack adequate remedies at law, their claims for equitable relief must be dismissed.

**F.    Plaintiffs' FAC Is Still Replete with Extraneous Allegation Which Should Be Dismissed or Stricken**

Rule 8(a)(2) requires Plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Further, under Rule 12(f), a party may move to strike "any redundant, immaterial, impertinent, or scandalous matter."  When presented with a complaint that violates Rule 8, the Court has discretion to strike extraneous matter under Rule 12(f).  *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1416 (N.D. Cal. 1995) ("When confronted with a complaint that runs afoul of Rule 8(a), the court . . . [may] use its power under [Rule] 12(f) to order stricken from the complaint redundant or immaterial matter.").

Plaintiffs' FAC continues to include immaterial and extraneous allegations that do not pertain to Thinx Underwear, Plaintiffs' purchases of or experience with the underwear, or statements by Thinx that no Plaintiff read or relied on or that are otherwise relevant to the causes of action:

- Thinx's "innovative" marketing approach, on which no Plaintiff claims to have relied (FAC ¶¶ 25, 192);

- Long-chain PFAS, which Plaintiffs do not allege are present in Thinx Underwear (*id.* ¶ 39);

1        •       Actions of companies other than Thinx (*id.* ¶ 44);

2        •       Whether Thinx Underwear is organic and allegations regarding Ocean

3  Lanka's GOTS certification, which are unsupported and conclusory (*id.* ¶¶ 58-69,

4  81); and

5        •       Unsubstantiated claims regarding Agion treatment (*id.* ¶¶ 45-57).

6  Thinx accordingly requests that the Court strike Paragraphs 25, 39, 44-69, 81, and

7  192 of the FAC.

### G. The Court Lacks Personal Jurisdiction Over Thinx for the Claims of Putative Non-California Class Members

10      Plaintiffs bring this case on behalf of themselves and "all persons residing in

11  the United States who purchased Thinx Underwear."[12] (FAC ¶ 117.)  But Plaintiffs

12  cannot represent a nationwide class when this Court would lack personal

13  jurisdiction over the non-California class members.  *See Bristol-Myers Squibb Co.*

14  *v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017).

15  Plaintiffs cannot meet their burden to establish either general or specific jurisdiction

16  as to the claims of the non-California putative class members, requiring dismissal

17  of their claims under Rule 12(b)(2).

18      Plaintiffs acknowledge that Thinx is a Delaware corporation with its

19  principal place of business in New York.  (FAC ¶ 15.)  Accordingly, the Court

20  lacks general jurisdiction over Thinx.  *See Daimler AG v. Bauman*, 571 U.S. 117,

21  136-39 & n.19 (2014) (courts have general jurisdiction over corporations only in:

22  (1) the corporation's state of incorporation; or (2) the state where the corporation

23  has its principal place of business).

24      The Court also lacks specific jurisdiction over Thinx with respect to the

25  claims of putative class members residing outside of California.  In *Bristol-Myers*,

---

[12] Thinx reserves its right to move to compel arbitration.  Any putative class member who made a purchase on Thinx's website is subject to the binding arbitration provision in Thinx's Terms and Conditions.  This is just one of the many challenges Plaintiffs face for class certification.

24

the United States Supreme Court found that, for a court to exercise specific

jurisdiction over a defendant there must be an "affiliation between the forum and

the underlying controversy," and this connection must be established for each

individual plaintiff.  *Id.* at 1780 (citation omitted).  Although the Supreme Court

left "open the question whether the Fifth Amendment imposes the same restrictions

on the exercise of personal jurisdiction by a federal court," *id.* at 1784, federal

courts interpreting *Bristol-Myers* have concluded that it precludes nationwide class

actions in forums where there is no general jurisdiction.  *See, e.g.*, *Carpenter v.*

*PetSmart, Inc.*, 441 F. Supp. 3d 1028, 1037 (S.D. Cal. 2020) (dismissing

nationwide class allegations for lack of personal jurisdiction under *Bristol-Myers*).[13]

As in *Bristol-Myers*, the claims of the putative out-of-state class members are

brought in a forum state with no alleged nexus to their claims.  Plaintiffs have failed

to establish any facts to show that these class members were injured in California,

or that their claims have any connection to Thinx's conduct within California.  *See*

*Bristol-Myers*, 137 S. Ct. at 1781.

## V.    CONCLUSION

For all these reasons, Thinx respectfully requests that the Court dismiss

Plaintiffs' FAC in its entirety, with prejudice.

Dated:    April 15, 2021                    MORRISON & FOERSTER LLP


                                             By:/s/ Purvi G. Patel
                                                  Purvi G. Patel

                                             **Attorneys for Defendant**
                                             **Thinx Inc.**

---

[13] *But see Robinson v. Unilever United States, Inc.*, No. CV-173010 DMG, 2018 WL 6136139, at *3 (C.D. Cal. June 25, 2018) (deferring ruling on *Bristol-Myers* issues to class certification); *Simon v. Ultimate Fitness Grp., LLC*, No. 19 Civ. 890 (CM), 2019 WL 4382204, at *4 (S.D.N.Y. Aug. 19, 2019) (explaining diverging views among federal courts over applicability of *Bristol-Myers*).

sf-4460208

# EXHIBIT 1

Alex R. Straus, SBN 321366
alex@whitfieldbryson.com
**WHITFIELD BRYSON LLP**
16748 McCormack Street
Los Angeles, CA 91436
Telephone: (917) 471-1894
Facsimile: (310) 496-3176
*Plaintiffs' Attorneys*

*Additional attorneys on signature page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DESTINI KANAN and HALEY BURGESS, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>THINX INC.,<br><br>          Defendant. | CASE NO. **2:20-cv-10341-JVS-JPR**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1. BREACH OF IMPLIED WARRANTY**<br>**2. BREACH OF EXPRESS WARRANTY**<br>**3. UNJUST ENRICHMENT** **(In the Alternative)**<br>**4. VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW, Cal. Bus. & Prof. Code § 17500,** *et seq.*<br>**5. VIOLATION OF CALIFORNIA LEGAL REMEDIES ACT, Cal. Bus. & Prof. Code § 1750,** *et seq.*<br>**6. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code § 17200,** *et seq*<br>**7. NEGLIGENT FAILURE TO WARN** |

1

Exhibit 1, Page 26

Plaintiffs Destini Kanan and Haley Burgess ("Plaintiffs") bring this First Amended Class Action Complaint against Defendant Thinx Inc. ("Defendant"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## NATURE OF THE CASE

1.      This is a civil class action brought by Plaintiffs on behalf of consumers who purchased Defendant's Thinx Cotton Brief, Cotton Bikini, Cotton Thong, Sport, Hiphugger, Hi-Waist, Boyshort, French Cut, Cheeky, and Thong ("Thinx Underwear"[1]), which are used for personal hygiene purposes to collect and/or absorb menstrual fluid. Plaintiffs seek damages and equitable remedies for themselves, and for the putative Class.

2.      Defendant designs, formulates, manufactures, markets, advertises, distributes, and sells the Thinx Underwear to consumers throughout the United States, including in the state of California. Its products are sold online on its website, as well as at various online and brick-and-mortar retailers.

3.      Consumers, including Plaintiffs, willingly pay a premium for this personal hygiene product compared to cheaper disposable alternatives such as tampons. This is because consumers, including Plaintiffs, would like an easier, safer, and more sustainable approach to feminine hygiene care compared to traditional single-use feminine hygiene products.

---

[1] The design, manufacture, and materials of the Cotton Brief, Cotton Brief, Cotton Bikini, Cotton Thong, Sport, Hiphugger, Hiphugger, Hi-Waist, Hi-Waist, Boyshort, French Cut, Cheeky, and Thong Underwear are substantially similar, if not identical.

4.      Through its uniform, widespread, nationwide advertising campaign, Thinx has led consumers to believe that Thinx Underwear is a safe, healthy choice for women, and that it is free of harmful chemicals.

5.      In reality, Thinx Underwear contains harmful chemicals, including multiple polyfluoroalkyl substances ("PFAS") and silver nanoparticles, which are a safety hazard to the female body.

6.      Plaintiffs' independent testing has confirmed the existence of these harmful chemicals in Thinx's products using industry standard testing. The presence of these chemicals contradicts all of Thinx's unvarying representations that the product is nontoxic, harmless, sustainable, organic, and otherwise safe for women and the environment.

7.      Thinx has knowingly and willfully concealed and misrepresented the true nature of Thinx Underwear to consumers by engaging in, *inter alia*, the following actions, as set out more fully herein:

a.  Representing that Thinx underwear is a safe and healthy choice for menstrual protection;

b.  Representing that Thinx Underwear is free of harmful chemicals;

c.  Concealing the true nature of the chemicals in Thinx Underwear;

d.  Misrepresenting and/or concealing the results of third-party testing;

e.  Holding out Thinx Underwear as having qualities and/or certifications that it does not possess;

f.  Concealing the true nature of the "anti-odor" technology it uses in Thinx Underwear;

g.  Representing that Thinx Underwear is free of toxic metals and/or nanoparticles;

h.  Representing that its cotton Thinx Underwear is organic;

i. Representing that Thinx Underwear is "sustainable," despite the presence of chemicals which are known to be harmful to the environment.

8. Thinx's misbranding is intentional, and it renders the Thinx Underwear worthless or less valuable. If Thinx had disclosed to Plaintiffs and putative Class Members that Thinx Underwear contained harmful chemicals, such as PFAS, Plaintiffs and putative Class Members would not have purchased Thinx Underwear or they would have paid less for the Thinx Underwear.

9. As a result of Thinx's misconduct and misrepresentations, Plaintiffs and putative Class Members have suffered injury in fact, including economic damages.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some Members of the proposed Class are citizens of a state different from Defendant.

11. This Court has personal jurisdiction over Defendant because it transacts business in the United States, including in this District, has substantial aggregate contacts with the United States, including in this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the state of California, and further, because Plaintiffs purchased the Thinx Underwear in this District.

12. In accordance with 28 U.S.C. § 1391, venue is proper in this District because this District is where a substantial part of the conduct giving rise to Plaintiffs' claims occurred, where Defendant transacts business, and where Plaintiffs purchased the Thinx Underwear.

**PARTIES**

13.     Plaintiff Destini Kanan is a citizen of California residing in San Fernando, Los Angeles County.

14.     Plaintiff Hayley Burgess is a citizen of California residing in San Francisco, San Francisco County.

15.     Defendant Thinx, Inc. is incorporated in Delaware with its principal place of business in New York, New York.

**FACTUAL ALLEGATIONS**

16.     Every day, around the world, some 800 million women and girls menstruate.[2]

17.     Throughout history, women have required products to hygienically manage their menstruation. Until very recently, commercially available feminine hygiene products in the United States were limited to disposable tampons and pads.

18.     Health concerns about feminine hygiene products date back to the 1980s, when tampons were first linked to toxic shock syndrome, a potentially life-threatening condition.[3]

19.     Currently, there is significant public health concern about the chemicals used in feminine hygiene products.[4] Potential negative health effects stemming from the chemicals in tampons and pads, in addition to environmental concerns related to single-use plastics, have caused many women to seek out alternative menstrual hygiene products.

20.     Industry research shows that increased demand for alternative menstrual hygiene products has largely been driven by young women in the 18-34-year-old

---

[2] https://www.worldbank.org/en/news/feature/2020/05/28/menstrual-hygiene-day-2020
[3] https://my.clevelandclinic.org/health/diseases/15437-toxic-shock-syndrome
[4] https://www.womensvoices.org/2018/06/05/new-tampon-testing-reveals-undisclosed-carcinogens-and-reproductive-toxins/

FIRST AMENDED CLASS ACTION COMPLAINT

Exhibit 1, Page 30

category who cite environmental and health concerns about traditional disposable period products.[5]

21.    According to a study conducted by the sustainability marketing firm Shelton Group, nearly 40% of women aged 18-34 have switched or are considering switching to reusable products to manage their periods. [6] Sustainability generally refers to a concern for how the use of resources will impact the environmental, social, and economic health of future generations.[7]

### Defendant's Business

22.    Thinx, Inc., well aware of the demand for reusable menstrual hygiene products, has quickly become a leader in the alternative menstrual product market. The company was founded in 2011 with the purported mission of empowering women by providing "safe, comfortable, and sustainable options for people with periods and bladder leaks."[8]

23.    Thinx Underwear are washable, reusable underwear designed to replace pads and tampons, or to be worn with tampons and menstrual cups for extra protection. In other words, they are "underwear that absorb your period."[9] Thinx Underwear uses "signature, innovative technology" that in addition to absorbing menstrual flow also wicks moisture, controls odors, and prevents leaks.[10]

24.    Without exception, every advertisement, marketing campaign, instructional video, and public statement produced and distributed in relation to Thinx's products encourages customers to use the Thinx Underwear the same way as traditional menstrual products and/or underwear.

---

[5] https://www.nonwovens-industry.com/issues/2019-11/view_features/feminine-hygiene-manufacturers-shift-focus/
[6] *Id.*
[7] https://www.sustain.ucla.edu/what-is-sustainability/
[8] https://www.shethinx.com/pages/thinx-it-works
[9] https://www.shethinx.com/pages/thinx-faq
[10] https://www.shethinx.com/pages/thinx-it-works

FIRST AMENDED CLASS ACTION COMPLAINT

25.    Thinx, Inc. has been widely praised for its innovative approach to women's healthcare. From its inception, Thinx has used a candid, personal approach to connect with its customers by openly discussing menstruation and its surrounding taboos in its advertising and marketing materials. In the words of former CEO Miki Agrawal, "It's not [advertising] copy, it's just conversation."[11]

26.    Thinx products have been marketed and advertised to women across a variety of platforms, including online advertisements, Facebook and Instagram mobile video ads, television commercials, and print advertisements.

27.    Because Thinx is aware of growing concerns surrounding traditional single-use menstrual products, especially among younger women, it has always positioned its Thinx Underwear as a safe, effective, and sustainable alternative from an honest and trustworthy brand. A statement from their website is reproduced below:[12]

> At its core, Thinx Inc. was founded to provide safe, comfortable, and sustainable options for people with periods and bladder leaks. Customer safety is important to us, and so is your trust. That's why we'll always be honest and transparent about how our products are made. From rigorous absorbency testing, to objective third-party tests of our finished products, here are all the steps we take to uphold the highest standards of product safety.

---

[11] https://www.thedrum.com/news/2016/03/07/its-not-copy-its-just-conversation-ceo-thinx-miki-agrawal-brands-clever-subway

[12] https://www.shethinx.com/pages/thinx-product-safety-standards

7

FIRST AMENDED CLASS ACTION COMPLAINT

28.   On Defendant's website, in a section titled "FAQ", the following representations appear[13]:

**Are Thinx free of harmful chemicals?**

Absolutely! We take customer health and safety seriously, which is why all Thinx Inc. products are rigorously tested for harmful chemicals, and independently certified through STANDARD 100 by OEKO-TEX®, which includes REACH requirements [20.HUS.04850 | HOHENSTEIN HTTI]. We're proud to say that third party testing has never revealed any harmful chemical levels in Thinx Inc. products.

**Are they really organic?**

Yes, our Organic Cotton line is made with organic cotton!

**How do Thinx control odor?**

The wicking layer of our signature period-absorbing technology has an application of non-migratory silver, commonly used in performance wear and medical devices to control odor and the spread of bacteria. "Non-migratory" means it won't come off your undies and that it only responds to bacteria *on the fabric*, not on your skin (so your vaginal microbiome stays fresh and balanced!).

---

[13] https://www.shethinx.com/pages/thinx-faq

8

29.   On its website, on a page called "Product Safety," Defendant makes the following additional claims[14]:

> All Thinx Inc. underwear are rigorously tested for harmful chemicals, and independently certified through STANDARD 100 by <u>OEKO-TEX®</u>, which includes <u>REACH</u> requirements [20.HUS.04850 | HOHENSTEIN HTTI]. This OEKO-TEX® certification means every component—from fabric to trim—is thoroughly tested and certified for ecological safety. Our finished products also undergo third-party testing by <u>Bureau Veritas</u>, an accredited, globally recognized facility. We're committed to third-party testing because it puts your safety first, ensuring that all results are honest and objective.

> **Do Thinx Inc. products contain toxic metals or nanoparticles?**

> No, Thinx Inc. products do not contain toxic metals or engineered nanoparticles. The anti-odor layer in our products is treated with Agion®, an EU regulated treatment that uses safe, non-migratory silver zeolite and silver copper zeolite. These compounds stay on the surface of the underwear and don't travel into your body.

---

[14] https://www.shethinx.com/pages/thinx-product-safety-standards

9

Exhibit 1, Page 34

30.     Thinx's product label indicates that it is made of several different fabrics, but does not list additional ingredients. An example of a Thinx Hiphugger underwear label is reproduced below:



**Plaintiffs' Testing**

31.     Plaintiffs sought independent third-party testing to determine whether Thinx Underwear contained any harmful chemicals.

32.     The method used in Plaintiffs' independent testing is the industry standard for detecting and determining whether materials, such as Thinx underwear, comply with quality and safety standards.

33.     Plaintiffs' independent testing from a third-party lab found short-chain PFAS chemicals within Thinx Underwear at material and above trace amounts. This non-conforming ingredient found within Thinx Underwear is material to Plaintiffs, customers, and potential class members.

**PFAS Chemicals**

34.     Thinx first came under scrutiny in early 2020 when reporter Jessian Choy wrote that she had sent several pairs of Thinx Underwear to Dr. Graham Peaslee, a nuclear scientist at the University of Notre Dame, for analysis. After testing, Dr. Peaslee discovered high levels of fluorine in the underwear he tested, in addition to finding the presence of copper and zinc. Based on his findings, Dr. Peaslee opined that due to the high levels of fluorine in the underwear, they likely contained polyfluoroalkyl substances ("PFAS"). Ms. Choy reported her findings in an article in Sierra magazine, published on January 7, 2020.[15]

35.     PFAS are a category of man-made chemicals which, *inter alia*, may be used to enhance the performance of textiles and apparel.

36.     PFAS chemical treatments are typically used on textiles in order to make them water repellant and/or stain resistant, and are frequently seen in outdoor apparel.

37.     While there are thousands of PFAS chemicals in existence, they are all categorized as either "long-chain" or "short-chain" based on the amount of carbon atoms they contain. Long-chain PFAS chemicals contain more than 8 carbon atoms, while any PFAS chemicals containing less than 8 carbon atoms are considered short-chain. All PFAS contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and in human bodies.[16]

---

[15] *See* https://www.sierraclub.org/sierra/ask-ms-green/my-menstrual-underwear-has-toxic-chemicals-it (last accessed November 10, 2020)
[16] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html

38.     Humans can be exposed to PFAS through a variety of ways, including ingestion, inhalation, and skin absorption.[17]

39.     Long-chain PFAS chemicals have been phased out of use in the United States and Europe due to their known toxicity to humans and the environment. Long-chain PFAS chemicals are bioaccumulative, meaning they build up in the body over time. These chemicals are sometimes called "forever chemicals" and have been associated with a variety of negative health effects for humans, including cancer. Long-chain PFAS chemicals would not be expected to appear in textiles.

40.     Short-chain PFAS chemicals are currently used in the apparel industry as a replacement for the eliminated long-chain PFAS chemicals. There are no long term studies to indicate whether short-chain PFAS chemicals are in fact safer for consumers; in fact, there are studies to suggest that they pose similar health risks to long-chain PFAS—including bioaccumulation.[18]

41.     Recently, the U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as their long-chain counterparts.[19] Their 2019 study found that both long and short-chain PFAS affected the same organ systems, with the greatest impact seen in the liver and thyroid hormone.[20]

42.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[21] This is a significant concern given the current public health issues surrounding COVID-19.

---

[17] *Id.*
[18] *See* https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33
[19] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html
[20] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html
[21] https://www.atsdr.cdc.gov/pfas/health-effects/index.html

First Amended Class Action Complaint

Exhibit 1, Page 37

43.     Furthermore, PFAS is known to migrate during laundering, meaning that clothing items which are treated with PFAS release the chemicals into waterways when they are washed.[22]

44.     As a result of emerging health and environmental concerns regarding short-chain PFAS, many apparel companies, including North Face and Patagonia, have committed to phasing them out of their products completely.[23]

**Silver and Silver Copper Nanoparticles**

45.     Antimicrobial textile finishes first gained popularity in the early 2010s as a way to make clothing—particularly athletic clothing—odor-free. Silver and copper are the most common ingredients in antimicrobial clothing; they work by killing bacteria that causes odor.

46.     Antimicrobial clothing has decreased in popularity in recent years due to concerns associated with silver shedding from fabric and causing harm to humans and the environment.

47.     On its website, the following representation appears[24]:

> **Do Thinx Inc. products contain toxic metals or nanoparticles?**
>
> No, Thinx Inc. products do not contain toxic metals or engineered nanoparticles. The anti-odor layer in our products is treated with Agion®, an EU regulated treatment that uses safe, non-migratory silver zeolite and silver copper zeolite. These compounds stay on the surface of the underwear and don't travel into your body.

---

[22] https://www2.mst.dk/Udgiv/publications/2015/04/978-87-93352-12-4.pdf

[23] https://www.gq.com/story/outdoor-gear-pfas-study

[24] https://www.shethinx.com/pages/thinx-product-safety-standards

13

48.     Agion is an antimicrobial treatment which uses silver and copper nanoparticles to reduce odor in textiles.[25]

49.     Nanoparticles are small-scale substances which are undetectable to the human eye.[26] Whether they are engineered or naturally occurring, it is a nanoparticle's *size* that creates a hazard since these small particles can readily enter the human body through inhalation, ingestion, and skin absorption.[27]

50.     The mere fact that a nanoparticle is naturally occurring does not automatically render it "safer" than an engineered nanoparticle. Thus Thinx's representation that it does not include "engineered nanoparticles" is misleading to a reasonable consumer.

51.     Silver nanoparticles present a particular risk to the female body. One study found that the vaginal administration of silver nanoparticles caused ultrastructural changes to the vaginal mucosa, urethra and rectum, in addition to leading to migration of silver into the bloodstream.[28]

52.     Silver can also have adverse effects on beneficial vaginal bacteria. A recent study by the Food and Drug Administration determined that silver is effective in killing lactobacillus.[29] Lactobacillus is one of the most important beneficial bacteria types in a healthy vagina. Disruption of a woman's microbial balance can lead to overgrowth of harmful bacteria resulting in bacterial vaginosis, increased risk of sexually transmitted diseases, increased risk of pregnancy complications and other similar conditions.[30]

---

[25] https://www.sciessent.com/water-repellent-anti-odor-antimicrobial-products/agion-silver-antimicrobial/
[26] https://www.twi-global.com/technical-knowledge/faqs/what-are-nanoparticles
[27] *Id.*
[28] https://pubmed.ncbi.nlm.nih.gov/26816649/
[29] https://www.ncbi.nlm.nih.gov/pubmed/29481051
[30] https://www.ncbi.nlm.nih.gov/pubmed/28257809

14

53.     The European Chemicals Agency ("ECHA"), the European Union's chemical regulatory agency, has also expressed concern specifically about silver zeolites and silver copper zeolites due to their potential impact on human health and the environment.[31] Silver copper zeolite and silver zeolite—including those specifically manufactured by the maker of Agion-- are currently under review and awaiting a determination of whether they will be phased out of use in the EU due to these health concerns.

54.     The vagina and vulva absorb chemicals at a higher rate than other areas of the body.[32] The fabric treated with Agion is the innermost layer of the Thinx Underwear, which comes into contact with the vulvar tissue and vulvar/vaginal mucous membranes.

55.     Silver nanoparticles are also known to migrate from treated clothing when it is laundered.[33] As a result of this migration, silver nanoparticles which are toxic to aquatic organisms are introduced into waterways.[34]

56.     In fact, there is no published study demonstrating the success of "non-migratory" silver additives.[35] Thinx's representation that its Agion treatment is non-migratory is untrue and misleading.

57.     Thinx does not reveal to consumers that Agion is an antimicrobial, or that it contains silver and silver copper nanoparticles which are known to migrate and pose a safety hazard to the female body and the environment. Thus, Thinx's representations that its Underwear does not contain harmful chemicals, toxic metals or engineered nanoparticles is inaccurate and misleading.

**Thinx Underwear Is Not Organic**

---

[31] https://echa.europa.eu/documents/10162/bd098d67-3754-461c-bcde-107da470d726
[32] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3948026/
[33] https://pubs.acs.org/doi/10.1021/nn502228w
[34] https://ec.europa.eu/environment/integration/research/newsalert/pdf/risk_to_aquatic_ecosystems_from_silver_nanoparticles_394na1_en.pdf
[35] https://www.womensvoices.org/nanosilver-in-period-care-products/#fn13

58.     Thinx represents on its website and in all of its marketing and advertising materials that its cotton underwear is organic. Plaintiffs and Class Members believed they were purchasing organic products.

59.     "Organic" is generally understood as meaning an agricultural product that was produced without the use of chemical fertilizers, pesticides, or other artificial agents.[36]

60.     For any agricultural product to be sold as "organic" in the United States, no matter where in the world the crop is grown, the raw fiber must have been certified to the USDA's National Organic Program's (NOP) Crop Standard. This includes fibers such as cotton, flax and hemp.[37]

61.     Global Organic Textile Standards ("GOTS") is the worldwide leading processing standard for organic fibers. GOTS provides standards for when textiles may be classified as organic, including independent certification of the entire textile supply chain.[38]

62.     In March 2020, GOTS released its latest standards which specifically prohibit the use of PFAS chemicals in any stage of processing. This prohibition extends to both long-chain and short-chain PFAS chemicals.[39]

63.     Plaintiffs' testing found PFAS within the Thinx Underwear at above trace amounts using industry standard testing.

64.     Thinx is not eligible for GOTS certification for its finished cotton underwear because they contain PFAS. Despite this, Thinx released a GOTS "Certificate of Compliance" which was issued to a company called Ocean Lanka. (**See Exhibit A- GOTS Certificate**) Thinx held out this certificate as its own, even though

---

[36] *See* https://www.usda.gov/media/blog/2012/03/22/organic-101-what-usda-organic-label-means
[37] https://specialtyfabricsreview.com/2020/03/12/global-organic-textile-standard-gots-clarifies-organic-product-standards/
[38] https://www.global-standard.org/the-standard
[39] See **Exhibit B** at page 7.

16
FIRST AMENDED CLASS ACTION COMPLAINT

it knew, or at least should have known, that the certification did not refer to the finished Thinx Underwear.[40]

65.   The inclusion of PFAS, at material and above trace amounts, of PFAS renders the Thinx Underwear not organic. The Defendant never disclosed this fact to Plaintiffs and Class Members.

66.   In fact, on its website, under the Frequently Asked Questions Section, Thinx made the following representation: "Are they really organic? Yes, our Organic cotton line is made with organic cotton!"[41]

67.   Consumers are willing to pay a premium for items labeled organic in order to avoid exposure to chemicals.

68.   A reasonable consumer would not expect to find any harmful chemicals— let alone man-made "forever chemicals" like PFAS--  in an item labeled "organic."

69.   Plaintiffs and Class Members purchased the Thinx Underwear based upon their belief that the Thinx Underwear was organic. This belief was the direct result of Thinx's specific representations on its website and other written marketing materials, including tags affixed to the products. In reality, the Thinx Underwear do not hold any independent organic certifications nor do they conform to industry standards for organic clothing.

### Defendant's Material Misrepresentations

70.   In response to allegations that Thinx Underwear contains harmful chemicals, Defendant's current CEO, Maria Molland, released the following statement on February 6, 2020:

> At Thinx Inc., we take customer health and product safety very seriously. As a CEO, and mother to my three-year-old daughter, I'm personally committed to ensuring our products are designed

---

[40] https://medium.com/@thinx/how-i-know-thinx-inc-products-are-safe-1e509dde60d5
[41] See *supra* at page 8.

First Amended Class Action Complaint

Exhibit 1, Page 42

and made to be safe for people and the planet. Our products undergo the ***strictest safety testing available***, and it was the company's deep and abiding commitment to safe and sustainable products that made me want to join the team (emphasis added).

We take the recent allegations about PFAS in Thinx Inc. products very seriously. For that reason, we immediately engaged Dr. Chris Mackay, who is a toxicologist with Intertox, Inc., a leading toxicology company that has been testing and assessing the risks posed by chemical and biological agents for the last 25 years, to review Dr. Peaslee's findings.

Based on this review, Dr. Mackay stated: "The testing methods Dr. Peaslee used are inappropriate and only indicate the presence of elemental fluoride — not PFAS. Fluoride is a common salt that's in everyday products like toothpaste. All of us carry fluoride around in our bodies and secrete it through things like blood and sweat. The presence of fluoride doesn't mean something contains PFAS; what it does mean is that some time in the history of the sample, it came into contact with one or more of any number of products containing fluoride. On its own, it has no toxicological significance."

Thinx Inc. uses the ***most rigorous scientific methods available*** in the world to ensure safe and sustainable products (emphasis added). Our products are tested by Bureau Veritas, S.A. an international certification agency with an accredited third-party lab that is recognized and respected around the world. This testing demonstrates that Thinx Inc. products meet the globally recognized standards of OEKO-TEX and comply with REACH regulations. Our testing with Bureau Veritas confirms that ***no detectable long-chain PFAS chemicals*** are present in Thinx Inc. products (emphasis added).

We appreciate and hear the concern our customers have expressed. In the weeks since Sierra Club's reporting, we've completed further testing that goes above and beyond REACH regulations and OEKO-TEX standards. This additional third-party testing, available for download on our blog, reaffirmed that Thinx Inc. products meet and exceed global safety standards. Make no mistake, since our founding, we have made safety a

FIRST AMENDED CLASS ACTION COMPLAINT

pillar of our products and brand identity. We remain committed to these principles even in the face of unreliable science and misinformation.

We will always push for more disclosure from our manufacturers, and more rigorous industry standards for regulation and compliance — and we urge others in our category to do the same.[42]

71.     Ms. Molland's statement was designed to further mislead and confuse customers regarding the presence of harmful chemicals in Defendant's products in the following ways:

      a.  By misrepresenting the scope and nature of Thinx's safety testing;

      b.  By misrepresenting the presence of PFAS in its products; and

      c.  By providing consumers with third-party testing results which are incomplete or otherwise inaccurate;

72.      Despite the fact that Defendant claims to take the allegations of PFAS in Thinx Inc. products "very seriously," the third-party testing it released in response to these allegations tested only for long-chain PFAS chemicals, which are no longer present in the apparel industry at large. Defendant's third-party testing failed to test for any short-chain PFAS chemicals.

73.     As the designer and manufacturer of Thinx Underwear, Thinx knew, or at minimum should have known, that its underwear is treated with short-chain PFAS chemicals in order to enhance its performance by making it water and/or stain resistant.

74.      Thinx did not conduct any testing for short-chain PFAS chemicals (or did not disclose the results of any testing for short-chain PFAS chemicals) because it knew that any such testing would reveal the existence of these chemicals in the Thinx Underwear.

---

[42] https://medium.com/@thinx/how-i-know-thinx-inc-products-are-safe-1e509dde60d5 (last accessed November 10, 2020)

FIRST AMENDED CLASS ACTION COMPLAINT

75.     Ms. Molland's statement denying the existence of "long-chain PFAS chemicals" in its products was specifically designed to deceive consumers, as the average consumer would not be aware of the existence of short-chain vs. long-chain PFAS chemicals. Thinx would have no reason to explicitly disclaim its use of "long-chain PFAS chemicals" except for the purpose of misleading a reasonable consumer into believing ***no*** PFAS chemicals were present in its products.

76.     Despite Ms. Molland's representation that Thinx uses the "strictest safety testing" available, the testing it released to the public only tested for an extremely limited range of chemicals.

77.     The reports released by Thinx also contain discrepancies which suggest they are inauthentic, incomplete, and/or fraudulent, and intended to mislead consumers. On its Technical Report No. (7420)009-0036(S)(R2), a different report number appears on pages 3-7, which contain the substantive results of the testing. (**See Exhibit C, Thinx Testing**) A remark also appears on page 3 which states "The test report (7420)009-0036(S)(R) has been replaced with (7420)009-0036(S)(R2) to change fabric composition as per vendor request."

78.     Furthermore, Defendant has only released test results for a fraction of its products and failed to release the results of other tests which are referenced in its publicly available reports, including Volatile Organic Compounds (VOC) testing, which would be of great interest and concern to consumers.

79.     Despite Ms. Molland's representation that Thinx uses the "most rigorous scientific methods available" to ensure the safety of its products, Bureau Veritas, the third-party lab Defendant employed to test its products does not specifically offer PFAS testing.[43]

---

[43]https://www.cps.bureauveritas.com/sites/g/files/zypfnx236/files/media/document/CPS_QA_Softline_v6_15OCT15.pdf(last accessed November 10, 2020)

FIRST AMENDED CLASS ACTION COMPLAINT

80.     The apparel industry has various certifications available with regard to consumer safety. Thinx claims to be independently certified by OEKO-TEX, but based on information and belief, Thinx does not currently hold an OEKO-TEX certification.

81.     The apparel industry also has various certifications available with regard to organic fabrics. Thinx claims its underwear is made from organic cotton, but based on information and belief, Thinx does not hold any certification that its products are organic. Furthermore, finished products containing PFAS and antimicrobials cannot be considered organic. Any reference to its products as "organic" was inaccurate and misleading to consumers.

82.     Despite requests from journalists and consumers, Defendant has refused to provide any independent testing data from prior years.[44]

83.     As described *supra*, Plaintiffs' independent testing from a third-party lab found short-chain PFAS chemicals within Thinx Underwear at material and above trace amounts. This non-conforming ingredient found within Thinx Underwear is material to Plaintiffs, customers, and potential class members.

84.     Had Plaintiffs and consumers known that the Thinx Underwear they purchased contained is treated with short-chain PFAS chemicals and harmful antimicrobials, and was not 100% organic, they would not have purchased the Thinx products or would have paid less for them.

**Plaintiff Destini Kanan's Facts**

85.     In 2019, Plaintiff Kanan purchased the Thinx Underwear from a Nordstrom department store located at 21725 Victory Blvd, Canoga Park, California, 91303.

---

[44] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Exhibit 1, Page 46

86.     Ms. Kanan first learned about Thinx products through their online advertising, which appeared on various websites and social media platforms she visited, and included both videos and print advertisements.

87.     After becoming familiar with the product through its advertising, Ms. Kanan also visited the Thinx website, www.shethinx.com, which provides detailed information about the products.

88.     At the time of her purchase, Ms. Kanan relied on Defendant's factual representations about the Thinx Underwear, including those representations made on Thinx's own website, in its online advertising and marketing materials, and the product's label and packaging. These representations all indicate that that the Thinx Underwear was safe for normal use and fit for the purpose of collecting and/or absorbing menstrual fluid and other vaginal discharge. The Thinx representations also stated the cotton underwear was organic, and Ms. Kanan relied upon that representation.

89.     As a direct and intended result of Thinx's advertising, marketing, instructional videos, and other public statements, Ms. Kanan purchased several varieties of Thinx underwear, including the Thinx organic cotton brief, which she used according the product specifications.

90.     Despite Thinx's representations that its product was safe and fit for the purpose of menstrual protection, during the time period in which Ms. Kanan used the Thinx underwear she also experienced recurrent yeast infections and urinary tract infections.

91.     In or around August of 2020, Ms. Kanan also became aware of reports, including information published by Sierra Club, that Thinx underwear contained harmful chemicals.

92.     When Plaintiff Kanan learned that the Defendant mislabeled its products, including failing to disclose harmful chemicals the products contained, she stopped purchasing the Thinx Underwear.

FIRST AMENDED CLASS ACTION COMPLAINT

93.     Ms. Kanan did not receive the benefit of her bargain when she purchased the Thinx Underwear products that failed to conform to Thinx's material representations, including by containing ingredients that did not conform to the representations and to the warranties made by Defendant.  Had she been aware of the misrepresentations, she would have either not purchased the Thinx Underwear or paid substantially less for it.

**Plaintiff Haley Burgess' Facts**

94.     In May of 2020, Plaintiff Haley Burgess purchased Thinx Sport Underwear from Amazon.

95.     At the time of Ms. Burgess' purchase, Thinx was on public notice of the harmful chemicals in its product, and had further misrepresented the safety of its Underwear.

96.     Ms. Burgess purchased Thinx underwear because she was actively seeking an eco-friendly and chemical-free alternative to traditional feminine hygiene products.

97.     Ms. Burgess viewed Thinx's website, where she sought out information regarding the product's ingredients and certifications.

98.     In making her purchase, Ms. Burgess specifically relied on Thinx's representations on its website that the product was safe, free of harmful chemicals, and certified for ecological safety. Ms. Burgess also relied on Thinx's representations that the products were OEKO-TEX certified, as she was already familiar with this certification. The Thinx representations also stated the product was organic and Ms. Burgess relied upon that representation.

99.     When Ms. Burgess learned in 2021 that Thinx's products contained harmful chemicals, she stopped purchasing the underwear.

100.     Ms. Burgess did not receive the benefit of her bargain when she purchased the Thinx underwear products that failed to conform to Thinx's material

23

Exhibit 1, Page 48

representations, including by containing ingredients that did not conform to the representations and warranties made by Defendant.

101.    Had she been aware of the misrepresentations regarding chemicals present in the underwear, Ms. Burgess would not have purchased the Thinx underwear or would have paid less for them.

**Thinx's Misrepresentations and Omissions are Material To Reasonable Consumers**

102.    Defendant's Thinx Underwear is a niche product that is directed at a specific group of consumers: women who are hoping to purchase a safe, environmentally sustainable, and economical alternative to female hygiene products.

103.    The representations made by Thinx were made to cater to this niche consumer group and drive consumer sales.

104.    Plaintiffs and Class Members, purchased the Thinx product because of its specific representations: that it did not contain "harmful chemicals", was organic, and did not contain heavy metals or nanoparticles. Each of these representations were important to a reasonable consumer, such as Plaintiffs and Class Members, when purchasing the Thinx Underwear.

105.    As a direct and proximate result of Defendant's advertising, marketing, and public statements, consumers, including Plaintiffs, purchased Thinx Underwear for their personal use.

106.    Contrary to representations made by Defendant in marketing materials, advertisements, social media and instructional videos on its website, Thinx Underwear contains chemicals which are harmful to the female body and the environment.

107.    Contrary to representations made by Defendant in marketing matierials, advertisements, social media, and its website, the Thinx Underwear are not organic.

FIRST AMENDED CLASS ACTION COMPLAINT

Exhibit 1, Page 49

108.   Contrary to representations made by Defendant in marketing materials, advertisements, social media and instructional videos on its website, Thinx Underwear contains toxic metals and nanoparticles which are harmful to the female body and the environment.

109.   Some users of Thinx Underwear have experienced physical symptoms including, but not limited to, urinary tract infections and yeast infections.

110.   Defendant knew or should have known of these dangers, and has undertaken a deliberate and willful pattern of  conduct (including taking active measures) aimed at deceiving consumers, including Plaintiffs, to believe that Thinx Underwear are free of chemicals shown to cause adverse health outcomes.

111.   At all relevant times, Defendant knew the true nature of the chemicals contained in Thinx Underwear, but nevertheless marketed, advertised, and sold Thinx Underwear for use without adequately warning consumers that they contain chemicals that are dangerous and could be damaging to the user's health.

112.   Even after being alerted to the presence of harmful chemicals in its products in early 2020, Defendant continued to willfully conceal this information from consumers and otherwise affirmatively deceive consumers by representing that its products had been independently certified as being free from harmful chemicals.

113.   As a direct and proximate result of Defendant's concealment of the presence of chemicals, its deceptive representations, and its failure to sufficiently warn consumers about it or its harmful consequences prior to their purchase, Plaintiffs and other similarly situated consumers purchased and used Defendant's Thinx Underwear to their detriment.

114.   Plaintiffs and Class Members were unaware of the harmful chemicals at the time they purchased Thinx Underwear. Had Plaintiffs and Class Members known the Thinx Underwear contained harmful chemicals or was not organic, they would not have purchased the Thinx Underwear or would have paid substantially less for it.

Exhibit 1, Page 50

115.   Plaintiffs and all putative Class Members purchased Thinx Underwear which contained the same chemicals at the point of sale to the public.

116.   Plaintiffs and each of the Class Members have been damaged and suffered an injury in fact caused by Defendant's false, fraudulent, unfair, deceptive, and misleading practices, as set forth herein, and seek compensatory damages, injunctive relief, and such other and further relief as this Court deems just and proper.

117.   Given the massive quantities of Thinx Underwear believed to have been sold all over the country, this class action is the proper vehicle for addressing Defendant's misconduct and for attaining needed relief for those affected.

## CLASS ACTION ALLEGATIONS

Plaintiffs bring this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the members of the following class ("Nationwide Class"):

> During the maximum period permitted by law, all persons residing in the United States who purchased Thinx Underwear.

In addition, or alternatively, Plaintiffs bring this action on behalf of themselves and the members of the following subclass ("California Subclass"):

> During the maximum period permitted by law, all persons residing in the State of California who purchased Thinx Underwear.

118.   Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class

Counsel. Plaintiffs reserve the right to amend the Class definition and Subclass definitions as necessary.

119.   <u>Numerosity</u>: The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of tens of thousands of people geographically disbursed throughout the United States, and the state of California. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily   identifiable from information and records in the possession of Defendant and its authorized retailers.

120.   <u>Typicality</u>: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased The Thinx Underwear that were designed, manufactured, marketed, advertised, distributed, and sold by Defendant. Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for a Product containing chemicals which make Thinx Underwear harmful to the female body and not fit for its intended use. Furthermore, the factual basis of Defendant's misconduct is common to all Class Members because Defendant has engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members.

121.   <u>Commonality</u>: Common questions of law and fact exist as to all Members of the Class. These questions predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such common legal or factual questions include, *inter alia*:

> (a)   Whether Defendants omitted or failed to disclose material information to Plaintiffs and Class Members;

FIRST AMENDED CLASS ACTION COMPLAINT

(b)  Whether Defendant's alleged conduct violated public policy;

(c)  Whether the claims discussed above about Thinx Underwear are true, or are misleading or reasonably likely to deceive;

(d)  Whether Defendant omitted material facts and/or failed to warn reasonable consumers regarding the known risks of using the Thinx Underwear;

(e)  Whether the representations discussed herein were material to a reasonable consumer;

(f)  Whether Defendant engaged in false or misleading advertising;

(g)  Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the Thinx Underwear as not containing harmful chemicals and as being organic;

(h)  Whether Defendant breached the implied warranty of merchantability and the Song-Beverly Consumer Warranty Act, relating to Thinx Underwear;

(i)  Whether Defendant violated Cal. Bus. & Prof. Code § 17500, *et seq.* (FAL);

(j)  Whether Defendant violated Civil Code §§ 1750, *et seq.* (CLRA);

(k)  Whether Defendant violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* (UCL);

(l)  Whether Defendant was negligent in its failure to adequately test;

(m)  Whether Defendant was negligent in its failure to warn;

(n)  Whether Plaintiffs and the Class are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

(o)  Whether Plaintiff and the other Class members have been injured and the proper measure of their losses as a result of those injuries; and

(p)  Whether Plaintiff and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

28

FIRST AMENDED CLASS ACTION COMPLAINT

122.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer product, misrepresentation, and mislabeling class actions, and Plaintiffs intend to prosecute this action vigorously.

123.   <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Defendant will continue to commit the unlawful practices alleged herein, and Plaintiffs and Class Members will remain at an unreasonable and serious safety risk as a result of the Thinx Underwear containing chemicals and being non-organic. Defendant has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

124.   <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

125.   Plaintiffs know of no difficulty to be encountered in the maintenance of this  action that would preclude its maintenance as a class action.

126.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

## FIRST CLAIM FOR RELIEF
### Breach of Express Warranty

127.    Plaintiffs repeat and reallege all previous paragraphs, as if fully included herein.

128.    Plaintiffs bring this cause of action on behalf of themselves and the Class, and alternatively, the California Subclass against Defendant.

129.    Defendant manufactured, marketed, advertised, distributed, and sold the Thinx Underwear as part of their regular course of business.

130.    Defendant made affirmations of fact and promises on the Products' packaging and/or through the marketing and advertising described herein. As described herein, Defendant expressly represented and warranted that:

     a.  Thinx Underwear is free of harmful chemicals;

     b.  Thinx Underwear is free of toxic metals and/or nanoparticles;

     c.  Its cotton Thinx Underwear is organic;

     d.  Its Thinx Underwear is "sustainable," despite the presence of chemicals which are known to be harmful to the environment;

     e.  Thinx is a safe and healthy way for women to manage their menstruation.

131.    Defendant made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiffs, California Subclass Members and Defendant.

30

Exhibit 1, Page 55

132.   Plaintiffs and the Class Members purchased the Thinx Underwear either directly from Defendants or through authorized retailers such as Nordstrom and Amazon.

133.   Defendant breached the foregoing express warranties by placing the Thinx Underwear into the stream of commerce and selling them to consumers, when the Thinx Underwear contain harmful chemicals, heavy metals and/or nanoparticles; are not organic; and otherwise fail to contain the properties they were represented to possess. The presence of harmful chemicals rendered the Thinx Underwear unfit for their intended use and purpose and substantially impaired the use and value of the Thinx Underwear.

134.   As manufacturer, marketer, advertiser, distributer and seller of the Thinx Underwear, Defendant is the only party with knowledge and notice of the fact that the Thinx Underwear contains harmful chemicals.

135.   Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's breaches of warranties because they would not have purchased the Thinx Underwear if the true facts had been known. Specifically, Plaintiffs and Class Members have suffered economic damages in connection with the purchase of the Thinx Underwear.

136.   As a result of Defendant's breach of these warranties, Plaintiffs and Class Members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

**SECOND CLAIM FOR RELIEF**
**Breach of Implied Warranties and**
**Song-Beverly Consumer Warranty Act California Civil Code § 1790,** *et seq.*

31

137.   Plaintiffs bring this count on behalf of themselves and the Class, and alternatively, the California Subclass, and repeat and re-allege all previous paragraphs, as if fully included herein.

138.   As described above, Plaintiffs have standing to pursue this claim because they have suffered injury-in-fact and have lost money or property as a result of Defendant's conduct.

139.   Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of Thinx Underwear. Defendant knew or had reason to know of the specific use for which the Thinx Underwear was purchased, including that the Thinx Underwear was marketed, advertised, and sold as a replacement and/or supplement to traditional feminine hygiene products like pads and tampons that were "free of dangerous chemicals". Further, Defendant sold the Thinx Underwear as an organic product.

140.   By placing Thinx Underwear into the stream of commerce, Defendant provided Plaintiffs and Class Members with implied warranties that the Thinx Underwear were merchantable and fit for the ordinary purposes for which they were sold.

141.   However, Thinx Underwear are not fit for its ordinary purpose of being used as a menstrual products that is "free of harmful chemicals" because, inter alia, the Thinx Underwear contained PFAS, a chemical known to be dangerous and which renders the products not organic and unsuitable for its intended use.

142.   The inclusion of the PFAS within the Thinx Underwear render the Thinx Underwear unsuitable to be labeled as an organic product, and hence, makes the Thinx Underwear not suitable for normal use for that purpose.

143.   The problems associated with the chemicals in the materials, such as increased exposure to toxic PFAS chemicals and antimicrobials, prevent the Thinx Underwear from being safely used for their intended purpose, and thus constitutes a

breach of the implied warranty of merchantability. These problems are caused by Defendant's failure to adequately warn Plaintiffs and consumers of the chemicals and that Thinx Underwear is not safe to use as a menstrual products without significant exposure to toxic chemicals and risk of resulting injury.

144. That the Thinx Underwear contained chemicals and was non-organic was not undiscoverable by Plaintiffs and Class Members at the time that they purchased Thinx Underwear;

145. Defendant impliedly warranted that Thinx Underwear were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that Thinx Underwear manufactured, supplied, distributed, and/or sold by Defendant was safe and reliable for use as a menstrual products and (ii) a warranty that Thinx Underwear would be fit for its intended use.

146. Contrary to the applicable implied warranties, Thinx Underwear, at the time of sale and thereafter, was not fit for its ordinary and intended purpose of providing Plaintiffs and Class Members with a safe menstrual product. Instead, Thinx Underwear contain harmful chemicals, are not organic, and not suitable for use as a safe menstrual product, as alleged herein.

147. Defendant's actions, as complained of herein, breached the implied warranties that Thinx Underwear were of merchantable quality and fit for such use in violation of Cal. Civ. Code §§ 1791.1 and 1792.

148. Defendant's intended beneficiaries of these implied warranties were ultimately Plaintiffs and the Class, not third-party retailers, resellers or distributors who sold Thinx Underwear. Moreover, Defendant exercises substantial control over which outlets can carry and sell its Product, which are the same places that Plaintiffs and Class Members purchased Think Underwear. In addition, Defendant's warranties are in no way designed to apply to the third-party retailers, resellers or distributors who purchase Thinx Underwear in bulk and then sell them on an individual basis to consumers.

33

FIRST AMENDED CLASS ACTION COMPLAINT

Individual consumers are the ones who ultimately review the labels prior to making any purchasing decisions. Accordingly, these warranties are specifically designed to benefit the individual consumers who purchased Thinx Underwear.

149. Plaintiffs and Class Members sustained damages as a direct and proximate result of Defendant's breaches in that they paid a premium for Thinx Underwear that they would not have otherwise paid. Plaintiffs and the Class also did not receive the value of Thinx Underwear they paid for—Thinx Underwear are worthless or worth far less than Defendant represents due to the presence of chemicals and that they are not organic.

150. Defendant's conduct described in this complaint constitutes a breach of implied warranties under UCC §§ 2-314 and 2-315, as adopted in whole or in substance by statutes in all 50 states and the District of Columbia:

> Ala. Code § 7-2-314, *et seq.*; Alaska Stat. § 45.02.314, *et seq.*; Ariz. Rev. Stat. § 47-2314, *et seq.*; Ark. Code § 4-2-314, *et seq.*; Cal. Com. Code § 2314, *et seq.*; Colo. Rev. Stat. § 4-2-314, *et seq.*; Conn. Gen. Stat. § 42a-2-314, *et seq.*; 6 Del. C. § 2-314, *et seq.*; D.C. Code § 28:2-314, *et seq.*; Fla. Code § 672.314, *et seq.*; O.C.G.A. § 11-2-314, *et seq.*; Haw. Rev. Stat. § 490:2-314, *et seq.*; Idaho Code § 28-2-314, *et seq.*; 810 Ill. Comp. Stat. 5/2-314, *et seq.*; Ind. Code § 26-1-2-314, *et seq.*; Iowa Code § 554.2314, *et seq.*; Kan. Stat. § 84-2-314, *et seq.*; Ky. Rev. Stat. § 355.2-314, *et seq.*; La. Rev. Stat § 9:2800.53(6), *et seq.*; 11 M.R.S.A. § 2-314, *et seq.*; Md. Code Ann., Com. Law § 2-314, *et seq.*; Mass. Code 106, § 2-314, *et seq.*; Mich. Comp. Laws 440.2314, *et seq.*; Minn. Stat. § 336.2-314, *et seq.*; Miss. Code § 75-2-314, *et seq.*; Mo. Rev. Stat. § 400.2-314, *et seq.*; Mont. Code § 30-2-314, *et seq.*; Neb. U.C.C. § 2-314, *et seq.*; Nev. Rev. Stat. § 104.2314, *et seq.*; N.H. Rev. Stat. § 382-A:2-314, *et seq.*; N.J. Stat. § 12A:2-314, *et seq.*; N.M. Stat. § 55-2-314, *et seq.*; N.Y. U.C.C. § 2-314, *et seq.*; N.C. Gen. Stat. § 25-2-314, *et seq.*; N.D. Cent. Code § 41-02-30, *et seq.*; Ohio Rev. Code § 1302.26, *et seq.*; Okla. Stat. Tit. 12A, § 2-314, *et seq.*; Or. Rev. Stat. § 72.3130, *et seq.*; 13 Pa. Cons. Stat. § 2314, *et seq.*; R.I. Gen.

34

Exhibit 1, Page 59

Laws § 6A-2-314, *et seq.*; S.C. Code § 36-2-313, *et seq.*; S.D. Codified Laws § 57A-2-313, *et seq.*; Tenn. Code § 47-2- 314, *et seq.*; V.T.C.A., Bus. & C. § 2.314, *et seq.*; Utah Code § 70A-2-314, *et seq.*; Vt. Stat. Tit. 9A, § 2-314, *et seq.*; Va. Code § 8.2-314, *et seq.*; Wash. Rev. Code § 62A.2-314, *et seq.*; W. Va. Code § 46-2-314, *et seq.*; Wis. Stat. § 402.314, *et seq.*; and Wyo. Stat. § 34.1-2-314, *et seq.*

151. Plaintiffs and the Class have sustained, are sustaining, and will sustain damages if Defendant continues to engage in such deceptive, unfair, and unreasonable conduct.

152. As a result of the breach of the implied warranty of merchantability, Plaintiffs and Class Members are entitled to legal and equitable relief, including injunctive relief, damages, attorneys' fees, litigation expenses and costs, rescission, and/or other relief as deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

### THIRD CLAIM FOR RELIEF
**(In the Alternative)**
**Unjust Enrichment**

153. Plaintiffs bring this count on behalf of themselves and the Class, and alternatively, the California Subclass, and repeat and re-allege all previous paragraphs, as if fully included herein.

154. Plaintiffs and Class Members conferred a monetary benefit on Defendant, and Defendant had knowledge of this benefit. The retail price for Thinx Underwear listed online is $24.00 or more.

155. By its wrongful acts and omissions described herein, including selling the Thinx Underwear with chemicals and that were not organic, Defendant was unjustly enriched at the expense of Plaintiffs and Class Members.

156. Plaintiffs and Class Members' detriment and Defendant's enrichment were related to and flowed from the wrongful conduct alleged herein.

157. Defendant has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs and Class Members under circumstances in which it would be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the Thinx Underwear.

158. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased Thinx Underwear on the same terms or for the same price had they known that the Thinx Underwear contained harmful chemicals and were not organic.

159. Defendant either knew or should have known that payments rendered by Plaintiffs and Class Members were given and received with the expectation that The Thinx Underwear were free of chemicals, were organic, and capable of providing the benefits represented by Defendant in the labeling, marketing, and advertising of Thinx Underwear. It is inequitable for Defendant to retain the benefit of payments under these circumstances.

160. Plaintiffs and Class Members seek restitution from Defendant and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct and establishing a constructive trust from which Plaintiffs and Class Members may seek restitution.

161. When required, Plaintiffs and Class Members are in privity with Defendant because Defendant's sale of Thinx Underwear was either direct or through authorized third-party retailers and resellers. Purchase through authorized retailer and resellers is sufficient to create such privity because such authorized third parties are Defendant's agents for the purpose of the sale of Thinx Underwear.

162. As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and Class Members are entitled to restitution of,

36

Exhibit 1, Page 61

disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant for its inequitable and unlawful conduct.

## FOURTH CLAIM FOR RELIEF
### Violation of the California False Advertising Law ("FAL")
### California Business and Professions Code §§ 17500, *et seq.*

163.   Plaintiffs bring this count on behalf of themselves and the California Subclass and repeat and re-allege all previous paragraphs, as if fully included herein.

164.   The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

165.   The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

166.   It also is unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Id.

167.   Defendant, when it marketed, advertised and sold Thinx, represented to Plaintiffs and California Class Members that Thinx was free of chemicals and safe, despite the fact that Thinx Underwear contained harmful chemicals in above-trace amounts and was not safe.

168.   Further, Defendant sold the Thinx Underwear as an organic product when the Thinx Underwear contains ingredients that render it not organic.

169.   At the time of its misrepresentations, Defendant was either aware that Thinx contained chemicals, was not safe, and not organic, or was aware that it lacked the information and/or knowledge required to make such a representation truthfully.

Defendant concealed and omitted and failed to disclose this information to Plaintiffs and California Class Members.

170.   Defendant's descriptions of Thinx Underwear were false, misleading, and likely to deceive Plaintiffs and other reasonable consumers.

171.   Defendant's conduct therefore constitutes deceptive or misleading advertising.

172.   Plaintiffs have standing to pursue claims under the FAL as they reviewed and relied on Defendant's packaging, advertising, representations, and marketing materials regarding Thinx Underwear when selecting and purchasing Thinx Underwear.

173.   In reliance on the statements made in Defendant's advertising and marketing materials and Defendant's omissions and concealment of material facts regarding the quality and use of Thinx Underwear, Plaintiffs and California Class Members purchased Thinx Underwear.

174.   Had Defendant disclosed the true nature of Thinx Underwear (that it contains chemicals and is not organic), Plaintiffs and California Class Members would not have purchased Thinx Underwear or would have paid substantially less for it.

175.   As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including but not limited to money from Plaintiffs and California Class Members who paid for the Thinx Underwear, which contained chemicals and were not organic.

176.   Plaintiffs and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendant and by means of its deceptive or misleading representations, including monies already obtained from Plaintiffs and California Class Members as provided for by the California Business and Professions Code § 17500.

## FIFTH CLAIM FOR RELIEF
### Violation of the California Consumer Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*

177.     Plaintiffs bring this count on behalf of themselves and the California Subclass and repeat and re-alleges all previous paragraphs, as if fully included herein.

178.   The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, et seq.

179.   The CLRA applies to all claims of all California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

180.   Plaintiffs and California Class Members are "consumers" as defined by Civil Code § 1761(d).

181.   Defendant is a "person" as defined by Civil Code § 1761(c).

182.   Thinx qualifies as "goods" as defined by Civil Code § 1761(a).

183.   Plaintiffs and the California Class Members' purchases of Thinx Underwear are "transactions" as defined by Civil Code 25 § 1761(e).

184.   As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

    (a)     "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." Civil Code § 1770(a)(5); and

    (b)     "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

185.   Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5) and (a)(7) when it represented,

through its advertising and other express representations, that Thinx Underwear had benefits or characteristics that it did not actually have.

186.   As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA, and has made representations regarding Thinx Underwear's benefits or characteristics that it did not in fact have, and represented Thinx Underwear to be of a quality that was not true. Indeed, Defendant concealed this information from Plaintiffs and California Class Members.

187.   Thinx Underwear was not and is not "reliable," in that it is not safe and is of inferior quality and trustworthiness compared to other products in the industry. As detailed above, Defendant further violated the CLRA when it falsely represented that Thinx Underwear meets a certain standard or quality.

188.   As detailed above, Defendant violated the CLRA when it advertised the Thinx Underwear with the intent not to sell Thinx Underwear as advertised and knew that the Thinx Underwear was not as represented.

189.   Specifically, Defendant marketed and represented the Thinx Underwear as being free of harmful chemicals, when in fact the Underwear contains PFAS and silver and silver copper nanoparticles.

190.   Further, Defendant sold the Thinx Underwear as an organic product when the Thinx Underwear contains ingredients that render it not organic.

191.   Defendant's deceptive practices were specifically designed to induce Plaintiffs and California Class Members to purchase or otherwise acquire Thinx Underwear.

192.   Defendant engaged in uniform marketing efforts to reach California Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use Thinx manufactured by Defendant. Defendant's packaging, advertising, marketing, website and retailer product identification and specifications, contain numerous false and misleading statements regarding the quality, safety, and

reliability of Thinx. These include, inter alia, the following misrepresentations contained in its advertising, marketing, social media platforms, and website:

- "At its core, Thinx Inc. was founded to provide safe, comfortable, and sustainable options for people with periods and bladder leaks."

- "Customer safety is important to us, and so is your trust. That's why we'll always be honest and transparent about how our products are made."

- "All Thinx Inc. underwear are rigorously tested for harmful chemicals."

- "We're proud to say that third party testing has never revealed any harmful chemical levels in Thinx Inc. products."

- "Our products undergo the strictest safety testing available, and it was the company's deep and abiding commitment to safe and sustainable products that made me want to join the team."

- "Call me a feminist, call me an entrepreneur, call me whatever you want, but I believe in elevating humanity using conscious consumerism as the vehicle to do that."

- "We will always push for more disclosure from our manufacturers, and more rigorous industry standards for regulation and compliance — and we urge others in our category to do the same."

- "What does a more sustainable period look like? It just makes me feel better about my period."[45]

193.   Despite these representations, Defendant also omitted and concealed information and material facts from Plaintiffs and California Class Members.

194.   In their purchase of Thinx Underwear, Plaintiffs and California Class Members relied on Defendant's representations and omissions of material facts.

---

[45]

FIRST AMENDED CLASS ACTION COMPLAINT

Exhibit 1, Page 66

195.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

196.    On November 11, 2020, Plaintiff Kanan provided written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions pursuant to the Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1770, et seq. Defendant failed to take any corrective action.

197.    In accordance with Civil Code § 1780(a), Plaintiffs and the other California Class Members seek injunctive and equitable relief for Defendant's violations of the CLRA, including an injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

198.    Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiffs seek an order enjoining Defendant from the unlawful practices described above, a declaration that Defendant's conduct violates the Consumers Legal Remedies Act, money damages, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

### SIXTH CLAIM OF ACTION
**Violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.***

199.    Plaintiffs bring this count on behalf of themselves and the California Subclass and repeat and re-allege all previous paragraphs, as if fully included herein.

200.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

201.    Plaintiffs and Class Members who purchased Defendant's the Thinx Underwear suffered an injury by virtue of buying products in which Defendant misrepresented and/or omitted Thinx Underwear's true quality, reliability, safety, and use. Had Plaintiffs and Class Members known that Defendant materially misrepresented

Exhibit 1, Page 67

Thinx Underwear and/or omitted material information regarding its Thinx Underwear and its safety, they would not have purchased Thinx.

202. Defendant's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in the preceding paragraphs of this complaint.

203. There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its Thinx Underwear.

204. Plaintiffs and Class Members who purchased Defendant's Product had no way of reasonably knowing that Thinx Underwear was deceptively packaged, marketed, advertised, and labeled, was not safe, and unsuitable for its intended use. Thus, Plaintiffs and California Class Members could not have reasonably avoided the harm they suffered.

205. Specifically, Defendant marketed, labeled, and represented the Thinx Underwear as being free of harmful chemicals, when in fact the Underwear contains PFAS and silver and silver copper nanoparticles.

206. Further, Defendant sold the Thinx Underwear as an organic product when the Thinx Underwear contains ingredients that render it not organic.

207. The gravity of the harm suffered by Plaintiffs and Class Members who purchased Defendant's Thinx outweighs any legitimate justification, motive or reason for packaging, marketing, advertising, and labeling the Thinx Underwear in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiffs and California Class Members.

208. The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiffs and Class Members, were and are likely to deceive reasonable consumers by

obfuscating the true nature of Defendant's Thinx Underwear, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, et seq.

209.   As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiffs, on behalf of herself and all others similarly situated, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law.

## SEVENTH CLAIM OF ACTION
### Negligence – Failure to Warn

210.    Plaintiffs bring this count on behalf of themselves and Class Members and repeat and re-allege all previous paragraphs, as if fully included herein.

211.  At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling Thinx Underwear to Plaintiffs and the Class. At all relevant times, it was reasonably foreseeable by Defendant that the use of Thinx Underwear in its intended manner involved a substantial risk of injury and was unreasonably dangerous to Plaintiffs and the Class as the ultimate users of Thinx.

212.   At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that Thinx Underwear posed to Plaintiffs and Class Members, as the harmful condition of the Thinx Underwear existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

213.   Defendant, as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of Thinx Underwear, had a duty to warn Plaintiffs and the Class of all dangers associated with the intended use of Thinx Underwear.

214. At minimum, the duty arose for Defendant to warn consumers that use of Thinx Underwear could result in injury and become unreasonably dangerous.

215. Defendant was negligent and breached its duty of care by negligently failing to provide adequate warnings to purchasers and users of Thinx Underwear, including Plaintiffs and the Class, regarding the risks and potential dangers of Thinx Underwear.

216. Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Thinx Underwear contains materials and chemicals known to cause adverse health effects in humans and in the environment.

217. Defendant knew, or through the exercise of reasonable care, should have known of the harmful condition and dangers associated with using Thinx Underwear as described herein, and knew that Plaintiffs and Class Members could not reasonably be aware of those risks. Defendants failed to exercise reasonable care in providing Plaintiffs and the Class with adequate warnings.

218. As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of Thinx Underwear, including its intended use, could cause and has caused injuries and other damages, Plaintiffs and the Class have suffered damages, as described herein.

## **RELIEF DEMANDED**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant, as follows:

    a.    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Class and the Subclass and Plaintiffs' attorneys as Class Counsel;

    b.    For an order declaring that Defendant's conduct violates the statutes referenced herein;

    c.    For an order finding in favor of Plaintiffs and the Class and the Subclass on all counts asserted herein;

d.   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.   For monetary damages pursuant to Cal. Bus. & Prof. Code § 17500, *et seq.*,

f.   For prejudgment interest on all amounts awarded;

g.   For an order of restitution and all other forms of equitable monetary relief;

h.   For injunctive relief as pled or as the Court may deem proper; and

i.   For an order awarding Plaintiffs and the Class and the Subclass their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

DATED: March 16, 2021.                    Respectfully submitted,


                                          /s/ Alex R. Straus
                                          Alex R. Straus, SBN 321366
                                          **WHITFIELD BRYSON LLP**
                                          16748 McCormack Street
                                          Los Angeles, CA  91436
                                          Telephone: (917) 471-1894
                                          Facsímile: (310) 496-3176
                                          alex@whitfieldbryson.com

                                          Daniel K. Bryson*
                                          Harper T. Segui*
                                          Erin J. Ruben*
                                          J. Hunter Bryson*
                                          **WHITFIELD BRYSON LLP**
                                          900 W. Morgan Street
                                          Raleigh, NC 27603
                                          P.O. Box 12638
                                          Raleigh, NC 27605
                                          Dan@whitfieldbryson.com
                                          Harper@whitfieldbryson.com
                                          Erin@whitfieldbryson.com
                                          Hunter@whitfieldbryson.com

                                          Rachel Soffin*
                                          **GREG COLEMAN LAW PC**
                                          800 S. Gay Street, Suite 1100
                                          Knoxville, TN 37929
                                          Telephone: (865) 247-0080
                                          Facsimile: (865) 522-0049
                                          rachel@gregcolemanlaw.com

FIRST AMENDED CLASS ACTION COMPLAINT

Exhibit 1, Page 72

*Pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Putative Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT

Control Union Certifications B.V.
Meeuwenlaan 4-6, 8011 BZ, Zwolle, Netherlands
+31 38 426 0100
www.controlunion.com

# CERTIFICATE OF COMPLIANCE

(Scope Certificate)

Certificate No: CU810136GOTS-2019-00018500
Registration No: 810136

Control Union Certifications declares that

## Ocean Lanka (Pvt) Limited

Block B, Biyagama Export Processing Zone, Walgama,
Malwana
Sri Lanka

has been inspected and assessed in accordance with the

Global Organic Textile (GOTS) 5.0

and that products of the categories as mentioned below (and further specified in the annex) comply with this standard:

Fabrics, Yarns

Processing steps / activities carried out under responsibility of the above-mentioned company (by the operations as detailed in the annex) for certified products

Dyeing, Printing, Exporting, Yarn dyeing, Knitting, Trading, Importing

This certificate is valid until:
2020-07-12
This certificate is valid from:
2019-07-13

---

Place and date of issue:



Stamp of the issuing body



Standard's Logo



2019-09-27, Zwolle

Name of authorised person:

On behalf of the Managing Director
Udaya Kumari Herath | Certifier

This certificate cannot be used as a transaction certificate. The issueing body can withdraw this certificate before it expires if the declared compliance is no longer guaranteed. Accredited by: Dutch Accreditation Council (RVA), Accreditation No: C 412



**Control Union Certifications B.V.**
POST · Meeuwenlaan 4-6 · 8011 BZ · Zwolle · Netherlands
T · +31 38 426 0100 · F · +31 38 426 0100 · certification@controlunion.com ·

This electronically issued document is the valid original version.

Control Union Certifications B.V.
Meeuwenlaan 4-6, 8011 BZ, Zwolle, Netherlands
+31 38 426 0100
www.controlunion.com

Annex to certificate no.: CU810136GOTS-2019-00018500

**Ocean Lanka (Pvt) Limited**
**Global Organic Textile (GOTS)**

In specific the certificate covers the following products:

| Name of product | Label grade | Processing unit(s) |
|---|---|---|
| Dyed yarns - 100% Organic Cotton | Organic | Ocean Lanka (Pvt) Limited |
| Knitted dyed fabric - 90% Organic Cotton + 10% Elastane | Made With Organic | Ocean Lanka (Pvt) Limited |
| Knitted dyed fabrics - 100% Organic Cotton | Organic | Ocean Lanka (Pvt) Limited |
| Knitted dyed fabrics - 95% Organic Cotton + 5% Elastane | Organic | Ocean Lanka (Pvt) Limited |
| Knitted dyed fabrics - 96% Organic Cotton + 4% Elastane | Organic | Ocean Lanka (Pvt) Limited |
| Knitted dyed fabrics - 97% Organic Cotton + 3% Elastane | Organic | Ocean Lanka (Pvt) Limited |
| Knitted printed fabrics - 95% Organic Cotton + 5% Elastane | Organic | Ocean Lanka (Pvt) Limited |
| Knitted printed fabrics -100% Organic Cotton | Organic | Ocean Lanka (Pvt) Limited |
| Knitted yarn dyed fabrics - 96% Organic Cotton + 4% Elastane | Organic | Ocean Lanka (Pvt) Limited |
| Yarn dyed knitted fabrics - 100% Organic Cotton | Organic | Ocean Lanka (Pvt) Limited |
| Yarn dyed knitted fabrics - 95% Organic Cotton + 5% Elastane | Organic | Ocean Lanka (Pvt) Limited |

Place and date of issue:

Stamp of the issuing body

Standard's logo





2019-09-27, Zwolle

Name of authorised person:

On behalf of the Managing Director

Udaya Kumari Herath | Certifier

This electronically issued document is the valid original version.

Certificate of Compliance, Page   2  /  3

Control Union Certifications B.V.
Meeuwenlaan 4-6, 8011 BZ, Zwolle, Netherlands
+31 38 426 0100
www.controlunion.com

Annex to certificate no.: CU810136GOTS-2019-00018500

**Ocean Lanka (Pvt) Limited**
**Global Organic Textile (GOTS)**

Under the scope of this certificate the following facilities / subcontractors have been inspected and assessed. The listed processing steps/activities comply with the corresponding criteria of the Global Organic Textile (GOTS) for the certified products:

| Name of unit | Address | Processes |
|---|---|---|
| Ocean Lanka (Pvt) Limited | Block B, Biyagama Export Processing Zone, Walgama, Malwana, Sri Lanka | Dyeing<br>Printing<br>Exporting<br>Yarn dyeing<br>Knitting<br>Trading<br>Importing |

| Place and date of issue: | Stamp of the issuing body | Standard's logo |
|---|---|---|
|  |  |  |

2019-09-27, Zwolle

Name of authorised person:

On behalf of the Managing Director
Udaya Kumari Herath | Certifier



GLOBAL ORGANIC TEXTILE STANDARD
ECOLOGY & SOCIAL RESPONSIBILITY

# GLOBAL ORGANIC TEXTILE STANDARD (GOTS)

# VERSION 6.0

## 01 MARCH 2020
## (EFFECTIVE DATE: 01 MARCH 2021)

Global Standard gemeinnützige GmbH
Rotebühlstr. 102 · 70178 Stuttgart · Germany

www.global-standard.org



# TABLE OF CONTENTS

TABLE OF CONTENTS _____ 2

1  PRINCIPLES _____ 3

  1.1  AIM OF THE STANDARD _____ 3

  1.2  SCOPE AND STRUCTURE _____ 3

  1.3  SCOPE CERTIFICATE _____ 3

  1.4  LABEL GRADES AND LABELLING _____ 3

  1.5  REFERENCE DOCUMENTS _____ 4

2  CRITERIA _____ 5

  2.1  REQUIREMENTS FOR ORGANIC FIBRE PRODUCTION _____ 5

  2.2  REQUIREMENTS FOR FIBRE MATERIAL COMPOSITION _____ 5

  2.3  GENERAL REQUIREMENTS FOR CHEMICAL INPUTS IN ALL PROCESSING
  STAGES _____ 5

  2.4  SPECIFIC REQUIREMENTS AND TEST PARAMETERS _____ 10

3  SOCIAL CRITERIA _____ 21

  3.1  SCOPE _____ 21

  3.2  EMPLOYMENT IS FREELY CHOSEN _____ 22

  3.3  FREEDOM OF ASSOCIATION AND COLLECTIVE BARGAINING _____ 22

  3.4  CHILD LABOUR SHALL NOT BE USED _____ 22

  3.5  NO DISCRIMINATION IS PRACTISED _____ 23

  3.6  OCCUPATIONAL HEALTH AND SAFETY (OHS) _____ 23

  3.7  NO HARASSMENT AND VIOLENCE _____ 24

  3.8  REMUNERATION AND ASSESSMENT OF LIVING WAGE GAP _____ 24

  3.9  WORKING TIME _____ 25

  3.10 NO PRECARIOUS EMPLOYMENT IS PROVIDED _____ 25

  3.11 MIGRANT WORKERS _____ 25

  3.12 SOCIAL COMPLIANCE MANAGEMENT _____ 26

4  QUALITY ASSURANCE SYSTEM _____ 26

  4.1  AUDITING OF PROCESSING, MANUFACTURING AND TRADING STAGES _____ 26

  4.2  TESTING OF TECHNICAL QUALITY PARAMETERS AND RESIDUES _____ 27

5  ETHICAL BUSINESS BEHAVIOUR _____ 27

6  ANNEX _____ 28

  6.1  SPECIFIC REQUIREMENTS FOR TEXTILE PERSONAL CARE PRODUCTS _____ 28

  6.2  SPECIFIC REQUIREMENTS FOR FOOD CONTACT TEXTILES _____ 29

7  DEFINITIONS _____ 30

8  LIST OF ABBREVIATIONS _____ 31



# 1    PRINCIPLES

## 1.1    AIM OF THE STANDARD

The aim of this Standard is to define requirements to ensure organic status of textiles, from harvesting of the raw materials, through environmentally and socially responsible manufacturing up to labelling in order to provide a credible assurance to the end consumer.

## 1.2    SCOPE AND STRUCTURE

This Standard covers the processing, manufacturing, packaging, labelling, trading and distribution of all textiles made from at least 70% certified organic natural fibres. The final products may include, but are not limited to fibre products, yarns, fabrics, garments, fashion textile accessories (carried or worn), textile toys, home textiles, mattresses and bedding products as well as textile personal care products.

The Standard focuses on compulsory criteria only except where an exception from this rule is expressly stated. Some of the criteria are compliance requirements for the entire facility where GOTS products are processed (2.4.10. Environmental management, 2.4.11. Wastewater treatment, 3. Minimum social criteria, 4.1. Auditing of processing, manufacturing and trading stages and 5. Ethical Business Behaviour), whereas the others are criteria relevant for the specific products subject to certification (all other criteria of Section 2 and Section 4.2. of this Standard). GOTS criteria or the local legal requirements, whichever are higher, shall be followed.

As it is to date technically nearly impossible to produce any textiles in an industrial way without the use of chemical inputs, the approach is to define criteria for low impact and low residual natural and synthetic chemical inputs (such as dyestuffs, auxiliaries and finishes) accepted for textiles produced and labelled according to this Standard.

The Standard sets requirements on working and social conditions that are equivalent to those of leading social sustainability standards.

As the Standard is also applied and monitored for entities in countries with developed and effectively applied social and labour legislation and collective agreements between employers and trade unions that conform with the universal standards of the International Labour Organisation (ILO), exceptions to monitoring, verification and audit requirements may be made. Conditions for making exceptions are defined in the Implementation Manual of this Standard.

## 1.3    SCOPE CERTIFICATE

*Processors*, *manufacturers*, *traders* and retailers that have demonstrated their ability to comply with the relevant GOTS criteria in the corresponding certification procedure to an *Approved Certifier* receive a GOTS Scope Certificate issued in accordance with the 'Policy and Template for issuing Scope Certificates (SCs)'. Accordingly, they are considered *Certified Entities*. Scope Certificates list the products/product categories that the *Certified Entities* can offer in compliance with the Standard as well as the processing, manufacturing and trading activities that are qualified under the scope of certification. *Subcontractors* and their relevant processing and manufacturing steps become listed on the Scope Certificate of the *Certified Entity* assigning the certification.

## 1.4    LABEL GRADES AND LABELLING

The Standard provides for a subdivision into two label-grades. The only differentiation for subdivision is the minimum percentage of 'organic' / 'organic - *in conversion*' material in the certified product. Labelling of products as *'in conversion'* is only possible, if the Standard, on which the certification of the fibre production is based, permits such labelling for the fibre in question.

Only textile goods (finished or intermediate) produced in compliance with this Standard by a *Certified Entity* and certified by an *Approved Certifier* (= *GOTS Goods*) may be sold, labelled or represented as:

Exhibit 1, Page 80



(a) "**organic**" or "**organic - in conversion**"

or

(b) "**made with (x %) organic materials**" or "**made with (x %) organic - in conversion materials**"

**and the GOTS logo** (or the immediate reference "Global Organic Textile Standard" or the short form "GOTS").

Labelling shall be completed by a reference to the *Approved Certifier* who has certified the *GOTS Goods* (e.g. certifier's name and/or logo) and the license number of the *Certified Entity* (as provided by the *Approved Certifier*).

In all cases the GOTS labelling can only be applied to the product/packaging by a *Certified Entity* and shall have been approved by the *Certified Entity*'s *Approved Certifier* in advance of its application.

Labelling of *GOTS Goods* sold in retail is mandatory.

Application of GOTS labelling shall be in compliance with the 'Licensing and Labelling Guide'.

## 1.5    REFERENCE DOCUMENTS

Beside this Standard the Global Standard gGmbH has released the following official reference documents that provide for binding provisions and requirements for *Approved Certifier*s and users of the GOTS:

### 1.5.1  Manual for the Implementation of the Global Organic Textile Standard:

provides interpretations and clarifications for specific criteria of GOTS. Its purpose is to prevent any inconsistent, inappropriate or incorrect interpretation of the Standard. It further contains requirements and detailed specifications for the application of the GOTS and the implementation of the related quality assurance system for certifiers.

### 1.5.2  Licensing and Labelling Guide:

specifies the licensing conditions for companies participating in the GOTS certification system and defines the corresponding license fees. It further sets the requirements for the use of the GOTS registered trademarks.

### 1.5.3  Labelling Release for GOTS Goods:

provides a release form for labelling of GOTS Goods

### 1.5.4  Labelling Release for GOTS Additives:

provides a release form for labelling of GOTS Additives

### 1.5.5  Policy and Template for issuing Scope Certificates (SCs):

provides detailed instructions with regard to policies, layout, format and text for issuing Scope Certificates.

### 1.5.6  Policy and Template for issuing Transaction Certificates (TCs):

provides detailed instructions with regard to policies, layout, format and text for issuing Transaction Certificates

### 1.5.7  Policy and Template for issuing Letters of Approval:

provides detailed instructions with regard to policies, layout, format and text for issuing Letters of Approval for colourants and textile auxiliaries which are approved as inputs for application in the processing of GOTS certified textile products

Exhibit 1, Page 81



### 1.5.8  Approval Procedure and Requirements for Certification Bodies:

specifies the approval and monitoring procedures and sets out the related requirements for Certification Bodies to implement the GOTS certification and quality assurance system

### 1.5.9  Policy for Change or Migration of Certifier:

specifies the steps to be undertaken by *Approved Certifier* and *Certified Entity* in case of change or migration of certifier.

## 2    CRITERIA

## 2.1    REQUIREMENTS FOR ORGANIC FIBRE PRODUCTION

Approved are natural fibres that are certified 'organic' or 'organic - in conversion' according to any standard approved in the IFOAM Family of Standards for the relevant scope of production (crop or animal production), such as Regulation (EC) 834/2007, USDA National Organic Program (NOP), APEDA's National Programme for Organic Production (NPOP), China Organic Standard GB/ T19630. The certification body shall have a valid and recognised accreditation for the standard it certifies against. Recognised accreditations are ISO 17065 accreditation, NOP accreditation and IFOAM accreditation.

Certifying of products as 'organic - in conversion' is only possible, if the standard on which the certification of the fibre production is based, permits such a certification for the fibre in question. Conversion status of fibres shall be stated as specified in Section 1.4. of this Standard.

## 2.2    REQUIREMENTS FOR FIBRE MATERIAL COMPOSITION

### 2.2.1  Products sold, labelled or represented as "organic" or "organic-in conversion"

No less than 95% (≥95%) of the fibre content of the products - excluding *accessories* - shall be of certified organic origin or from *'in conversion'* period (identified and labelled as specified in Sections 1.4 and 2.1 of this Standard). Up to 5% (≤5%) of the fibre content of the products may be made of non-organic fibres that are listed under 'additional fibre materials' in Section 2.4.9. The percentage figures refer to the weight of the fibre content of the products at normal conditions. No fibres shall be used which originate from production projects with regard to which there is evidence of a persistent pattern of gross violations of the ILO core labour norms (as far as these are relevant for agriculture) and/of animal welfare principles (including Mulesing) or irrefutable evidence of a persistent pattern of land grabbing methods.

### 2.2.2  Products sold, labelled or represented as "made with x % organic materials" or "made with x % organic-in conversion materials"

No less than 70% (≥70%) of the fibre content of the products - excluding *accessories* - shall be of certified organic origin or from *'in conversion'* period (identified and labelled as specified in Sections 1.4 and 2.1 of this Standard). Up to 30% (≤30%) of the fibre content of the products may be made of non-organic fibres that are listed under 'additional fibre materials' in Section 2.4.9. The percentage figures refer to the weight of the fibre content of the products at normal conditions. No fibres shall be used which originate from production projects with regard to which there is evidence of a persistent pattern of gross violations of the ILO core labour norms (as far as these are relevant for agriculture) and/or of animal welfare principles (including Mulesing) or irrefutable evidence of a persistent pattern of land grabbing methods.

## 2.3    GENERAL REQUIREMENTS FOR CHEMICAL INPUTS IN ALL PROCESSING STAGES

### 2.3.1  Prohibited and restricted inputs

The following table lists chemical *inputs* that may (potentially) be used in conventional textile processing but that are explicitly banned or restricted for environmental and/or toxicological reasons in all

Exhibit 1, Page 82



processing stages of *GOTS Goods*. It is not to be seen as a comprehensive and inclusive list of all chemical *inputs* that are prohibited or restricted under GOTS. Prohibition or restriction of substance groups or individual *substances* that are not explicitly listed in this Section may further result from Section 2.3.2 'Requirements related to hazards and toxicity' or from other criteria of this Standard.

| Substance group | Criteria |
|---|---|
| **Aromatic and/or halogenated solvents** | Prohibited |
| **Flame retardants** | Prohibited are<br>- Chlorinated flame retardants<br>- Brominated flame retardants<br>- Phosphate based flame retardants, listed in Manual<br>- Flame retardants containing Antimony or Antimony Trioxide<br>- Disodium octaborate |
| **Chlorinated benzenes and toluenes** | Prohibited |
| **Chlorophenols (including their salts and esters)** | Prohibited (such as mono, di, tri, tetra and penta- chlorophenols) |
| **Complexing agents and surfactants** | Prohibited are:<br>• all APs and APEOs (i.e. NP, OP, NPEO, OPEO, APEOs terminated with functional groups, APEO-polymers)<br>• EDTA, DTPA, NTA<br>• LAS, α-MES |
| **Endocrine disruptors** | Prohibited |
| **Formaldehyde and other short-chain aldehydes** | Prohibited are *inputs* that contain or generate formaldehyde or other short-chain aldehydes (like glyoxal) during designated application |
| **Glycol Derivatives** | Prohibited are the glycol derivatives listed in the Manual |
| **Genetically modified organisms (GMO)** | Prohibited are all inputs that:<br>• contain GMO<br>• contain enzymes derived from GMO<br>• are made from GMO raw materials (e.g. starch, surfactants or oils from GM plants)<br>• GMO based traceability markers |
| **Heavy metals** | Prohibited, *inputs* shall be '*heavy metal free*'. Impurities shall not exceed the limit values as defined in annex B. Exceptions valid for dyes and pigments are set in Sections 2.4.6. and 2.4.7. |
| ***Inputs* (e.g. azo dyes and pigments) releasing carcinogenic arylamine compounds (MAK III, category 1,2,3,4)** | Prohibited |
| ***Inputs* containing functional nanoparticles (= particles with a size < 100 nm)** | Prohibited |
| ***Inputs* with halogen containing compounds** | Prohibited are *inputs* that contain > 1% *permanent AOX.*<br>Exceptions valid for pigments are set in Section 2.4.7. |
| **Organotin compounds** | Prohibited (such as DBT, DMT, DOT, DPhT, DPT, MBT, MMT, MOT, MPhT, TBT, TCyHT, TeBT, TeET, TMT, TOT, TPhT, TPT) |
| **Plasticizers** | Prohibited are:<br>PAH, phthalates and esters of phthalic acid, Bisphenol A and all other plasticizers with endocrine disrupting potential |

Exhibit 1, Page 83



| Substance group | Criteria |
|---|---|
| Per- and Polyfluorinated compounds (PFC) | Prohibited. (such as PFCA (incl. PFOA), PFSA (incl. PFOS) FTOH, PFNA, PFHpA, PFDA) |
| Quaternary ammonium compounds | Prohibited are: DTDMAC, DSDMAC and DHTDMAC |
| Chlorinated Paraffins | |
| Short-chain chlorinated paraffins (SCCPs, $C_{10-13}$) | Prohibited |
| Medium-chain chlorinated paraffins (MCCPs, $C_{14-17}$) | Prohibited |
| Cyclic Siloxanes (D4, D5, D6) | Prohibited are inputs that shall lead to ≥ 1000 ppm of cyclic siloxanes in processed *GOTS Goods*. |
| *Substances* and *preparations* that are prohibited for application in textiles with a recognised internationally or a nationally valid legal character | Prohibited |
| *Substances* and *preparations* having restrictions in usage for application in textiles with a recognised internationally or nationally legal character | The same restrictions apply, provided the *substances* and *preparations* are not already prohibited or have stricter restrictions criteria according to this Standard. *Substances* and *preparations* listed in regulation EC 552/2009 (amending regulation EC 1907/2006 (REACH), annex XVII), and the 'candidate list of substances of very high concern for authorisation' of the European Chemicals Agency (ECHA) are prohibited. |
| *Microplastics* | Prohibited are: Intentionally added synthetic *microplastics*. |
| In-can preservatives in chemical inputs | Prohibited are: In-can preservatives which do not meet the requirements of Sections 2.3.1 and 2.3.2 Except, allowed are: Biocidal active substance(s) that comply with European biocidal products regulation (BPR 528/2012) and listed on the Union list of BPR for product type PT06 (preservatives for products during storage): https://echa.europa.eu/en/information-on-chemicals/biocidal-active-substances |

### 2.3.2  Requirements related to hazards and toxicity

| Substance group | Criteria |
|---|---|
| *Inputs* which are classified with specific hazard statements (risk phrases) related to health hazards | Prohibited are: - *substances* which are classified with any of the following hazard statements, if applied as direct input - *preparations* which are classified with any of the following hazard statements - *preparations* which contain at least one substance which is classified with any of the following hazard statements in accordance with the codification system of the Global Harmonized System (GHS) as published by the United Nations, annex 3: H300    Fatal if swallowed |

Exhibit 1, Page 84



| | H310   Fatal in contact with skin |
| | H330   Fatal if inhaled |
| | H340   May cause genetic defects |
| | H341   Suspected of causing genetic defects |
| | H350   May cause cancer |
| | H351   Suspected of causing cancer |
| | H360   May damage fertility or the unborn child |
| | H361   Suspected of damaging fertility or the unborn child |
| | H370   Causes damage to organs |
| | H371   May cause damage to organs |
| | H372   Causes damage to organs through prolonged or repeated exposure |
| | For *inputs* assessed on basis of GHS, where the implementation system does not provide for the codified H-statements, the corresponding hazard classes and categories of GHS, annex 3 apply. For *inputs* assessed according to the 'risk phrase' classification (Directive 67/548EEC amended and appealed by Regulation EC 1272/2008) the equivalent risk phrases apply. |
| ***Inputs* which are classified with specific hazard statements / risk phrases related to environmental hazards** | **Prohibited are:**<br><br>- ***substances* which are classified with any of the following hazard statements / risk phrases, if applied as direct input**<br><br>- *preparations* which are classified with any of the following hazard statements / risk phrases<br><br>a) in accordance with the codification system of the Global Harmonized System (GHS) as published by the United Nations, annex 3:<br>  H400: Very toxic to aquatic life<br>  H410: Very toxic to aquatic life with long lasting effects<br>  H411: Toxic to aquatic life with long lasting effects<br>  H420: Harms public health and the environment by destroying ozone in the upper atmosphere<br>  H433: Harmful to terrestrial vertebrates |
| **Inputs which are bio-accumulative and not rapidly degradable** | **Prohibited are substances, if applied as direct input, and *preparations* classified with H413: 'May cause long-lasting effects to aquatic life' (respective R53) that are both, 'bio-accumulative'[1] and not rapidly degradable[2], [3]** |

1) All *substances* or *preparations* are considered as (potentially) bio-accumulative, if BCF (= bio-concentration factor) ≥ 500 or, if absent, log $K_{ow}$ (= logarithm of the n-octanol-water partition coefficient) ≥ 4

2) Testing requirement: >70% OECD 301A [28d] or equivalent testing method according to footnote 4 of the table below, except test methods related to eliminability (OECD 302). In those cases where only BOD and COD data are available the input is considered 'rapidly degradable' when the ratio of BOD5/COD is ≥ 0,5.

3) This criterion is not applicable to preparations whose very low solubility in water prevents their bioaccumulation (e.g. pigment preparations)

Exhibit 1, Page 85



All *preparations* applied shall further comply with the following requirements:

| Parameter | Criteria |
|---|---|
| **Oral Toxicity** [1] | $LD_{50} > 2000$ mg/kg [2] |
| **Aquatic Toxicity** [3] | $LC_{50}$, $EC_{50}$, $IC_{50} > 1$ mg/l |
| **Relation of biodegradability / eliminability** [4] **to aquatic toxicity** [3] | Only allowed, if: < 70% and > 100 mg/l > 70% and > 10 mg/l > 95% and > 1 mg/l |

1) Performing new animal tests to determine unknown $LD_{50}$ values in the course of the GOTS assessment procedure for inputs (refer to Section 2.3.3) is prohibited. Instead, alternative methods (e.g. Acute Toxicity Estimates (ATE); conclusions on analogy from similar products; validated structure-activity relationships; calculation from available data of substances contained; expert judgment; in vitro tests) shall be used to determine unknown values.

2) *Substances* and *preparations*, such as alkalis and acids that fail to meet this requirement because of their pH value only, are exempt from this requirement.

3) Performing new fish and daphnia tests to determine unknown $LC_{50}$ / $EC_{50}$ values in the course of the GOTS assessment procedure for inputs is prohibited. Instead, alternative methods such as Acute Toxicity Estimates (ATE); validated structure-activity relationships; conclusion on analogy from similar products; calculation from available data of substances contained; fish egg test (embryo toxicity test (FET)); in vitro test; IC50 algae; OECD 201 [72hr] shall be used to determine unknown values.

4) Accepted test methods: OECD 301A, OECD 301E, ISO 7827, OECD 302A, ISO 9887, OECD 302B, ISO 9888 or OECD 303A; alternatively, to meet the 70% level a *preparation* tested with one of the methods OECD 303A or ISO 11733 a percentage degradation of at least 80% shall be shown - or if tested with one of the methods OECD 301B, ISO 9439, OECD 301C, OECD 302C, OECD 301D, ISO 10707, OECD 301F, ISO 9408, ISO 10708 or ISO 14593, a percentage degradation of at least 60% shall be shown. To meet the 95% level, if tested with any of the mentioned methods, a percentage degradation of 95% shall be shown. Testing duration with each method is 28 days.

### 2.3.3  Assessment of chemical inputs

All chemical *inputs* intended to be used to process *GOTS Goods* are subject to approval by a GOTS *Approved Certifier* prior to their usage. *Preparations* shall have been evaluated and their trade names registered on approved lists prior to their usage by a GOTS *Approved Certifier* who is authorised by the Global Standard gGmbH for the specific accreditation scope: "Approval of textile auxiliary agents (chemical inputs) on positive lists" (Scope 4).

Approval shall be applied by the applicable chemical producer or supplier of the *preparations* who receive conformity documents (Letters of Approval) issued by the authorised certifiers and containing the trade names of applied *preparations* that have been found to be compliant with the criteria of this Standard.

For all chemical *inputs* (*substances* and *preparations*), a Material Safety Data Sheet (SDS), prepared according to an applicable recognised norm or directive shall be available. The *Approved Certifier*s are requested, where appropriate and felt necessary, to include further sources of information (such as additional toxicological and environmental data on specific components of the auxiliary agents, test reports, independent lab analysis and traceability checks of ingredients, no intentional use declarations, sources of data for hazard & toxicity, etc.) in the assessment.

Certified Entities shall have copies of valid Letters of Approval on hand listing all *preparations* they are using in processing and manufacturing GOTS Goods as verification proof that all colourants and textile auxiliaries used for GOTS Goods are actually approved.

### 2.3.4  Product Stewardship of chemical inputs

Chemical *formulators* shall implement appropriate and effective product stewardship practices. Adequate systems for product testing and quality assurance shall be in place.

Exhibit 1, Page 86

### 2.3.5 Environment, Health and Safety for Chemical Suppliers

Chemical *formulators* shall undergo environmental management system and safety audit of their premises. On-site inspection shall be performed for the first year and every 3rd year of granted Letter of Approval or Standard Revision, whichever is earlier.

Following GOTS criteria shall be included in the audit of a chemical supplier:

- Section 2.4.10
- Section 2.4.11, (see Manual for COD requirements).
- Section 3.6

Above criteria is applicable to whole facility for the whole year.

At all stages through the chemical manufacturing and distribution, adequate measures for Separation and Identification shall be established. It shall be ensured that GOTS Approved *inputs* and other chemicals are not commingled and GOTS Approved *inputs* are not contaminated by contact with prohibited substances.

## 2.4    SPECIFIC REQUIREMENTS AND TEST PARAMETERS

### 2.4.1 Separation and Identification

All stages through the supply chain shall be established so as to ensure that organic and conventional fibres are not commingled and that organic fibres and *GOTS Goods* are not contaminated by contact with prohibited substances.

All organic raw materials and GOTS goods shall be clearly labelled and identified as such at all stages of the supply chain.

### 2.4.2 Spinning

Allowed are additives which meet the basic requirements as set in Sections 2.3.1. and 2.3.2. only. Any paraffin products used shall be fully refined with a limited value for residual oil of 0.5%. *Machine oils* that may come in contact with GOTS goods shall be *heavy metal-free.*

Synthetic fibres, which are to be dissolved at a later processing stage, are not allowed to be used.

### 2.4.3 Sizing and weaving / knitting

Allowed sizing agents include starch, starch derivatives, other natural *substances* and CMC (carboxymethylcellulose).

Synthetic sizes which meet the basic requirements as set in Sections 2.3.1. and 2.3.2. may be used for no more than 25% of the total sizing in combination with natural *substances* only, calculated for the chemical without water. In case such synthetic sizes are recycled/recovered in the wastewater from desizing process with a ratio >80% they may be used without limitation in the total sizing but shall still meet the requirements as set in Sections 2.3.1 and 2.3.2.

*Machine oils* that may come in contact with GOTS goods shall be *heavy metal-free.* Other *inputs* shall be derived from *natural materials* only.

### 2.4.4 Non-woven manufacture

Allowed non-woven manufacturing processing includes only mechanical compaction, webbing and entangling such as hydro entanglement.

### 2.4.5 Pre-treatment and other wet processing stages

| Treatment / process | Criteria |
|---|---|
| Ammonia treatment | Prohibited |

Exhibit 1, Page 87

| Treatment / process | Criteria |
|---|---|
| | - Exception: allowed for after-treatment of wool, if performed in closed system. |
| Bleaches | On basis of oxygen only (peroxides, ozone, etc.). *Approved Certifiers* may grant exceptions for non-cotton fibre products where oxygen bleaches are not sufficiently functional, provided they meet the basic requirements as set in Sections 2.3.1. and 2.3.2. |
| Boiling, kiering, washing | Allowed are auxiliaries that meet the basic requirements as set in Sections 2.3.1. and 2.3.2. only. Washing detergents shall not contain phosphates. |
| Chlorination of wools | Prohibited |
| Desizing | Allowed are GMO free enzymatic desizing and other auxiliaries that meet the basic requirements as set in Sections 2.3.1. and 2.3.2. only |
| Mechanical/thermal treatments | Allowed |
| Mercerization | Allowed with auxiliaries that meet the basic requirements as set in Sections 2.3.1. and 2.3.2. only. Alkali shall be recycled. |
| Optical brightening | Allowed are optical brightening agents (OBAs) that meet all criteria for the selection of dyes and auxiliaries as set in Section 2.4.6. Dyeing only. |
| Other, not explicitly listed pre-treatment methods | Allowed are mechanical / thermal pre-treatment methods and such with the use of *substances* on basis of *natural materials*. |

## 2.4.6 Dyeing

| Parameter | Criteria |
|---|---|
| Selection of dyes and auxiliaries | Allowed are natural dyes, synthetic dyes, pigments and auxiliaries that meet the requirements as set in Sections 2.3.1 and 2.3.2. only. |
| | Prohibited are (disperse) dyes classified as sensitizing / allergenic. |
| | Prohibited are colourants classified as carcinogenic or suspected carcinogenic (H350 / H351). Prohibited are dyes containing heavy metals as an integral part of the dye molecule (e.g. heavy metal dyes, certain reactive dyes) under consideration of the following exceptions: |
| | - General exception for Iron |
| | - Specific exception for copper: permitted up to 5% by weight in blue, green and turquoise dyestuffs. |
| | The use of natural dyes and auxiliaries that are derived from a threatened species listed on the Red List of the IUCN is prohibited. |

## 2.4.7 Printing

| Parameter | Criteria |
|---|---|
| Selection of dyes, pigments and auxiliaries | Allowed are dyes, pigments and auxiliaries that meet the requirements as set in Sections 2.3.1 and 2.3.2 only. |
| | Prohibited are (disperse) dyes classified as sensitizing / allergenic. |
| | Prohibited are colourants classified as carcinogenic or suspected carcinogenic (H350 / H351). |

Exhibit 1, Page 88



| | Flock printing is allowed with non-GMO natural and regenerated fibres if the fibres used meet the limit values for residues as listed in Section 2.4.16. |
| | Ammonia is allowed as a required buffer in pigment printing pastes. |
| | Prohibited are dyes and pigments containing heavy metals as an integral part of the dye molecule (e.g. heavy metal dyes, certain reactive dyes) under consideration of the following exceptions: |
| | - General exception for Iron |
| | - Specific exception for copper: permitted up to 5% per weight in blue, green and turquoise dyestuffs and pigments only. |
| | While in general *inputs* that contain > 1% *permanent AOX* are prohibited, exceptionally for yellow, green and violet pigments the limit is 5%. |
| | Prohibited are printing methods using aromatic solvents, phthalates or chlorinated plastics (e.g. PVC). |
| | The use of natural dyes and auxiliaries that are derived from a threatened species listed on the Red List of the IUCN is prohibited. |

## 2.4.8 Finishing and Manufacturing

| Parameter | Criteria |
|---|---|
| **Selection of finishing methods and auxiliaries** | Allowed are mechanical, thermal and other physical finishing methods. |
| | Allowed are natural and synthetic *inputs* that meet the basic requirements as set in Sections 2.3.1 and 2.3.2 only. |
| | Prohibited in general is the use of synthetic *inputs* for anti-microbial finishing (including biocides), coating, filling and stiffening, lustring and matting as well as weighting. |
| | Prohibited are garment finishing methods that are considered to be harmful to the workers (such as sand blasting of denim). |
| *Machine oils* | In Finishing and Manufacturing, *Machine oils* that may come in contact with GOTS goods shall be *heavy metal-free*. |

## 2.4.9 Requirements for additional fibre materials and accessories

### 2.4.9.1 Requirements for additional fibre materials

| Additional Fibre Materials | Criteria |
|---|---|
| **Fibre materials accepted for the remaining non-organic balance of the product's material composition** (max. 5% according to Section 2.2.1. and max. 30% according to Section 2.2.2.) | The additional fibre materials may be mixed with the organic fibres to the fabric or used in certain details of the product. |
| | Blending organic and conventional fibres of the same type in the same product is not permitted. |
| | All additional materials shall meet the limit values for residues as listed in Section 2.4.16. |
| | **Allowed are:** |
| | Individually or in combination as a sum total **up to 30% (≤30%)** |
| | a) non-GMO conventional natural vegetable fibres |
| | b) non-GMO conventional animal fibres. |
| | c) Lyocell or protein-based fibres derived from non-GMO sources and from certified organic raw materials or pre- or post-consumer waste or from raw materials certified according to a programme that verifies compliance with sustainable management principles |
| | d) recycled synthetic (polymer) fibres from *pre-* or *post-consumer waste*: only polyester, polyamide, polypropylene, elastomultiester |

Exhibit 1, Page 89



| Additional Fibre Materials | Criteria |
|---|---|
| | (elasterell-p) and polyurethane (elastane)<br>e) PLA (polylactic acid) fibre produced from non-GMO bio-mass sources<br><br>Individually or in combination as a sum total **up to 10% (≤10%)**<br>a) regenerated fibres like **lyocell**, viscose or modal: raw materials used shall be non-GMO<br>b) virgin synthetic (polymer) fibres: only polyamide, polypropylene, elastomultiester (elasterell-p) and polyurethane (elastane)<br>c) stainless steel fibres and mineral fibres<br><br>**Prohibited are:**<br>a) conventional cotton<br>b) conventional angora hair fibre<br>c) virgin polyester<br>d) acrylic<br>e) asbestos, carbon and silver fibres<br>f) any other not explicitly permitted fibres<br>g) mulesed wool |

### 2.4.9.2 Requirements for Accessories

| *Accessories* | Criteria |
|---|---|
| **Material in general**<br><br>(valid for appliqué, borders, buckles, buttons and press-studs, cords, edgings, elastic bands and yarns, embroidery yarns, fasteners and closing systems, adhesive tapes used for fusing, hatbands, laces, linings, inlays, interface, labels (heat-transfer/ adhesive/ care/ GOTS), interlinings, pockets, seam bindings, sewing threads, shoulder pads, padding for undergarments, trims, zippers and any other, not below explicitly listed *accessories)* | **Allowed** are:<br>a) *natural materials* including biotic material (such as (organic or conventional) natural fibre, wood, leather, horn, bone, shell) and non-biotic material (such as minerals, metals, stone)<br>b) regenerated and synthetic materials<br><br>**Prohibited is** the use of:<br>a) asbestos<br>b) carbon fibres<br>c) silver (filament, treated) fibres<br>d) chromium (e.g. as component of a metal or in leather tanning, except that stainless steel is permitted)<br>e) nickel (e.g. as component of a metal, except that stainless steel is permitted)<br>f) material from threatened animals, plant and timber<br>g) Chlorinated plastics (e.g. PVC)<br>All materials used for *accessories* shall meet the applicable limit values for residues as listed in Section 2.4.16. |
| **Fillings, stuffing** | If textile fibres are used, the material requirements of Sections 2.2.1 respective 2.2.2 apply (since fillings with fibres are not considered *accessories*).<br>If non-textile material is used only *natural materials* are permitted. *Natural materials* shall be from certified organic (in conversion) production in case such certification is applicable for the kind of material used (e.g. for plant-based materials such as grain spelt or animal based-materials such as feathers).<br>Latex foam used as filling or stuffing shall be made from certified organic (in conversion) latex or from latex certified according to a program that verifies compliance with sustainable forestry management principles. |
| **Supports and frames** | The requirements as specified in the row 'material in general' apply. |

Exhibit 1, Page 90

| Accessories | Criteria |
|---|---|
| | Latex foam used in mattresses shall be made from certified organic (in conversion) latex or from latex certified according to a program that verifies compliance with sustainable forestry management principles. |
| | Polyurethane foams are not permitted in mattresses or other textile bedding products. |
| Non-Slip Floor Covering | Backing materials used shall be of certified natural origin and satisfy requirements of Section 2.3 of the GOTS Standard. Inorganic materials (such as dolomite) may be used in conjunction with this backing material, if they are of natural origin and satisfy Section 2.3 of the GOTS Standard. |

## 2.4.10  Environmental management

In addition to GOTS criteria, all companies shall assure compliance with the applicable national and local legal environmental requirements applicable to their processing/manufacturing stages (including those referring to emissions to air, wastewater discharge as well as disposal of waste and sludge).

They shall have a written environmental policy and procedures in place to allow monitoring and improving relevant environmental performances in their facilities. The environmental policy shall be shared with all employees. Depending on the processing/manufacturing stages, the available data and procedures need to include:

a)  person responsible
b)  data on energy and water resources and their consumption per kg of textile output
c)  target goals and procedures to reduce energy and water consumption per kg of textile output
d)  monitoring of waste and discharges
e)  procedures to minimise waste and discharges
f)  procedures to follow in case of waste and pollution incidents
g)  documentation of staff training in the conservation of water and energy, proper handling and minimal use of chemicals and their correct disposal
h)  programme for improvement

Adequate inventory of GOTS approved chemical inputs should be maintained for processing *GOTS Goods.* Wet processing units shall keep full records of the use of chemicals, energy, water consumption and wastewater treatment, including the disposal of sludge. In particular, they shall continuously measure and monitor wastewater temperature, wastewater pH and sediment quantities. On-site waste burning or uncontrolled waste landfilling shall not be undertaken.

Certified Entities are required to collect information on sources of greenhouse gas emissions (GHG) within their own operations and identify means for reduction for each source.

## 2.4.11  Wastewater treatment

Wastewater from all wet processing units shall be treated in an internal or external functional wastewater treatment plant before discharged to environment. The applicable national and local legal requirements for wastewater treatment - including limit values with regard to pH, temperature, TOC, BOD, COD, colour removal, residues of (chemical) pollutants and discharge routes - shall be fulfilled. Minimum criteria is local / national law if GOTS requirements are lower.

Wastewater discharges to the environment shall not exceed 20 g COD/kg of processed textile (output). For scouring greasy wool an exceptional limit of 45 g COD/kg applies.

Treatment of wastewater from water retting of bast fibres shall achieve a reduction of COD (or TOC) of at least 95% for hemp fibres and 75% for all other bast fibres.

Exhibit 1, Page 91



Where legal limits for pH and temperature are not defined for wastewater discharges to surface waters, discharge shall have a pH between 6 and 9 (unless the pH of the receiving water is outside this range) and a temperature of less than 35 °C (unless the temperature of the receiving water is above this value).

Wastewater analyses shall be performed and documented periodically at normal operating capacity.

## 2.4.12   Storage, packaging and transport

### 2.4.12.1   B2B trade of *GOTS Goods*

Organic textile products shall be stored and transported in such a manner as to prevent contamination by prohibited *substances* and commingling with conventional products or substitution of the contents.

Transport means and routes shall be documented.

In cases where pesticides/biocides are mandated for use due to national or regional rules or law, they may be used in Storerooms / Transport, but they shall comply with the applicable international or national organic production standard. Wooden pallets used in storage and transport activities are exempt from this requirement.

### 2.4.12.2   Retail (B2C) trade of GOTS Goods

Single use virgin plastic hangers are prohibited in retail packaging of *GOTS Goods*. Recycled plastic hangers may be used.

Final products with complete GOTS labelling can be stored / transported together with conventional products of similar type with positive assurance that there can be no substitution of products.

Synthetic packaging material shall not contain chlorinated plastics (e.g. PVC). The use of plastic packaging materials should be minimized.

Paper or cardboard used in packaging material for the retail trade of *GOTS Goods* (incl. labelling items such as hang tags or swing tags) shall be recycled from *pre-* or *post-consumer waste* or certified according to a program that verifies compliance with sustainable forestry management principles.

Textile fibre materials used for packaging, shall follow one of these three conditions:

   a)  are certified organic (as explained in Section 2.2.1) and meet RSL criteria as in Section 2.4.15
   b)  are certified organic - in- conversion (as explained in Section 2.2.2) and meet RSL criteria as in Section 2.4.15
   c)  meet criteria for accepted additional fibres (Section 2.4.9.1) without limitation on percentages and meet criteria as in Section 2.4.16.

## 2.4.13   Record keeping & internal quality assurance

All operational procedures and practices shall be supported by effective documented control systems and records that enable to trace:

   a)  the origin, nature and quantities of organic and additional (raw) materials, *accessories* as well as *inputs* which have been delivered to the unit
   b)  the flow of goods within the unit (processing/manufacturing steps performed, recipes used and stock quantities)
   c)  the composition of manufactured products
   d)  the nature, quantities and consignees of *GOTS Goods* which have left the unit
   e)  any other information that may be required for the purposes of proper inspection of the operation

Records relevant to the inspection shall be kept for at least five years.

*Certified Entities* purchasing organic fibres shall receive and maintain transaction certificates (=TCs, certificates of inspection), issued by a recognised certifier and certified in accordance with the criteria of Section 2.1 for the whole quantity purchased.

*Certified Entities* purchasing *GOTS Goods* shall receive and maintain GOTS transaction certificates, issued by an *Approved Certifier* for the whole quantity of *GOTS Goods* purchased, in accordance with the current Policy and Template for issuing Transaction Certificates (TCs). Certified Entities purchasing

Exhibit 1, Page 92



organic fibres shall receive and maintain Scope Certificates and / or Transaction Certificates (where applicable) of the producer and trader(s) (if applicable) for the Organic Production Standard for the whole quantity purchased. All further conditions as prescribed in the latest version of the 'Policy and Template for issuing Transaction Certificates (TCs)' shall be followed.

The consignee of any organic fibres and *GOTS Goods* shall check the integrity of the packaging or container and verify the origin and nature of the certified products from the information contained in the product marking and corresponding documentation (e.g. invoice, bill of lading, transaction certificate) upon receipt of the certified products.

A product whose GOTS compliant status is in doubt may only be put into processing or packaging after elimination of that doubt.

Organic fibres and *GOTS Goods* shall clearly be identified as such on all corresponding invoices.

*Certified Entities* shall have invoices, delivery notes as well as copies of valid Letters of Approval at hand listing all *preparations* they are using in processing and manufacturing *GOTS Goods* as verification proof that all colourants and textile auxiliaries used for *GOTS Goods* are actually approved.

The *Certified Entity* shall have concluded a contract with each *subcontractor* stipulating the conditions of the relevant job work assigned and remains finally responsible for compliance with all criteria of this Standard.

Certified Entities shall collect, collate and share non-commercial information related to impact measurement if and as required by GOTS.

## 2.4.14  Technical quality parameters

Any final product labelled according to this Standard shall comply with the following technical quality parameters.

| Parameter | Criteria | Test method |
|---|---|---|
| **Rubbing fastness**, dry<br>for fibre blends | 3-4<br>3 | ISO 105 X12 |
| **Rubbing fastness**, wet | 2 | ISO 105 X12 |
| **Perspiration fastness**, alkaline and acidic<br>    Shade Change<br>    Staining on Multi-fibre | <br>3-4<br>3-4 | ISO 105 E04 |
| **Perspiration fastness** for fibre blends<br>    Shade Change<br>    Staining on Multi-fibre | <br>3<br>3 | ISO 105 E04 |
| **Light fastness** | 3-4 | ISO 105 B02 |
| **Dimensional change** after washing at 40 °C (30 °C for animal fibre material and blends thereof).<br>    Knitted/hosiery:<br>    Woven:<br>This criterion is only valid for the garment sector. | <br><br>max. ±8%<br>max. ±3% | ISO 6330 |
| **Saliva fastness**<br>(only for *textiles for babies*) | 5 | BVL B 82.92.3<br>DIN 53160-1 |
| **Washing fastness** when washed at 40 °C<br>    Shade Change<br>    Staining on Multi-fibre | <br>3-4<br>3-4 | ISO 105 C06 A1M |
| **Washing fastness** of animal fibre material and blends thereof when washed at 30 °C<br>    Shade Change<br>    Staining on Multi-fibre | <br><br>3-4<br>3-4 | ISO 105 C06 A1S without use of steel balls |

Exhibit 1, Page 93

## 2.4.15  Limit values for residues in *GOTS Goods*

Even if produced in compliance with this Standard, textiles may carry traces of residues (e.g. due to unavoidable contamination). The following table lists the corresponding limit values for *GOTS Goods*:

| Parameter | Criteria | Test method |
|---|---|---|
| **Alkylphenol** (ethoxylates)<br>NP, OP, HpP, PeP, NPEO, OPEO sum parameter<br>NP, OP, HpP, PeP Sum parameter | < 20 mg/kg<br>< 10 mg/kg | For NP, OP: Extraction, derivatisation, GC/MS or HPLC/MS<br>For NPEO, OPEO: Extraction in methanol, derivatisation, HPLC/MS : EN ISO 18254-1 or NPLC : EN ISO 18254-2<br>(test range for NPEO and OPEO: 3-15 moles) |
| **AOX** | < 5 mg/kg | Extraction with boiling water, adsorption on charcoal; AOX analyser based on ISO 9562<br>Alternatively: HJ/T 83-2001 |
| **Arylamines**<br>with carcinogenic properties (amine-releasing azo dyes MAK III, category 1,2,3) | < 20 mg/kg | EN 14362-1 and -3; (HPLC/GCMS) |
| Aniline, free (MAK III category 4) | <100 mg/kg | EN 14362-1; (HPLC/GCMS) without reductive cleavage |
| **Disperse dyes** classified as allergenic[1] | < 30 mg/kg | DIN 54231; (LC/MS) |
| **Formaldehyde** | < 16 mg/kg | Japanese Law 112; or based on ISO 14184-1 |
| **Glyoxal** and other short-chain aldehydes (mono- and dialdehydes up to C6) | <20 mg/kg | Extraction (acc. to ISO 14184-1), ISO 17226-1 (HPLC) |
| **pH** value | 4.5–9.0<br>(no skin contact)<br>4.5-7.5 (all others) | ISO 3071 |
| **Chlorophenols** | | LFGB 82-02-08; (GC/MS) |
| PCP | < 0.01 mg/kg | |
| TeCP | < 0.01 mg/kg | |
| TrCP | < 0.2 mg/kg | |
| DCP | < 0.5 mg/kg | |
| MCP | < 0.5 mg/kg | |
| **O-Phenyl phenol (OPP)** | < 1.0 mg/kg | |
| **Pesticides**, sum parameter | | § 64 LFGB L 00.00-34 (GC/MS); § 64 LFGB L 00.00-114 (LC/MS/MS) |
| All natural fibres (except shorn wool) | <0.1 mg/kg | |
| Shorn wool | <0.5 mg/kg | |
| **Extractable Heavy metals** | In eluate. Figures in mg/kg refer to textile | Elution DIN EN ISO 105-E04, ISO 17294-2 (ICP/MS), EN 16711-2 |
| Antimony (Sb) | < 0.2 mg/kg | |
| Arsenic (As) | <0.2 mg/kg | |
| Cadmium (Cd) | < 0.1 mg/kg | |
| Chromium (Cr) | < 1.0 mg/kg | |
| Cobalt (Co) | < 1.0 mg/kg | |
| Copper (Cu) | < 25.0 mg/kg | |
| Lead (Pb) | < 0.2 mg/kg | |
| Nickel (Ni) | < 1.0 mg/kg | |
| Mercury (Hg) | < 0.02 mg/kg | |
| Selenium (Se) | < 0.2 mg/kg | |

---

[1] See List in Manual, Section 2.4.6

Exhibit 1, Page 94



| Parameter | Criteria | Test method |
|---|---|---|
| Tin (Sn) | < 2.0 mg/kg | |
| Manganese (Mn) | < 90 mg/kg | |
| Zinc (Zn) | < 750 mg/kg | |
| Barium (Ba) | < 1000 mg/kg | |
| Chromium VI (Cr-VI) | < 0.5 mg/kg | Elution DIN EN ISO 105-E04, ISO 11083 |
| **Total Heavy metals (in digested sample)** | | |
| Cadmium (Cd) | < 45 mg/kg | EPA 3050 B, ICP/MS, EPA 3051 or EN 16711-1 |
| Lead (Pb) | < 50 mg/kg | EPA 3050 B, ICP/MS, EPA 3051 or EN 16711-1 |
| **Organotin compounds** | | Extraction in solvent, ISO 17353 (GC/MS) or ISO/TS 16179 |
| TBT | < 0.05 mg/kg | |
| TphT | < 0.05 mg/kg | |
| DBT | < 0.05 mg/kg | |
| DOT | < 0.05 mg/kg | |
| MBT | < 0.1 mg/kg | |
| DMT, DPT, MoT, MMT, MPhT, TeBT, TCyHT, TMT, TOT, TPT, DphT, TeET | < 0.1 mg/kg | |
| **Per- and Polyfluorinated compounds (PFC)** | | |
| **individually:** | absent | |
| **PFOA, PFOS** | < 1.0 µg/m$^2$ | Extraction in solvent, LC/MS |
| **FTOH** | < 0.01 mg/kg | Extraction in solvent, GC/MS |
| **Phthalates** (such as BBP, DBP, DCHP, DEHP, DEP, DHNUP, DHP, DHxP, DIBP, DIDP, DIHP, DIHxP, DINP, DMEP, DMP, DNOP, DNP, DPP, DPrP) | | DIN EN 15777: 2009-12 (GC/MS) or ISO 14389 |
| sum parameter | < 100 mg/kg | |
| **Polycyclic Aromatic Hydrocarbons (PAH):** | | ISO 18287 (GC/MS) or AfPS GS 2014:01 |
| sum parameter | < 5.0 mg/kg | |
| Chrysene | < 0.5 mg/kg | |
| Benzo[a]anthracene | < 0.5 mg/kg | |
| Benzo[b]fluoranthene | < 0.5 mg/kg | |
| Benzo(j)fluoranthene | < 0.5 mg/kg | |
| Benzo[k]fluoranthene | < 0.5 mg/kg | |
| Benzo[a]pyrene | < 0.5 mg/kg | |
| Benzo[e]pyrene | < 0.5 mg/kg | |
| Dibenzo[a,h]anthracene | < 0.5 mg/kg | |
| Naphthalene | < 1.0 mg/kg | |
| Acenaphthylene | < 1.0 mg/kg | |
| Acenapthene | < 1.0 mg/kg | |
| Fluorene | < 1.0 mg/kg | |
| Phenanthrene | < 1.0 mg/kg | |
| Anthracene | < 1.0 mg/kg | |
| Fluoranthene | < 1.0 mg/kg | |
| Pyrene | < 1.0 mg/kg | |
| Indeno[1,2,3-cd]pyrene | < 1.0 mg/kg | |
| Benzo[g,h,i]perylene | < 1.0 mg/kg | |
| Cyclopenta (c,d)pyrene | < 1.0 mg/kg | |
| Dibenzo [a,e] pyrene | < 1.0 mg/kg | |

Exhibit 1, Page 95

| Parameter | Criteria | Test method |
|---|---|---|
| Dibenzo [a,h] pyrene | < 1.0 mg/kg | |
| Dibenzo [a,i] pyrene | < 1.0 mg/kg | |
| Dibenzo [a,l] pyrene | < 1.0 mg/kg | |
| 1-Methylpyrene | < 1.0 mg/kg | |
| **Chlorinated Paraffins** | | |
| Short Chain Chlorinated Paraffins ($C_{10-13}$) & Medium Chain Chlorinated Paraffins ($C_{14-17}$) | | |
| Sum parameter | <50 mg/kg | |
| **Cyclic Siloxanes** (D4, D5, D6) | <1000 mg/kg | Extraction in Solvent, GC/MS |
| **Other Chemical Residues** | | |
| Azodicarboxamide/ Azodicarbonamide/ Diazene-1,2-dicarboxamide (ADCA) | <1000 mg/kg | |
| **Chlorinated Benzenes & Toluenes** | < 1.0 mg/kg | |

## 2.4.16  Limit values for residues in additional fibre materials and accessories

Additional materials and *accessories* (in accordance with the criteria of Section 2.4.9) used for *GOTS Goods* need to comply with the following limit values for residues:

| Criteria | Limit Values | | Test Method |
|---|---|---|---|
| | **For use in t*extiles for babies and textile personal care products** | **For use in all other *GOTS Goods** | |
| **Arylamines** with carcinogenic properties (amine-releasing azo dyes MAK III, category 1,2,3) | < 20 mg/kg | < 20 mg/kg | EN 14362-1 and -3; (HPLC/GCMS) |
| Aniline (MAK III category 4) (free) | <20 mg/kg | <50 mg/kg | EN 14362-1 (HPLC/GCMS), without reductive cleavage |
| **Disperse** dyes (classified as allergenic or carcinogenic) | < 30 mg/kg | < 30 mg/kg | DIN 54231; (LC/MS) |
| **Formaldehyde** | < 16 mg/kg | < 75 mg/kg (Skin Contact) <150 mg/kg (no skin contact) | Japanese Law 112; or based on ISO 14184-1 |
| **Glyoxal** and other short-chain aldehydes (mono- and dialdehydes up to C6) | <20 mg/kg | <75 mg/kg (skin contact) <300 mg/kg (no skin contact) | Extraction (acc. to ISO 14184-1), ISO 17226-1 (HPLC) |
| **pH value** | 4.0-7.5 | 4.0-7.5 | ISO 3071 |
| **Chlorophenols** | | | |
| PCP | <0.05 mg/kg | <0.5 mg/kg | LFGB 82-02-08; (GC/MS) |
| TeCP | <0.05 mg/kg | <0.5 mg/kg | |
| TrCP | <0.2 mg/kg | <2.0 mg/kg | |
| DCP | <0.5 mg/kg | <3.0 mg/kg | |
| MCP | <0.5 mg/kg | <3.0 mg/kg | |
| **Pesticides, sum parameter** | | | |
| All natural fibres (except shorn wool) | <0.5 mg/kg | <1 mg/kg | § 64 LFGB L 00.00-34 (GC/MS); § 64 LFGB L 00.00-114 (LC/MS/MS) |
| Shorn wool | <1.0 mg/kg | <1 mg/kg | |
| **Extractable Heavy metals** | | | |

Exhibit 1, Page 96



| Criteria | Limit Values | | Test Method |
|---|---|---|---|
| | **For use in textiles for babies and textile personal care products** | **For use in all other GOTS Goods** | |
| Arsenic (As) | <0.2 mg/kg | <1.0 mg/kg | |
| Cadmium (Cd) | <0.1 mg/kg | <0.1 mg/kg | |
| Chromium (Cr) | <1.0 mg/kg | <2.0 mg/kg | |
| Cobalt (Co) | <1.0 mg/kg | <4.0 mg/kg | Elution DIN EN ISO 105-E04, ISO 17294-2 (ICP/MS) |
| Copper (Cu) | <25.0 mg/kg [1] | <50.0 mg/kg [1] | |
| Lead (Pb) | <0.2 mg/kg | <1.0 mg/kg (not for Glass) | |
| Nickel (Ni) | <1.0 mg/kg | <4.0 mg/kg | |
| Mercury (Hg) | <0.02 mg/kg | <0.02 mg/kg | |
| Chromium VI (Cr-VI) | <0.5 mg/kg | <0.5 mg/kg | Elution DIN EN ISO 105-E04, ISO 11083 |
| **Total Heavy metals (in digested sample)** | | | |
| Cadmium (Cd) | <40 mg/kg | <40 mg/kg | EPA 3050 B, ICP/MS, EN16711-1 |
| Lead (Pb) | <90 mg/kg | <90 mg/kg | |
| **Nickel release** | < 0.28 µg/cm$^2$/week | < 0.28 µg/cm$^2$/week | EN 12472, EN 1811 |
| **Organotin compounds** | | | |
| TBT | <0.5 mg/kg | <1.0 mg/kg | |
| TphT | <0.5 mg/kg | <1.0 mg/kg | |
| DBT | <1.0 mg/kg | <2.0 mg/kg | Extraction in solvent, ISO 17353 (GC/MS) or ISO/TS 16179 |
| DOT | <1.0 mg/kg | <2.0 mg/kg | |
| MBT | <1.0 mg/kg | <2.0 mg/kg | |
| DMT, DPT, MoT, MMT, MPhT, TeBT, TCyHT, TMT, TOT, TPT, DphT, TeET | <1.0 mg/kg | <2.0 mg/kg | |
| **Phthalates** (such as DINP, DMEP, DNOP, DEHP, DIDP, BBP, DBP, DIBP, DEP, DIHP, DHNUP, DCHP, DHxP, DIHxP, DPrP, DHP, DNP, DPP, DMP) | | | ISO 14389 |
| sum parameter | <0.05% | <0.05% | |
| **Polycyclic Aromatic Hydrocarbons (PAH):** | | | |
| **sum parameter** | **<5.0 mg/kg** | **<10.0 mg/kg** | |
| 1-Methylpyrene | <0.5 mg/kg | <1.0 mg/kg | |
| Acenaphthene | <0.5 mg/kg | <1.0 mg/kg | |
| Acenaphthylene | <0.5 mg/kg | <1.0 mg/kg | |
| Anthracene | <0.5 mg/kg | <1.0 mg/kg | |
| Benzo(e)pyrene | <0.5 mg/kg | <1.0 mg/kg | |
| Benzo(j)fluoranthene | <0.5 mg/kg | <1.0 mg/kg | |
| Benzo[a]anthracene | <0.5 mg/kg | <1.0 mg/kg | |
| Benzo[a]pyrene | <0.5 mg/kg | <1.0 mg/kg | ISO 18287 (GC/MS) or AFPS GS 2014:01 |
| Benzo[b]fluoranthene | <0.5 mg/kg | <1.0 mg/kg | |
| Benzo[g,h,i]perylene | <0.5 mg/kg | <1.0 mg/kg | |
| Benzo[k]fluoranthene | <0.5 mg/kg | <1.0 mg/kg | |
| Chrysene | <0.5 mg/kg | <1.0 mg/kg | |
| Cyclopenta (c,d)pyrene | <0.5 mg/kg | <1.0 mg/kg | |
| Dibenzo [a,e] pyrene | <0.5 mg/kg | <1.0 mg/kg | |
| Dibenzo [a,h] pyrene | <0.5 mg/kg | <1.0 mg/kg | |

Exhibit 1, Page 97



| Criteria | Limit Values | | Test Method |
|---|---|---|---|
| | **For use in textiles for babies and textile personal care products** | **For use in all other GOTS Goods** | |
| Dibenzo [a,i] pyrene | <0.5 mg/kg | <1.0 mg/kg | |
| Dibenzo [a,l] pyrene | <0.5 mg/kg | <1.0 mg/kg | |
| Dibenzo[a,h]anthracene | <0.5 mg/kg | <1.0 mg/kg | |
| Fluoranthene | <0.5 mg/kg | <1.0 mg/kg | |
| Fluorene | <0.5 mg/kg | <1.0 mg/kg | |
| Indeno[1,2,3-cd]pyrene | <0.5 mg/kg | <1.0 mg/kg | |
| Naphthalene | <0.5 mg/kg | <1.0 mg/kg | |
| Phenanthrene | <0.5 mg/kg | <1.0 mg/kg | |
| Pyrene | <0.5 mg/kg | <1.0 mg/kg | |
| **Chlorinated Paraffins** | | | |
| Short Chain Chlorinated Paraffins ($C_{10-13}$) & Medium Chain Chlorinated Paraffins ($C_{14-17}$) | | | |
| Sum parameter | <50 mg/kg | <50 mg/kg | |
| **Cyclic Siloxanes** (D4, D5, D6) | <1000 mg/kg | <1000 mg/kg | |
| **Other Chemical Residues** | | | |
| Azodicarboxamide/ Azodicarbonamide/ Diazene-1,2-dicarboxamide (ADCA) | <1000 mg/kg | <1000 mg/kg | |
| **Solvent Residues** | | | |
| NMP, DMAc, DMF | 0.05 % by weight | 0.05 % by weight | |
| Formamide | 0.02% by weight | 0.02% by weight | |
| **Chlorinated Benzenes & Toluenes** | 1.0 mg/kg | 1.0 mg/kg | |
| **Nonylphenol Ethoxylates** | 100 mg/kg | 100 mg/kg | |

1) Criterion not applicable to inorganic / non-biological materials (such as metals)

| **Further parameters relevant for specific materials used in accessories** | **Criteria** | **Test method** |
|---|---|---|
| **Polyester fibres:** Antimony (Sb) | < 30 mg/kg | Elution DIN EN ISO 105-E04, ISO 17294-2 (ICP/MS) |
| **Natural latex foam:** Butadiene Chlorophenols (incl. salts and esters) Carbon disulphide Nitrosamines | < 1.0 mg/kg < 1.0 mg/kg < 0.02 mg/m$^3$ < 0.001 mg/m$^3$ | GC- FID LFGB 82-02-08 (GC/MS) Chamber test, DIN ISO 16000-6 Chamber test; ZH 1/120-23 or BGI 505-23 for air sampling and analysis |

# 3   SOCIAL CRITERIA

## 3.1   SCOPE

The following social criteria apply to all textile processing, manufacturing and trading stages which are employing workers. The same principles and requirements apply also to the farm level, taking account

Exhibit 1, Page 98



of its specific nature and recognizing the limited direct monitoring and assurance possibilities with this Standard.

For adequate implementation and assessment of the following specific criteria adherence to the corresponding International Labour Conventions of the International Labour Organisation (ILO), United Nations Guiding Principles on Business and Human Rights (UNGPs) and OECD shall be assured. Certifiers are expected to study, assimilate and consider local and national conditions in their Risk Assessment while conducting inspections and audits.

Certified Entities shall create awareness on GOTS social criteria within their workforce by appropriate means.

## 3.2   EMPLOYMENT IS FREELY CHOSEN

3.2.1   There is no servitude, forced, bonded, trafficked or indentured labour.

3.2.2   Forced labour shall not be used.

3.2.3   Workers are not required to lodge "deposits" or their identity papers with their employer. Workers are free to leave their employer after mutually agreed notice period, as stated in employment contract.

3.2.4   Workers are not required to pay for entering employment.

3.2.5   Workers are not forced to use factory provided lodging or transportation.

## 3.3   FREEDOM OF ASSOCIATION AND COLLECTIVE BARGAINING

3.3.1   Freedom of association and the right to collective bargaining are respected.

3.3.2   Workers, without distinction, have the right to join or form trade unions of their own choosing and to bargain collectively.

3.3.3   The employer adopts an open and supportive attitude towards the activities of trade unions and their organisational activities and does not hinder or prevent or interfere with activities or engage in surveillance of those activities.

3.3.4   Workers representatives have access to carry out their representative functions in the workplace free of intimidation, discrimination or fear of reprisal. Employers do not intimidate or discriminate against workers for their union membership or activities.

3.3.5   Collective bargaining agreements shall be respected.

3.3.6   Display (for example, on a notice board) and communicate (for example, in employment contracts) about workers' right to collective bargaining.

3.3.7   If there is no trade union on site, the employer shall not deny time and resources for workers to elect representatives. Elected representatives shall have access to workers and employer's representative on a regular basis.

3.3.8   Each category of employees can be represented by elected representative(s) of the corresponding category of employees.

3.3.9   Where the right to freedom of association and collective bargaining is restricted under law, the employer facilitates, and does not hinder, the development of parallel means for independent and free association and bargaining and allows their workers to freely elect their own representatives with whom the company can enter into dialogue about related issues.

## 3.4   CHILD LABOUR SHALL NOT BE USED

3.4.1   Child labour, regardless of gender shall not be used.

3.4.2   Young workers (age between minimum age up to 18 years old) under 18 shall not be employed at night or in hazardous conditions.

Exhibit 1, Page 99



3.4.3  A young worker cannot work for more than 8 hours in a day or the legal limit for young workers, whichever is lower. Overtime is prohibited and a minimum consecutive period of 12 hours' rest as well as customary weekly rest days shall be provided.

3.4.4  These policies and procedures including the interpretation of the terms "child" and "child labour" shall conform at the very minimum of to the provisions of the relevant ILO conventions C138 and C182, or national / local laws, which ever affords greater protection.

## 3.5  NO DISCRIMINATION IS PRACTISED

3.5.1  There is no kind of discrimination e.g. in hiring, compensation, access to training, promotion, termination, retirement or right to overtime hours based on race, caste, ethnic or national origin, nationality, religion, age, disability, gender, marital status, pregnancy, sexual orientation, union membership, political affiliation, social background or any other condition that could give rise to discrimination. In particular, workers shall not be harassed or disciplined on any of the grounds listed above.

## 3.6  OCCUPATIONAL HEALTH AND SAFETY (OHS)

3.6.1  Working conditions are safe and hygienic.

3.6.2  A safe and hygienic working environment shall be provided, bearing in mind the prevailing knowledge of the industry and of any specific hazards. Vulnerable individuals such as - but not limited to - young workers, new and expecting mothers and persons with disabilities, shall receive special protection.

3.6.3  Appropriate personal protective equipment shall be provided to the workers (including homeworkers) at no cost to such workers and it shall be assured that these are being used whenever necessary. Adequate steps shall be taken to prevent accidents and injury to health arising from, associated with, or occurring in the course of work, by minimising, so far as is reasonably practicable, the causes of hazards inherent in the working environment.

3.6.4  Companies shall ensure adequate occupational medical assistance and related facilities.

3.6.5  Systems shall be in place to detect, assess, avoid and respond to potential threats to the health and safety of workers. Effective measures shall be taken to prevent workers from having accidents, injuries or illnesses, arising from, associated with, or occurring during work.

3.6.6  For all chemical substances and preparations used the corresponding Material Safety Data Sheet (SDS) shall be maintained and it shall be assured that the applicable health and safety measures for handling and storing these chemicals are implemented.

3.6.7  Companies shall take all appropriate measures within their sphere of influence, to see to the stability and safety of the equipment and buildings they use, including accommodation to workers, where provided, as well as to protect against any foreseeable emergency. Workers shall be able to exit the premises in case of imminent danger without seeking permission.

3.6.8  A safe and hygienic working environment shall be provided, bearing in mind the prevailing knowledge of the industry, any specific hazards, and context/country specific risks.

3.6.9  Workers shall receive regular and recorded health and safety training incl. fire prevention training and evacuation drills, and such training shall be repeated for new or reassigned workers.

3.6.10 Employers shall provide training and make safety signs available in the local language and the language(s) spoken by their workforce.

Exhibit 1, Page 100



3.6.11  Workers (including homeworkers) and staff shall receive regular and recorded health and safety training including fire prevention training and evacuation drills (as relevant), and such training shall be repeated for new or reassigned workers.

3.6.12  If the facility employs homeworkers, it shall take effective actions to ensure that such homeworkers are given a level of protection equivalent to that given to the workers working at the facility.

3.6.13  Access to functional clean toilet facilities and to free of charge potable water, and, if appropriate, to rest areas, food consuming areas and sanitary facilities for food storage shall be provided and not unreasonably restricted.

3.6.14  Accommodation, where provided, shall be clean, safe, and meet the basic needs of the workers.

3.6.15  Employer shall assign responsibility for health and safety to a senior management representative.


## 3.7   NO HARASSMENT AND VIOLENCE

3.7.1   Employers shall make a commitment within their social compliance policy (see section 3.12) to foster an environment at work free from harassment, bullying and violence.

3.7.2   Sexual harassment, sexual violence and gender-based violence is not permitted in the workplace, irrespective of gender.

3.7.3   Prohibited is any act of gender-based violence that results in, or is likely to result in, physical, sexual or psychological harm or suffering to women including threats of such acts, coercion or arbitrary deprivation of liberty, whether occurring in public or in private life.

3.7.4   Physical abuse or discipline, the threat of physical abuse, sexual or other harassment and verbal abuse or other forms of intimidation shall be prohibited.

3.7.5   Workers shall be treated with respect and dignity.

3.7.6   Human Rights shall be respected and protected. Employer shall have a policy commitment for the same.

3.7.7   Confidential reporting of abuse or harsh treatment shall be encouraged by the management. Each facility shall display contact details for the local point of contact at the workplace for grievance redressal, in a way that all workers have access to it. This information shall be provided before signing an employment contract.

3.7.8   All disciplinary measures shall be recorded.


## 3.8   REMUNERATION AND ASSESSMENT OF LIVING WAGE GAP

3.8.1   Wages and benefits paid for a standard working week meet, at a minimum, national legal standards or industry benchmark standards, whichever is higher. In any event wages should always be enough to meet basic needs and to provide some discretionary income.

3.8.2   All workers shall be provided with written and understandable information about their employment conditions compliant with national legal requirements and including wages and social benefits legally granted before they enter employment.

3.8.3   Wages shall be paid regularly (at least monthly) and promptly. Workers shall be informed about the particulars of their wages for the pay period concerned each time that they are paid.

3.8.4   Withholding of wages for payment as a lump-sum at the end of a term of employment or training is prohibited.

3.8.5   For specified work (being done at home or at facility) paid by the 'piece rate', the rate of remuneration shall be comparable to that received by a worker in the facility of the employer, doing similar work on an hourly basis. If there is no such worker, then the

Exhibit 1, Page 101



remuneration in another facility in the same field of activity and region concerned can be used as a benchmark by the Approved Certifier.

3.8.6   Deductions from wages as a disciplinary measure are not permitted. Other deductions are permitted only under the conditions and to the extent prescribed by law or fixed by collective agreement.

3.8.7   Overtime shall be paid at a premium rate established by law or through collective bargaining, whichever is higher. Premium rate shall not be less than one and one-quarter times the regular rate. Equivalent leisure time may also be provided as compensation for overtime, if permitted by local regulations.

3.8.8   Workers shall receive wages directly in their hand / bank account or in a manner convenient to workers.

3.8.9   Certified Entities shall calculate 'Living Wages' for their respective operations. Furthermore, they shall compare Living Wages data with their remuneration data and calculate the 'Wage Gap' for their workers.

## 3.9   WORKING TIME

3.9.1   Working hours shall comply with national laws, collective bargaining agreements and benchmark industry standards, whichever affords greater protection.

3.9.2   In any event, workers shall not be required to work in excess of 48 hours per week on a regular basis, shall have the right to have rest breaks in every working day and shall be provided with at least one day off for every 7-day period on average.

3.9.3   Overtime shall be voluntary, shall not exceed 12 hours per week, shall not be demanded on a regular basis and shall not represent a significantly higher likelihood of occupational hazards.

## 3.10   NO PRECARIOUS EMPLOYMENT IS PROVIDED

3.10.1   To every extent possible work performed shall be on the basis of recognised employment relationship established through national law and practice.

3.10.2   Obligations to employees under labour or social security laws and regulations arising from the regular employment relationship shall not be avoided through the use of labour-only contracting, subcontracting, or home-working arrangements, or through apprenticeship schemes where there is no real intent to impart skills or provide regular employment, nor shall any such obligations be avoided through the excessive use of fixed-term contracts of employment.

## 3.11   MIGRANT WORKERS

3.11.1   Equality in treatment shall be provided as compared to local workers who work at employer's facilities. This includes remunerations, social security, access to training and other provisions of GOTS Social Criteria.

3.11.2   Migrant workers shall have access to their travel documents

3.11.3   Besides other standard requirements, written employment contract shall include - in a language that the worker understands- clear information about provisions of terms, duration and hours of employment, deductions, benefits (such as leave and insurance), housing, food, transportation, and other applicable provisions.

3.11.4   If food, accommodation, transportation or other services are provided, they shall be provided at a rate not higher than the market rate.

Exhibit 1, Page 102

## 3.12   SOCIAL COMPLIANCE MANAGEMENT

Companies shall have a policy for social accountability to ensure that the social criteria can be met. They shall support the implementation and monitoring of the social criteria by:

3.12.1 Nominating a person responsible for social accountability.

3.12.2 Monitoring compliance with the social criteria and implementing necessary improvements at its facilities, also keeping in mind potential adverse impacts.

3.12.3 Informing its workers about the contents of their employment contract, minimum social criteria and any other related information provided by GOTS in the applicable local language(s).

3.12.4 Maintaining records of the name, age, working hours and the wages paid for each worker.

3.12.5 Allowing the workers to nominate a representative for social accountability that can provide feedback to the management regarding implementation status of and compliance with social criteria.

3.12.6 Providing time and space to workers to organise and engage in collective bargaining.

3.12.7 Recording and investigating complaints from workers or third parties related to the adherence to the social criteria and maintaining records about any necessary corrective measures arising from them.

3.12.8 A functional and effective complaint mechanism shall be established. Anonymous complaint mechanism shall be followed to the maximum possible extent.

3.12.9 Upon request, Certified Entities shall provide information about complaint records to their Certified Buyers should complaints possibly be related to the business practices of such Certified Buyers.

3.12.10 Refraining from disciplinary measures, dismissals or other forms of discrimination against workers for providing information concerning observance of the social criteria.

3.12.11 For home-workers, data on the nature, extent and characteristics of home-work shall be compiled by the employer and made available to Certification Bodies. Appropriate access to private home-working premises shall be arranged by employers for the purposes of inspection and audit.


# 4    QUALITY ASSURANCE SYSTEM

## 4.1    AUDITING OF PROCESSING, MANUFACTURING AND TRADING STAGES

*Processors*, *manufacturers* and *traders* of *GOTS Goods* shall participate in the GOTS certification procedure which is based on an on-site annual inspection cycle (including possible additional unannounced inspections based on a risk assessment of the operations). They shall hold a valid certificate of compliance listing the certified products/product categories and the processing, manufacturing and trading activities that are qualified under the scope of certification (including names of s*ubcontractors* assigned and their relevant processing and manufacturing steps).

Exceptions for Traders and Retailers are defined in corresponding Implementation Manual.

Exceptions to annual onsite inspection for small scale *subcontractors* with a low risk potential are possible under certain conditions, as defined in corresponding Implementation Manual.

On-site inspection shall however be performed to such units at least for the first year and every 3rd year of granted certification.

The entity under whose name or brand the labelled *GOTS Goods* are sold to the end consumer is responsible for exercising due care in ensuring compliance of the products with this Standard, the Licensing and Labelling Guide and further provisions as released by the Global Standard gGmbH.

Certifiers shall be authorised by the Global Standard gGmbH for the specific scope(s) in which they offer certification services:

   a)   Certification of mechanical textile processing and manufacturing operations and their products

Exhibit 1, Page 103



b) Certification of wet processing and finishing operations and their products

c) Certification of trading operations and related products

Basis for authorisation by the Global Standard gGmbH is an accreditation of the certifier in accordance with the document 'Approval Procedure and Requirements for Certification Bodies' by the main co-operation partner of the Global Standard gGmbH for this process, IOAS, or another recognised accreditation body.

## 4.2 TESTING OF TECHNICAL QUALITY PARAMETERS AND RESIDUES

*Certified Entities* are expected to undertake testing in accordance with a risk assessment in order to assure compliance with this Standard and in specific with the criteria of Section 2.4.14 (Technical Quality Parameters) as well as 2.4.15 and 2.4.16 (Limit Values for Residues in *GOTS Goods*, additional materials and *accessories*). All *GOTS Goods,* the components of these products and the *inputs* used are to be included in this risk assessment and therefore potentially subject to testing. The testing frequency, the type and number of samples are to be established according to this risk assessment.

Samples for residue testing may also be taken by the inspector during the required on-site inspection, either as back-up to the inspection process or in case of suspicion of contamination or non-compliance. Additional samples of goods may be taken from the supply chain at any time without advance notice.

Laboratories that are accredited according to ISO/IEC 17025 or qualified to GLP and that have appropriate experience in residue testing for textiles respective chemical *inputs* are approved to perform residue testing for those tests that are under the scope of their accreditation.

## 5 ETHICAL BUSINESS BEHAVIOUR

Ethical Business Behaviour is a crosscutting prerequisite at all stages of the supply chain and applies to all stakeholders of the supply chain. It is critically important for maintaining confidence among stakeholders of the certification process (workers, business partners, customers, certification body and scheme) and towards consumers. To assure Ethical Business Behaviour, the following criteria shall be met:

a) Companies have a Code of Conduct (CoC) in place which prescribes ethical behaviour, honesty, fair dealings and prevention of corruption.

b) Adherence to relevant OECD guidelines shall be assured.

c) Companies are not involved in any act of corruption, extortion or embezzlement, nor in any form of bribery - including but not limited to - the promising, offering, giving or accepting of any improper monetary or other incentive.

d) Companies keep accurate information regarding their activities, structure and performance, and disclose these in accordance with applicable regulations and industry benchmark practices.

e) Companies shall neither participate in falsifying such information, nor in any act of misrepresentation in the supply chain. They are expected to collect, use and otherwise process any personal information (including that from workers, business partners, customers and consumers in their sphere of influence) with reasonable care.

f) The collection, use and other processing of personal information shall comply with privacy and information security laws and regulatory requirements.

g) Companies have established an anonymous non-discriminatory whistle-blower mechanism, assuring easy access and effective measures to protect whistle-blowers and ensuring that any information received regarding corruption or non-compliance is followed up and necessary actions taken.

h) Companies provide training on integrity regulations and inform about sanctions for non-compliance

Exhibit 1, Page 104



# 6    ANNEX

## 6.1    SPECIFIC REQUIREMENTS FOR TEXTILE PERSONAL CARE PRODUCTS

This Annex lists criteria for Textile Personal Care Products that deviate from or are set in addition to the general criteria of this Standard. Where no deviating requirements are set in this Annex, the applicable general GOTS criteria apply.

Important note: Any entity selling personal care products shall be aware of and meet the specific legal (hygienic) requirements applicable for its products and in the country / region where they are sold. It may well be that some of these legal requirements for specific personal care products conflict with environmental criteria set by GOTS. Accordingly, except where specified below, these products cannot be certified and labelled to GOTS.

### 6.1.1   Scope

For the purpose of this Standard, Textile Personal Care Products are grouped as following:

Group I:         *Topical products* – such as cotton wool, sanitary towels, bandages, nappies, gauze cotton tissue (Gamgee),
                     island dressings, wound strips, sticking plasters and gauze dressings.

Group II:       *Physically invasive products* – such as tampons, ear buds and dental rolls, and
                     *Clinically invasive products* – such as surgical swabs and gauze swabs.

### 6.1.2   Specific criteria for materials and inputs (for Group I and Group II)

**Fibre material components**

> All fibres used shall be Totally Chlorine Free (TCF).

> Non-woven and absorbent materials shall be composed of 100% certified organic fibres.

> Synthetic fibre components are not permitted for group II products unless the use of other fibre materials is required to meet legal medical regulations and does not exceed 5% of the content (if labelled as organic) or 30% (if labelled as 'made with x% organic materials').

**Super Absorbing Polymers (SAPs)**

> SAPs shall be made from non-GMO renewable raw materials (ADM-type).

> SAPs may as a maximum contain 5% by weight of water-soluble extracts.

**Barrier films**

> Except for wound contact layers, barrier films shall be composed of biodegradable polymers. All raw materials used shall be non-GMO.

**Specific Criteria for Tampons**

> Only paper or cardboard tampon applicators are permitted. Additionally, applicator materials shall satisfy chemical residue requirements of Section 2.4.16.

> Synthetic security veils are not permitted.

### 6.1.3   Specific criteria for Inputs

**Sizing**

> No sizing shall be used for group II products.

Exhibit 1, Page 105



**Colourants**

> The use of colourants is only allowed if their use is required to meet a mandatory legal regulation.

> All used colourants shall be GOTS approved. Approved Certifiers may further grant exceptions where a clear functional purpose exists (e.g. to identify wound dressing orientation).

**Optical Brightening Agents**

> Optical brightening agents (OBAs) shall not be used.

**Fragrances, lotions and lubricants**

> Any fragrances, lotions and lubricants used shall comply – beside the input criteria of GOTS – also with the input criteria of the COSMOS-Standard (Cosmetics Organic and Natural Standard).

## 6.2    SPECIFIC REQUIREMENTS FOR FOOD CONTACT TEXTILES

This Annex lists criteria for Food Contact Textiles (FCT) that are set in addition to the general criteria of this Standard. Where no requirements are set in this Annex, the applicable general GOTS criteria apply.

Important note: Any entity selling FCT shall be aware of and meet the specific legal (hygienic and GMP) requirements applicable for its products and in the country / region where they are sold. It may well be that some of these legal requirements for specific FCTs conflict with environmental criteria set by GOTS. Accordingly, except where specified below, these products cannot be certified and labelled to GOTS.

### 6.2.1  Scope

FCTs can potentially contaminate food or water by transferring substance into it. All FCTs are covered under the scope of this Annex. It applies to all sectors and to all stages of manufacturing, processing and distribution of FCTs.

### 6.2.2  Specific criteria for FCTs

All textiles used shall be Totally Chlorine Free (TCF).

FCTs shall be composed of 100% certified organic fibres.

Printing is prohibited on the food contact side of the textiles. GMP should, in particular, ensure that chemical substances are not transferred through the substrate.

Exhibit 1, Page 106



# 7 DEFINITIONS

For the purpose of this Standard, the following terms are defined:

| Term | Definition for the purpose of this Standard |
|---|---|
| *Accessories* | Items that are added to supplement *GOTS Goods* for required functional or for fashionable reasons. Most commonly used *accessories* are listed in Section 2.4.9. The processing of those accessories is not under direct scope of the GOTS on-site certification system. The GOTS criteria applicable to accessories are listed in Section 2.4.9 and 2.4.16. |
| *Approved Certifier* | Certification body which is approved by the Global Standard gGmbH to perform inspections and certifications according to GOTS in the relevant scope. An updated list of Approved Certifiers and their scopes is available at: http://www.global-standard.org/certification/approved-certification-bodies.html |
| *Certified Entity* | *Processor*, *manufacturer, trader* or retailer of *GOTS Goods* certified by an *Approved Certifier*. |
| *Endocrine disruptor* | An exogenous substance or mixture that alters function(s) of the endocrine system and consequently causes adverse health effects in an intact organism, or its progeny, or (sub)populations |
| *Food Contact Textiles* | Any textile articles that are intended to come into prolonged contact with, or are already in contact with, or can reasonably be expected to be brought into contact with or to transfer their constituents to food or water intended for human consumption under normal or foreseeable conditions of use. |
| *Formulator* | An organisation involved in manufacturing, producing or creating a mixture of chemical substances blended together (formulation) to be used for textile processing. A formulation is the finished chemical product sold or distributed ready for use. |
| *GOTS Goods* | Textile goods (finished or intermediate) produced in compliance with GOTS by a *Certified Entity* and certified by an *Approved Certifier*. |
| *'Heavy Metal Free'* | An *input* is considered as 'heavy metal free' if it does not contain heavy metals as a functional constituent and any impurities contained do not exceed the following limit values (as set by ETAD for dyes): Antimony: 50 mg/kg, Arsenic: 50 mg/kg, Barium: 100 mg/kg, Cadmium: 20 mg/kg, Cobalt: 500 mg/kg, Copper: 250 mg/kg, Chromium: 100 mg/kg, Iron: 2500 mg/kg, Lead: 100 mg/kg, Manganese: 1000 mg/kg, Nickel: 200 mg/kg, Mercury: 4 mg/kg, Selenium: 20 mg/kg, Silver: 100 mg/kg, Zinc: 1500 mg/kg, Tin: 250 mg/kg<br><br>Special Limits for Pigments : Cadmium : 50 mg/kg; Mercury : 25 mg/kg. |
| *'In conversion'* | A product from an operation or portion thereof, which has completed at least 12 months under organic management and is under the supervision of a certification body. |
| *Input* | General term for all *substances* and *preparations* directly applied as textile auxiliary agents, inks, dyes or pigments. |
| *Invasive products* | *Clinically invasive products:* Any device that penetrates the body through the skin, with the aid of or in the context of a surgical operation.<br><br>*Physically invasive products*: Any device that, in whole or part, penetrates inside the body through a natural or artificial orifice. |
| *Manufacturer* | Entity in the manufacturing chain (sewing industry or so called CMT (cutting, making, trimming) industry up to labelling and final packing) of *GOTS Goods*. |
| *Natural materials* | A *natural material* is any product or physical matter that comes from plants, animals, or the ground. Minerals and the metals that can be extracted from them are also considered to belong into this category. *Natural materials* include biotic materials (materials that originates from living organisms such as (organic) natural fibre, wood, leather, horn, bone, shell, seed and plant oils etc.) and non-biotic material (such as minerals, metals, stone). |
| *'Permanent AOX'* | AOX is permanent, if the halogen is permanently bound to the molecule (e.g. in the chromophore of a dyestuff or pigment) and cannot get hydrolysed or released during fibre processing. |
| *Preparations* | Mixtures or solutions composed of two or more *substances*. |

Exhibit 1, Page 107



| Pre-consumer waste | Material diverted from the waste stream during the manufacturing process. Excluded is the reutilization of materials such as rework, regrind or scrap generated in a process and capable to being reclaimed within the same process. |
| --- | --- |
| Post-consumer waste | Material generated by households or by commercial, industrial and institutional facilities in their role as end-users of the product that can no longer be used for its intended purpose. This includes returns of materials from the distribution chain. |
| Processor | Entity in the processing chain (post-harvest handling up to finishing) of *GOTS Goods*. |
| Subcontractor | Entity in the supply chain of *GOTS Goods* performing job work (in the field of processing or manufacturing) for a *Certified Entity* without becoming proprietor of the *GOTS Goods* and not assigning an own (independent) GOTS certification. |
| Substances | Chemical elements and their compounds as they occur in the natural state or as produced by industry. |
| Textiles for babies | Textiles products used for babies and small children up to the age of 36 months |
| Topical Products | Any device that does not penetrate inside the body, either through a body orifice or through the skin |
| Trader | Entity trading with (=buying and selling) *GOTS Goods* in the supply chain between the producer of the fibre and the retail merchant of the final product regardless whether the goods are physically received or not (e.g. an import, export or wholesale trading entity). Agents that do not become proprietor of the goods and retailers only selling to the end consumer are not considered as traders. |
| Wage Gap | The difference between average Living Wage and Average Wages Paid to workers in a Certified Entity. |
| Worker | Any individual engaged in work who is not a senior manager or owner. |
| Migrant Worker | Individual who migrates from one geographical region to another with a view to being employed and includes any person regularly admitted as a migrant for employment. |
| Home-worker | Individual carrying out work for remuneration in his or her home or at other premises mutually agreed with the employer, other than the regular workplace of the employer. |
| Facility | An individual establishment or site where processing, manufacturing, trading or retailing of *GOTS Goods* is done. It is operated by a *Certified Entity* and inspected by an *Approved Certifier*. |
| Machine Oil | Oil intended essentially for lubrication of machines and machine parts used for processing of *GOTS Goods* including but not limited to spinning, weaving, knitting etc. and which may come in contact with *GOTS Goods*. |
| Microplastics | Based on working definition of ECHA: A material consisting of solid polymer containing particles where ≥ 1% w/w of particles have all dimensions 1nm ≤ x ≤ 5mm. **Note: This definition is under public consultation and the final outcome will be deemed applicable.** |
| Young Worker | A worker who older than the minimum age but less than 18 years old. |

# 8    LIST OF ABBREVIATIONS

| AOX | Absorbable halogenated hydrocarbons and substances that can cause their formation. | IFOAM | International Federation of Organic Agriculture Movements |
| --- | --- | --- | --- |
| APEDA | Agricultural & Processed Food Products Export Development Authority, India | ILO | International Labour Organisation |
| APEO | Alkylphenolethoxylates | IOAS | International Organic Accreditation Service |
| B2B | Business to Business | ISO | International Organization for Standardization |
| B2C | Business to Consumer | IUCN | International Union for Conservation of Nature |
| BBP | Benzylbutyl phthalate | IVN | International Association Natural Textile Industry, Germany |

Exhibit 1, Page 108



| BOD | Biological Oxygen Demand | JOCA | Japan Organic Cotton Association, Japan |
|---|---|---|---|
| COD | Chemical Oxygen Demand | LAS | Linear alkyl benzene sulphonate |
| DBP | Dibutyl phthalate | LC50 | Lethal concentration (50% mortality) |
| DBT | Dibutyltin | MAK | Maximum Allowable Concentration (of a substance at the working place). The parameter refers to findings and categorisation of a German research commission |
| DCHP | Di cyclohexylphthalate | MBT | Monobutyltin |
| DEHP | Diethylhexyl phthalate | MMT | Monomethyltin |
| DEP | Diethyl phthalate | MOT | Monooctyltin |
| DHNUP | Di-C$_{7-11}$ branched and linear alkylphthalates | MPhT | Monophenyltin |
| DHP | Di-n-hexylphthalate | NP | Nonylphenol |
| DHTDMAC | Dihydrogenated tallow dimethylammonium chloride | NPEO | Nonylphenol ethoxylates |
| DHxP | Di hexyl phthalates | NTA | Nitrilotriacetic acid |
| DIBP | Di-isobutyl phthalate | OECD | Organisation of Economic Cooperation and Development |
| DIDP | Diisodecyl phthalate | OP | Octylphenol |
| DIHP | Di-C$_{6-8}$ branched alkylphthalates | OPEO | Octylphenol ethoxylates |
| DIHxP | Di-iso hexylphthalate | OTA | Organic Trade Association, USA |
| DINP | Diisononyl phthalate | PAH | Polycyclic aromatic hydrocarbons |
| DMEP | Bis(2-methoxyethyl) phthalate | PCB | Polychlorinated Biphenyls |
| DNOP | Di-n-octyl phthalate | PCP | Pentachlorophenol |
| DNP | Di-n-nonylphthalate | PeP | Pentylphenol |
| DPhT | Diphenyltin | PFCA | Perfluorinated carboxylic acids |
| DPP | Dipentylphthalate | PFOA | Perfluorooctanoic acid |
| DPrP | Di-n-propyl phthalate | PFOS | Perfluoroctane sulfonate |
| DPT | Dipropyltin | PFSA | Perfluorosulfonic acids |
| DSDMAC | Distearyldimethylammonium chloride | PPE | Personal Protective Equipment |
| DTDMAC | Ditallowdimethylammonium chloride | PVC | Polyvinyl chloride |
| DTPA | Diethylenetriamine penta-acetate | REACH | EC Regulation regarding Registration, Evaluation, Authorisation and Restriction of Chemicals |
| EC | European Commission | SA | Soil Association, UK |
| EC50 | Effect concentration (50%) | TBT | Tributyltin |
| ECHA | European Chemicals Agency | TCyHT | Tricyclohexyltin |
| EDTA | Ethylenediamine tetra-acetate | TeBT | Tetrabutyltin |
| ETAD | Ecological and Toxicological Association of Dyes and Organic Pigments Manufacturers | TeCP | Tetrachlorophenol |
| FCT | Food Contact Textiles | TeET | Tetraethyltin |
| FTOH | Fluorotelomer alcohol | TMT | Trimethyltin |
| GHS | Global Harmonized System | TOC | Total Organic Carbon |
| GLP | Good Laboratory Practice | TOT | Trioctyltin |

Exhibit 1, Page 109



| GMO | Genetically modified organisms | TPhT | Triphenyltin |
| GMP | Good Manufacturing Practices | TPT | Tripropyltin |
| GOTS | Global Organic Textile Standard | USDA | United States Department of Agriculture |
| HpP | Heptylphenol | α-MES | α-methyl ester sulphonate (C16/18) |
| IC50 | Inhibition concentration (50% inhibition) | | |

» » » » » » » »

Availability of documents:

This Standard, the Interpretation Manual, reference documents and any further relevant public information as released by Global Standard gGmbH are available for download on the website www.global-standard.org

\* \* \* \* \* \* \* \* \* \*

**Important:**

The following verbal forms are used to indicate requirements, recommendations, permissions, or capabilities in this policy:

- "**shall**" indicates a mandatory requirement
- "**should**" indicates a recommendation
- "**may**" indicates a permission
- "**can**" indicates a possibility or capability

**Copyright: © 2020 by**
**Global Standard gGmbH**

Exhibit 1, Page 110